BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: NATIONAL RIFLE ASSOCIATION BUSINESS EXPENDITURES LITIGATION | § § § § § § MDL Docket No. _____<br><br>ORAL ARGUMENT REQUESTED |

MEMORANDUM OF LAW IN SUPPORT OF THE NATIONAL RIFLE ASSOCIATION'S MOTION TO TRANSFER CASES FOR COORDINATED OR CONSOLIDATED PRE-TRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407

William A. Brewer
Sarah B. Rogers
**BREWER, ATTORNEYS & COUNSELORS**
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 489-1400
Facsimile: (212) 751-2849

**ATTORNEYS FOR MOVANT
THE NATIONAL RIFLE ASSOCIATION**

**TABLE OF CONTENTS**

**TABLE OF CONTENTS** ........................................................................................................... I

**TABLE OF AUTHORITIES** ................................................................................................... II

**INTRODUCTION** ....................................................................................................................... 1

**ARGUMENT** ............................................................................................................................... 7

    A.    THE ACTIONS INVOLVE COMMON QUESTIONS OF FACT. ............................................... 7
    B.    CENTRALIZATION SERVES THE CONVENIENCE OF THE PARTIES AND WITNESSES. ..................... 12
    C.    CENTRALIZATION WILL PROMOTE THE JUST AND EFFICIENT CONDUCT OF THESE ACTIONS. ..... 14
    D.    TRANSFER TO THE NORTHERN DISTRICT OF TEXAS WOULD BEST SERVE THE GOALS OF 28 U.S.C. § 1407. ...................................................................................................................... 14

**CONCLUSION** ......................................................................................................................... 16

# TABLE OF AUTHORITIES

### CASES

*In re Centurylink Residential Customer Billing Disputes Litig.*,
  280 F. Supp. 2d 1383 (J.P.M.L. 2017) ................................................................................. 8
*In re Conseco Life Ins. Co. Cost of Ins. Litig.*, 323 F. Supp. 2d 1381 (J.P.M.L. 2004) ................. 8
*In re Daily Fantasy Sports Mktg. & Sales Practices Litig.*,
  158 F. Supp. 3d 1375 (J.P.M.L. 2016) ................................................................................ 13
*In re Delphi Corp. Sec., Derivative & "Erisa" Litig.*, 403 F. Supp. 2d 1358 (J.P.M.L. 2005) .... 16
*In re E.I. du Pont de Nemours & Co. C-8 Personal Injury Litig.*,
  939 F. Supp. 2d 1374 (J.P.M.L. 2013) .................................................................................. 7
*In re Ford Motor Co. F-150 and Ranger Truck Fuel Economy Mktg. and Sales Pracs. Litig.*,
  412 F. Supp. 3d 1355 (J.P.M.L. 2019) ................................................................................ 16
*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
  396 F. Supp. 3d 1374 (J.P.M.L. 2019) ................................................................................ 16
*In re IDT Corp. Calling Card Terms Litig.*, 278 F. Supp. 2d 1381 (J.P.M.L. 2003) ............... 7, 13
*In re M3Power Razor System Mktg. and Sales Practices Litig.*,
  398 F. Supp. 2d 1363 (J.P.M.L. 2005) .................................................................................. 7
*In re Merscorp. Inc. Real Estate Settlement Procedures Act (RESPA) Litig.*,
  560 F. Supp. 2d 1371 (J.P.M.L. 2008) .................................................................................. 7
*In re Metoprolol Succinate Patent Litig.*, 329 F. Supp. 2d 1368 (J.P.M.L. 2004) ...................... 14
*In re MI Windows & Doors, Inc., Prod. Liab. Litig.*, 857 F. Supp. 2d 1374 (J.P.M.L. 2012) ..... 14
*In re Peruvian Rd. Litig.*, 380 F. Supp. 796 (J.P.M.L. 1974) ........................................................ 8
*In re Plumbing Fixture Cases*, 298 F. Supp. 484 (J.P.M.L. 1968) .............................................. 14
*In re Radioshack Corp. "ERISA" Litig.*, 528 F. Supp. 2d 1348 (J.P.M.L. 2007) ....................... 14
*In re Treasury Sec. Auction Antitrust Litig.*, 148 F. Supp. 3d 1360 (J.P.M.L. 2015) .................. 14
*In re Wells Fargo Wage and Hour Emp't Practices Litig. (No. III)*,
  804 F. Supp. 2d 1382 (J.P.M.L. 2011) ................................................................................ 14
*In re Westinghouse Electric Corp. Uranium Con. Litig.*, 405 F. Supp. 316 (J.P.M.L. 1975) ...... 13
*In re Zimmer NexGen Knee Implant Prods. Liab. Litig.*, 802 F. Supp. 2d 1374 (J.P.M.L. 2011) .. 7

### STATUTES

28 U.S.C. § 1407 ............................................................................................................... *passim*

### RULES

Judicial Panel on Multidistrict Litigation Rule 6.2 ......................................................................... 1

### OTHER AUTHORITIES

Barbara J. Rothstein & Catherine R. Borden, Managing Multidistrict Litigation in Products
  Liability Cases: A Pocket Guide for Transferee Judges, Federal Judicial Center (2011) .......... 5
Manual for Complex Litigation (Fourth) (2010) ................................................................... 14, 15

Pursuant to 28 U.S.C.§ 1407 and Judicial Panel on Multidistrict Litigation ("JPML" or the "Panel") Rule 6.2, The National Rifle Association ("NRA" or the "Association") respectfully moves the Panel for an order transferring the currently-filed cases listed in the attached schedule of actions (collectively, the "Actions"), as well as any cases subsequently filed involving similar facts or claims ("tag-along cases") to the Northern District of Texas for coordinated pre-trial proceedings, or alternatively, to any other court with the capacity to facilitate their expeditious resolution.

## INTRODUCTION

The presently-filed Actions are four cases currently pending in four different district courts concerning the finances and governance of the NRA, a New York-domiciled not-for-profit corporation. The Actions center on alleged abuses by NRA fiduciaries, and encompass lawsuits by the NRA designed to redress these abuses, along with a pretextual, unconstitutional gambit by New York State officials to sue derivatively regarding the same transactions. Because the Actions make overlapping and contradictory factual claims regarding the same parties, events and relationships, the risk of inconsistent adjudications is high, and voluminous duplicative discovery is a certainty. The parties to the Actions—and other, related actions that are likely to be removed to federal court—have already acknowledged that the cases involve common questions of fact, and that litigating them piecemeal in different fora would be inefficient.[1] Accordingly, the NRA seeks transfer and consolidation.

---

[1] *See e.g.*, *Nat'l Rifle Ass'n of Am. v. James*, Civ. No. 1:20-cv-00889 (N.D.N.Y.), Dkt. No. 8 (letter from NYAG to the Court) at 3 ("*Finally*, given the pending Charities Bureau Action addressing the NRA's alleged violations of New York's statutory scheme for the oversight of not-for-profit entities, it is respectfully submitted that abstention is appropriate here."); *Nat'l Rifle Ass'n of Am. v. North*, Index No. 903843-20 (Sup. Ct. Albany Cnty.), Dkt. No. 48 (order granting motion for stay), at 6 ("In his answer . . . North denies engaging in misconduct and alleges that the NRA is retaliating against him for reporting potential financial wrongdoing and inadequate governance to

In mid-2017, the NRA learned that high-ranking New York State Democratic officials intended to weaponize the state government's regulatory powers against it in order to weaken it as a political force before the 2020 election. One intended cudgel was the New York State Office of the Attorney General (the "NYAG"), which had broad supervisory authority over not-for-profits that are domiciled in New York, like the NRA. New York's former Attorney General, Eric Schneiderman, was apparently so troubled by this campaign that he warned the NRA about it. Schneiderman advised that the NRA should get its affairs in order, because the NYAG would eventually be forced to investigate its operations and finances. Despite believing it was operating in compliance with New York law, the NRA undertook an internal review of its controls, compliance and governance—to inform its strategy in anticipated litigation, and to fortify itself against the attacks Schneiderman warned were coming.

The NRA's efforts ultimately led it to determine that its largest vendor, advertising agency Ackerman McQueen ("Ackerman"), was systematically overcharging the NRA and falsifying invoices, as well as misrepresenting the benefits of a significant amount of the services it provided. For example, Ackerman provided misleading, inflated viewership metrics for NRATV, the digital media platform it pitched, produced and scripted, where costs were skyrocketing and programming inexplicably wandered far afield from the NRA's mission of defending the Second Amendment. Ackerman also engaged in a practice of pass-through block billing that obscured the purpose and

---

other NRA officials and directors . . . [and] "begins by referencing the Attorney General's . . . complaint in the Dissolution Case"), 9 ("North argues that a stay of this action during the pendency of the Dissolution Case 'will preserve judicial resources, prevent inconsistent results, and protect [his] rights' because the Dissolution Case 'encompasses substantially all of the issues in this action.'"), 11 ("Initially, it is apparent that the AG's Complaint in the Dissolution Case encompasses the bulk of the issues raised by the NRA's request for declaratory and injunctive relief in this action.").

2

amount of certain expenditures, including payments to the NRA's new president, Oliver North, purportedly in connection with his role in an NRATV series. When the NRA sought additional documentation from Ackerman, Ackerman refused to provide it, leading to litigation beginning in April 2019 between the NRA and Ackerman. One of those actions is pending in the Northern District of Texas[2], where the NRA claims against Ackerman for fraud and breach of fiduciary duty recently withstood a motion to dismiss and discovery has begun.[3]

In response to the litigation (the "Ackerman Litigation") Ackerman and its employees (*e.g.* North) have made retaliatory and disingenuous allegations of financial improprieties at the NRA, including inappropriate personal expenditures by NRA CEO Wayne LaPierre. Upon learning of these accusations, an NRA donor commenced a putative class action on behalf of all NRA donors in the Middle District of Tennessee (the "Dell'Aquila Litigation").[4] The class action complaint specifically references allegations made by North concerning LaPierre's spending[5] as well as excessive payments to Ackerman[6], and seeks refunds of contributions on the basis of alleged fraud and RICO violations. Although the court in that action dismissed all claims against LaPierre and the RICO claim against the NRA, it denied the motion as to a claim for fraud against the Association. As such, a conference to set a discovery schedule is set for November 6, 2020.

---

[2] *Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc., et al.*, Civ. Case No. 3-19-cv-02074-G (N.D. Tex.).

[3] Preliminary document discovery has occurred. A Scheduling Order was entered on October 13, 2020, and depositions are slated to begin in November 2020. *See id.* Dkt. No. 174.

[4] *See Dell'Aquila v. LaPierre* et al., Civ. Case No. 3:19-cv-00679 (M.D. Tn.), Dkt. 1 ¶ 14 ("Plaintiff . . . has learned this information from an investigation conducted by the NRA's former President, Lt. Col. Oliver North."); *id.* ¶¶ 27-28 ("LaPierre terminated the NRA's agreement with . . . Ackerman McQueen . . . . Ackerman . . . responded to the breach by disclosing information concerning certain financial improprieties raised in this lawsuit.").

[5] *Id.* ¶ 45c, d, and h.

[6] *Id.* ¶ 45e.

Additionally, a former Ackerman employee, Grant Stinchfield, filed an affidavit in the Ackerman Litigation attesting to corrupt practices he witnessed during his employment at the company. On December 20, 2019, Ackerman sued Stinchfield in the United States District Court for the Northern District of Texas in retaliation for his testimony—ostensibly challenging its veracity (such lawsuit, the "Stinchfield Litigation").[7] The truthfulness of Stinchfield's statements about Ackerman's dealings with the NRA is centrally at issue in the Stinchfield Litigation; thus, discovery is expected to overlap extensively with the discovery in the other Actions. The Stinchfield Litigation is currently in discovery.

In the meantime, Schneiderman resigned from the office of the NYAG, and his successor, Letitia James, made the destruction of the NRA a central theme of her campaign for office. Even before the Ackerman allegations surfaced, James vowed that if elected, she would undertake a fishing expedition into the NRA's finances, maligning the Association as a "criminal enterprise" whose "deadly propaganda" (*i.e.*, gun rights advocacy) should be extinguished. James took office in January 2019, and, as promised, launched a sweeping investigation as part of her plan to distract and ultimately destroy the NRA. The investigation included taking testimony and obtaining evidence from nearly 90 witnesses located in 27 states. It focused frequently on the exact same transactions and issues that the NRA targeted in its own compliance review, many of which were *already the subject of litigation* commenced by the NRA to recover funds from faithless former agents like Ackerman.

---

[7] *Ackerman McQueen Inc. v. Stinchfield*, Civ. No. 3:19-cv-03016-X (N.D. Tx.).

Ultimately, James delivered on her campaign promise to leverage the full power of her office against the NRA. On August 10, 2020[8], the NYAG filed an action in New York State court (the "NYAG State Action")[9] that purported to sue derivatively, on behalf of NRA members, with respect to many of the same transactions that were already the subject of the Ackerman Litigation and the Dell'Aquila Litigation. Predictably, the suit seeks dissolution of the NRA. Like other pending litigation, the NYAG State Action involves allegations of self-dealing by former and current NRA executives (including LaPierre[10]) and makes repeated references to the NRA's transactions with Ackerman[11] as the basis for claiming a lack of NRA board oversight into how the NRA spent its donations. Because (i) James' allegations bear no resemblance to traditional corporate dissolution actions, which have historically been levied against sham non-profits; and (ii) James had repeatedly stated during her campaign that her "top issue" as Attorney General would be using the non-profit laws to "target" the NRA, James' enforcement action has been roundly criticized by legal scholars, the ACLU, and other civil rights advocates as politically motivated and an extraordinary abuse of power.[12] On August 6, 2020, the NRA filed a Section

---

[8] James purported to commence the NYAG State Action on August 6, 2020, but the verification that accompanied that filing was defective. *See People v. Nat'l Rifle Ass'n of Am.*, et al., Index No. 451625/2020 (Sup. Ct. N.Y. Cnty.), Dkt. Nos 10-11.

[9] Although the NYAG State Action is currently pending in state court, the NRA takes the view that the action belongs in federal court as a compulsory counterclaim to its own Section 1983 action, which as a result of James' failure to properly verify her complaint, was first-filed. The NRA has moved to dismiss the state action on *forum non conveniens* and related grounds. In any event, should these actions be consolidated, the state action will benefit from the coordinated discovery practices recommended to transferee judges dealing with related state actions. *See, e.g.*, Barbara J. Rothstein & Catherine R. Borden, Managing Multidistrict Litigation in Products Liability Cases: A Pocket Guide for Transferee Judges, FEDERAL JUDICIAL CENTER, Ch. 6 (2011).

[10] *See* Ex. A to *Nat'l Rifle Assn'n of Am. v. James*, No. 1:20-cv-00889 (N.D.N.Y.) ¶¶ 35-215.

[11] *Id.* ¶¶ 297-396.

[12] *See, e.g.*, Editorial, *How Did Caribbean Yacht Vacations Promote the Second Amendment? We May Find Out in Court*, WASH. POST. (Aug. 8, 2020), https://www.washingtonpost.com/opinions/

5

1983 suit against James in the Northern District of New York alleging infringement of the NRA's First and Fourteenth Amendment rights on the ground that James' hostilities represented retaliation for the NRA's protected political advocacy and constituted selective enforcement of New York's not-for-profit law (such litigation, the "NYAG Federal Action" and collectively with the NYAG State Action, the "NYAG Litigation").[13] While in its infancy, James' defense to the NYAG Federal Action will no doubt include the same affirmative allegations of misconduct that are found in the NYAG State Action and the Dell'Aquila Litigation, all of which directly overlap with the subject matter of the Ackerman Litigation and Stinchfield Litigation.

---

is-this-really-the-right-penalty-for-the-nra/2020/08/07/f81778fc-d8e2-11ea-930e-d88518c57dcc_story.html ("We question whether dissolution is the right penalty, even if the charges are proved in court."); Henry Olsen, *New York's Lawsuit to Dissolve the NRA is Outrageous*, WASH. POST. (Opinion, Aug. 7, 2020), https://www.washingtonpost.com/opinions/2020/08/07/new-yorks-lawsuit-dissolve-nra-is-outrageous/ ("James's allegations . . . would certainly be damning if true. . . . None of this, however, justifies destroying the organization itself. The NRA is still supported by millions of people and has substantial assets. It is neither broke nor derelict."); Ruth Marcus, *The NRA is a Cesspool. That Doesn't Mean It Should Be Dissolved*, WASH. POST. (Opinion, Aug. 9, 2020), https://www.washingtonpost.com/opinions/2020/08/09/nra-is-cesspool-that-doesnt-mean-it-should-be-dissolved/; Noah Feldman, *New York's Attorney General Shouldn't Dismantle the NRA*, BLOOMBERG (Opinion, Aug. 6, 2020), https://www.bloomberg.com/opinion/articles/2020-08-06/new-york-s-attorney-general-shouldn-t-dismantle-nra-in-lawsuit; David Cole, *The NRA Has a Right to Exist*, WALL ST. J. (Opinion, Aug. 26, 2020), https://www.wsj.com/articles/the-nra-has-a-right-to-exist-11598457143?mod=opinion_lead_pos7 ("The American Civil Liberties Union rarely finds itself on the same side as the National Rifle Association in policy debates or political disputes. Still, we are disturbed by New York Attorney General Letitia James's recent effort to dissolve the NRA"); Jonathan Turley, *The Tragic Irony of the New York State Lawsuit Against the NRA*, THE HILL (Opinion, Aug. 8, 2020), https://thehill.com/opinion/judiciary/511155-the-tragic-irony-of-the-new-york-state-lawsuit-against-the-national-rifle-association ("Trying to dissolve an organization engaged in political speech should not occur absent overwhelming proof that it is a criminal enterprise, which is why this has never happened with a group like the NRA."); Alan Z. Rozenshtein, *The Attempt to Dissolve the NRA Threatens Democratic Norms*, LAWFARE (Opinion, Aug. 11, 2020), https://www.lawfareblog.com/attempt-dissolve-nra-threatens-democratic-norms ("I personally can't stand [the NRA] . . . . [b]ut that said . . . . James's attempt to dissolve the NRA in its entirety is a violation of key democratic and rule-of-law norms.").

[13] *Nat'l Rifle Ass'n of Am. v. James*, Civ. Case No. 1:20-cv-00889 (N.D.N.Y.).

# ARGUMENT

## Legal Standard

Congress authorized the Judicial Panel on Multidistrict Litigation (the "Panel") to transfer multiple civil actions for consolidated or coordinated pretrial proceedings when three criteria are met: (1) "one or more common questions of fact are pending in different districts"; (2) transfer would serve the "convenience of the parties and witnesses"; and (3) transfer would "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407. In applying § 1407, this Panel has held that transfer is particularly appropriate where it will "eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary."[14] Although only three federal actions have been filed thus far, the posture of those cases and the fact that one is a putative class action demonstrates that consolidation is necessary for an efficient resolution.

**A.    The Actions Involve Common Questions of Fact.**

Actions should be centralized when they involve common questions of fact.[15] Even though individual factual or legal issues may exist, centralization does not require complete identity of issues, or even a majority.[16] "The presence of differing legal theories is outweighed when the underlying actions, such as those here, arise from a common factual core."[17] Here, consolidation

---

[14] *In re IDT Corp. Calling Card Terms Litig.*, 278 F. Supp. 2d 1381, 1382 (J.P.M.L. 2003).

[15] *See In re E.I. du Pont de Nemours & Co. C-8 Personal Injury Litig.*, 939 F. Supp. 2d 1374, 1374 (J.P.M.L. 2013).

[16] *See In re Zimmer NexGen Knee Implant Prods. Liab. Litig.*, 802 F. Supp. 2d 1374, 1376-77 (J.P.M.L. 2011) (centralization "does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer."); *In re Merscorp. Inc. Real Estate Settlement Procedures Act (RESPA) Litig.*, 560 F. Supp. 2d 1371, 1372 (J.P.M.L. 2008) (presence of "unique state law claims" did not weigh against transfer).

[17] *In re M3Power Razor System Mktg. and Sales Practices Litig.*, 398 F. Supp. 2d 1363, 1364 (J.P.M.L. 2005); accord *In re Centurylink Residential Customer Billing Disputes Litig.*, 280 F.

is appropriate because all of the actions concern the central issue of how the NRA was spending its money; moreover, all will entail discovery regarding the relationship between the NRA and Ackerman and the performance by various executives of their fiduciary duties in connection with the same.[18]

Despite seeking different relief and raising varying legal issues, each of the four Actions centers on broader questions of the NRA's governance, policies and procedures, its vendor relationships, and the manner in which it has expended its donations. This is no coincidence. When New York's former Attorney General warned the NRA that it would likely face hostilities from his office (at the behest of partisan political powers in New York), the NRA undertook to prepare itself for such an attack by examining and bolstering, where appropriate, its internal controls. Many events which flowed from this effort lay at the heart of all four Actions. Although the NRA is now accused in the NYAG Litigation of giving inadequate scrutiny to expenses submitted by certain executives and "favored vendors,"[19] in truth, it was the NRA's demand that all officers, executives, directors and vendors rigorously comply with expense-documentation requirements beginning in 2018 which led to the revelations and disputes at the core of the Actions.[20] As set forth in the

---

Supp. 2d 1383, 1385 (J.P.M.L. 2017) (rejecting argument for denying centralization based on "differences among the various state laws on which plaintiffs bring their claims.").

[18] *See In re Conseco Life Ins. Co. Cost of Ins. Litig.*, 323 F. Supp. 2d 1381, 1383 (J.P.M.L. 2004) (granting transfer where each action named the same defendant and "share questions of fact arising out of" defendant's decision to change its method of calculating deductions, which plaintiffs alleged breached the terms of their life insurance policies); *In re Peruvian Rd. Litig.*, 380 F. Supp. 796, 798 (J.P.M.L. 1974) (granting transfer of two contract actions filed by subcontractor against construction companies because factual allegations were "inextricably intertwined and raise sufficiently complex common issues concerning the design and construction of the road project.").

[19] Declaration of Sarah B. Rogers in Support of Motion to Transfer Cases for Consolidated Pre-Trial Proceedings Pursuant to 28 U.S.C. § 1407 ("Rogers Decl."), Ex. A ¶¶ 4-8.

[20] *Id.* ¶ 15; *see also* Declaration of Michael J. Collins in Support of Motion to Transfer Cases for Consolidated Pre-Trial Proceedings Pursuant to 28 U.S.C. § 1407 ("Collins Decl."), Ex. A ¶ 47.

NYAG Federal Action[21] and Ackerman Litigation,[22] a "handful of executives and vendors" resisted the NRA's compliance demands, and would ultimately attempt to shift blame for their conduct—resulting in multiple overlapping lawsuits.

Among NRA vendors, Ackerman was the most hostile to transparency and reform, and "embark[ed] on a campaign to 'kill the messenger'" by demanding that NRA employees, and even NRA outside counsel, who questioned its expenses be fired or denied access to records.[23] Eventually, a group of internal NRA whistleblowers emerged whose concerns (including serious alleged abuses by Ackerman) were presented to the Audit Committee of the NRA Board of Directors. Those whistleblower concerns now figure prominently in all four Actions.[24] Lt. Col. Oliver North, who had been elected president of the NRA, was receiving a seven-figure salary from Ackerman under a contract he refused to disclose, and which had not been properly approved in accordance with the NRA's bylaws.[25] Over the course of late 2018 and early 2019, North and Ackerman attempted to squelch scrutiny of Ackerman's dealings, including through North's assertion of pretextual concerns regarding the NRA's governance.[26] These tensions culminated in an attempted leadership coup at the April 2019 NRA Annual Meeting, wherein North and an allied Board member with ties to Ackerman, Dan Boren, threatened to release purportedly damaging expense information (the same information that Ackerman previously concealed from the NRA)

---

[21] Rogers Decl. Ex. A ¶ 15.

[22] Collins Decl. Ex. A ¶¶ 51-58.

[23] *Id.* ¶ 56.

[24] Rogers Decl. Ex. A ¶¶ 488-494.

[25] *Id.* ¶¶ 449, 465, 467; *see also* Rogers Decl. Ex. B ¶ 22; *see also* Collins Decl. Ex. A ¶¶ 62-67, 148, 172.

[26] Rogers Decl. Ex. A ¶¶ 457, 461-462; *see also* Collins Decl. Ex. A ¶ 56.

unless NRA CEO Wayne LaPierre agreed to resign and withdraw a then-pending lawsuit—a state-court precursor to the Ackerman Litigation.[27]

Contemporaneously with these events, the NYAG prepared for and commenced the politically driven investigation which underlies the recently-filed NYAG Litigation.[28] The NYAG aggressively sought documents from the NRA regarding the NRA-Ackerman relationship and expenses billed to the NRA by Ackerman; unsurprisingly, these document productions overlap heavily with discovery in the Ackerman Litigation,[29] and NRA counsel expect that the voluminous discovery required in the two matters will continue to overlap as the NYAG Litigation proceeds.[30] Among the facts and transactions encompassed by both the NYAG investigation and the Ackerman Litigation were: an aborted real-estate purchase in Dallas, Texas orchestrated by Ackerman;[31] executive travel and entertainment expenses invoiced through Ackerman;[32] the NRA Audit Committee's review of Ackerman-related contracts;[33] alleged sexual harassment of an Ackerman executive by a now-fired NRA executive;[34] the coup attempt at the 2019 April Annual Meeting;[35] and operations and controls associated with NRATV.[36]

---

[27] Collins Decl. Ex. A ¶¶ 70-74, 78; *see also id.* ¶ 2; *see also* Rogers Decl. Ex. A ¶¶ 468-470; *see also id.* Ex. B at ¶¶ 15, 22.

[28] Rogers Decl. ¶ 6; *see also id.* Ex. B ¶¶ 22-23.

[29] Rogers Decl. Ex. B ¶¶ 24-25; *see also id*. ¶ 6.

[30] *Id.* ¶ 6.

[31] Rogers Decl. Ex. A ¶¶ 209-215; *see also* Collins Decl. Ex. B ¶¶ 51, 115.

[32] Rogers Decl. Ex. A ¶¶ 247, 249, 299, 309-323; *see also* Collins Decl. Ex. A ¶¶ 19, 53, 72, 75; *see also id.* Ex. B ¶¶ 50, 115.

[33] Collins Decl. Ex. A ¶¶ 62-64; *see also* Rogers Decl. Ex. A ¶¶ 510-513, *see also id*. Ex. B ¶ 33.

[34] Rogers Decl. Ex. A ¶ 270; *see also* Collins Decl. Ex. B ¶ 30.

[35] Rogers Decl. Ex. A ¶¶ 468-471; *see also* Collins Decl. Ex, A ¶¶ 70-74.

[36] Rogers Decl. Ex. A ¶ 447; *see also* Collins Decl. Ex. A ¶¶ 21-37.

The two remaining Actions—the Dell'Aquila Litigation and the Stinchfield Litigaiton—both sprang from the same events. The Dell'Aquila Litigation was commenced in August 2019 by an NRA donor who expressed concerns about Ackerman's accusations of misspending at the NRA, and referenced them extensively in his operative pleading.[37] The Stinchfield Litigation, meanwhile, was brought by Ackerman against a former employee who testified in support of the NRA in the Ackerman Litigation, and hinges on the veracity of that employee's statements about Ackerman's business relationship with the NRA.[38]

Although none of the Actions has progressed past the discovery stage, the Ackerman Litigation is furthest along,.[39] The propriety of Ackerman's billing, including what NRA executives knew about Ackerman's billing practices and their level of control over those practices, will be a focus of discovery in all four Actions.[40] As part of its defense to the Ackerman Litigation, Ackerman has asserted certain improprieties in NRA spending, and has also made allegations about purportedly excessive legal fees incurred by the NRA.[41] The same issues feature in the NYAG Litigation[42] and the Dell'Aquila Litigation.[43] Discovery will be voluminous: roughly 3,000 pages of material have been produced in the Ackerman Litigation and Stinchfield Litigation, even

---

[37] Declaration of William A. Brewer in Support of Motion to Transfer Cases for Consolidated Pre-Trial Proceedings Pursuant to 28 U.S.C. § 1407 ("Brewer Decl."), Ex. A.

[38] Declaration of Ian Shaw in Support of Motion to Transfer Cases for Consolidated Pre-Trial Proceedings Pursuant to 28 U.S.C. § 1407 ("Shaw Decl."), Ex. A ¶¶ 1-2; 9-32. Counsel for the NRA also represents Mr. Stinchfield and the declaration is filed solely in his capacity as an individual with relevant knowledge of the litigation.

[39] Collins Decl. ¶¶ 6-7.

[40] Collins Decl. ¶ 10; *see also* Rogers Decl. ¶ 7; *see also* Shaw Decl. ¶ 4; *see also* Brewer Decl. ¶ 4.

[41] Collins Decl. Ex. B, Page 34 ¶ 2.

[42] Rogers Decl. ¶ 7.

[43] Brewer Decl. ¶ 4.

though discovery is in its early stages, and a prior, related state action (which was stayed for overlapping with the Ackerman Litigation) entailed 59,880 pages of document discovery.[44] There are currently 36 third-party subpoenas outstanding in the Ackerman Litigation alone.[45] Many overlapping or related documents will be relevant to the NYAG Litigation.[46] Although discovery has not yet begun in either the NYAG State Action or the NYAG Federal Action, more than 88,000 pages of documents were produced by the NRA to the NYAG in advance of the NYAG State Action, and it is expected that this record will be augmented as discovery proceeds.[47] Discovery in the Dell'Aquila Litigation will encompass the same issues.[48] Such discovery is expected to be voluminous, and to overlap with discovery in the other Actions. The Actions will notably require testimony from an immense number of witnesses, either by deposition or at trial. Exhibit E to the Rogers Declaration identifies witnesses likely to possess knowledge or documents relevant to one or more Actions.[49] Moreover, although Exhibit E to the Rogers Declaration focuses on third-party witnesses, numerous NRA employees and current and former Board members likewise possess knowledge and/or records relevant to all four Actions; duplicative discovery from these witnesses, too, could be avoided or mitigated by consolidation.

**B.   Centralization Serves the Convenience of the Parties and Witnesses.**

Transfer for coordinated or consolidated pre-trial proceedings serves the convenience of the parties because, without it, the parties would necessarily be engaged in duplicative pre-trial

---

[44] Collins Decl. ¶ 7.

[45] Collins Decl. ¶ 7.

[46] Rogers Decl. ¶¶ 6-7.

[47] Rogers Decl. ¶ 6.

[48] Brewer Decl. ¶ 3.

[49] Rogers Decl. Ex. E.

motion practice, discovery, and other proceedings in at least four separate actions, and likely more. Accordingly, a transfer of these actions for centralized pre-trial proceedings would "eliminate duplicative discovery . . . and conserve the resources of the parties, their counsel, and the judiciary."[50]

Absent transfer, most of the witnesses, who are numerous and scattered across the country, would face the prospect of being separately deposed in each of the actions. A transfer and resulting consolidation would minimize the burden placed on these witnesses.[51] If the investigation performed by the New York Attorney General is any indication, this could encompass up to 90 different witnesses.

To the extent one of the Actions presents a unique discovery issue, the transferee judge would be well-situated to develop a pre-trial program to "insure that the needs of the respective parties" for any such individualized issues would "be accommodated concurrently with the common pretrial matters."[52]

---

[50] *In re IDT Corp. Calling Card Terms Litig.*, 278 F. Supp. 2d 1381, 1382 (J.P.M.L. 2003).

[51] *See In re Daily Fantasy Sports Mktg. & Sales Practices Litig.*, 158 F. Supp. 3d 1375, 1379 (J.P.M.L. 2016) (even where different theories of relief are involved, centralization is appropriate where actions involve common discovery regarding the nature of the defendants' business, advertising, and internal policies, and at least some of defendants' employees will be witnesses in all actions).

[52] *In re Westinghouse Electric Corp. Uranium Con. Litig.*, 405 F. Supp. 316, 319 (J.P.M.L. 1975) ("Section 1407 proceedings will prevent duplication of discovery, eliminate the possibility of colliding pretrial rulings by courts of coordinated jurisdiction, and avoid potentially conflicting preliminary injunctive demands on Westinghouse with respect to its delivery of uranium.").

## C. Centralization Will Promote the Just and Efficient Conduct of These Actions.

Centralization under Section 1407 would promote the just and efficient conduct of the three pending actions and any potential tag-along actions[53] by avoiding unnecessary duplication of judicial effort and inconsistent rulings.

Centralization is appropriate when it "will eliminate duplicative discovery . . . and conserve the resources of the parties, their counsel and the judiciary."[54] Given the large volume of documents and witnesses at issue and the near-total overlap in factual issues, this remains the case even when only a handful of actions are at issue. As this Panel stated in a decision on an MDL request to consolidate four actions, "common factual issues . . . at the core of the four cases [ ] before the Panel" meant "[d]iscovery among these actions regarding defendants' corporate policies therefore will overlap," justifying centralization.[55] Consolidation in one forum will allow efficient resolution of the common core factual issues regarding, among others, Ackerman's billing practices, Wayne LaPierre's alleged personal expenses, the NRA's legal expenditures and the NRA board's oversight of these issues.

## D. Transfer to the Northern District of Texas Would Best Serve the Goals of 28 U.S.C. § 1407.

Although centralization in any of the four district courts in which the Actions are currently pending would be permissible under 28 U.S.C. § 1407, the NRA respectfully suggests that transfer

---

[53] *See In re Metoprolol Succinate Patent Litig.*, 329 F. Supp. 2d 1368, 1369-70 (J.P.M.L. 2004) (potential for future tag-along actions weighed in favor of centralization).

[54] *In re Treasury Sec. Auction Antitrust Litig.*, 148 F. Supp. 3d 1360, 1362 (J.P.M.L. 2015); *see also* Manual for Complex Litigation (Fourth) § 20.131 (2010) at 219-21 (citing *In re Plumbing Fixture Cases*, 298 F. Supp. 484 (J.P.M.L. 1968)).

[55] *In re Wells Fargo Wage and Hour Emp't Practices Litig. (No. III)*, 804 F. Supp. 2d 1382, 1384 (J.P.M.L. 2011); *see also In re MI Windows & Doors, Inc., Prod. Liab. Litig.*, 857 F. Supp. 2d 1374, 1375 (J.P.M.L. 2012) (consolidating five actions); *In re Radioshack Corp. "ERISA" Litig.*, 528 F. Supp. 2d 1348, 1349 (J.P.M.L. 2007) (consolidating four cases).

to the Northern District of Texas would best serve the goals of 28 U.S.C. § 1407. While the Panel uses "no single factor" to select the transferee district, it does consider, among other things, "where the largest number of cases is pending, where discovery has occurred, where cases have progressed furthest, the site of the occurrence of the common facts, where the cost and inconvenience will be minimized, and the experience, skill, and caseloads of available judges."[56]

These factors weigh strongly in favor of a Texas forum. Two of the four Actions—the Ackerman Litigation, and the Stinchfield Litigation—are already pending in the Northern District of Texas. Moreover, these are the most advanced of the four Actions: discovery has already begun in both the Ackerman Litigation and Stinchfield Litigation, whereas the Dell'Aquila Litigation and NYAG Litigation are still at the preliminary motion-practice stage. Many of the NRA's meetings with Ackerman, including those which underlay an aborted real-estate purchase that figures prominently in the NYAG Litigation, occurred in Dallas, Texas. Other Ackerman-related documents and witnesses are clustered in the vicinity of Ackerman's headquarters in nearby Oklahoma City, Oklahoma, and the company's other flagship office in Dallas.[57] Moreover, based on the progress of discovery thus far, Magistrate Judge Toliver, who has been overseeing discovery in the Ackerman Litigation, has demonstrated the requisite skill and experience to handle discovery in these consolidated matters.[58] Judge Toliver has decided hundreds of discovery-related motions during her time on the bench and is already familiar with the complicated facts common to all four Actions.

---

[56] Manual for Complex Litigation, Fourth § 20.131 (2010).

[57] Collins Decl. ¶ 9.

[58] Collins Decl. ¶ 9.

15

The Panel has often considered the location of witnesses and documents to be a compelling, if not overriding, factor in determining the most convenient location for centralization.[59] Many of the Ackerman witnesses are located in Texas or in Oklahoma.

## CONCLUSION

For the foregoing reasons, the NRA respectfully requests that this Panel enter an order transferring all of the Actions set forth in the Schedule of Actions, and any actions subsequently filed against the NRA involving the same common issues of fact, to the Northern District of Texas for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.

---

[59] *See, e.g., In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 396 F. Supp. 3d 1374, 1375 (J.P.M.L. 2019) (Northern District of California "is an appropriate transferee forum" because "common documents and witnesses likely will be located in this district"); *In re Ford Motor Co. F-150 and Ranger Truck Fuel Economy Mktg. and Sales Pracs. Litig.*, 412 F. Supp. 3d 1355, 1356 (J.P.M.L. 2019) (Eastern District of Michigan was an "appropriate transferee forum" where "Ford, the sole defendant in all actions, has its headquarters in this district, and thus relevant documents and witnesses will be located in this district"); *In re Delphi Corp. Sec., Derivative & "Erisa" Litig.*, 403 F. Supp. 2d 1358, 1360 (J.P.M.L. 2005) (selecting district with "a significant nexus to the litigation" because "[t]his district is where many relevant documents and witnesses are likely to be found, inasmuch as [defendant's] principal place of business is located there.").

16

Dated: October 20, 2020

        Respectfully submitted,

        By: /s/ *Sarah B. Rogers* _____
           William A. Brewer III
           wab@brewerattorneys.com
           Sarah B. Rogers
           sbr@brewerattorneys.com

        **BREWER, ATTORNEYS & COUNSELORS**
        750 Lexington Avenue, 14th Floor
        New York, New York 10022
        Telephone: (212) 489-1400
        Facsimile: (212) 751-2849

        **ATTORNEYS FOR MOVANT**
        **THE NATIONAL RIFLE ASSOCIATION**