# **EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, | Index No. |
| | |
| Plaintiff, | **Summons** |
| v. | |
| THE NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., WAYNE LAPIERRE, WILSON PHILLIPS, JOHN FRAZER, and JOSHUA POWELL, | Date Index No. Purchased: August 6, 2020 |
| Defendants. | |

TO THE ABOVE NAMED DEFENDANTS:

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue pursuant to CPLR § 503(a) is that Plaintiff is located in New York County, with its address at 28 Liberty Street, New York, New York 10005, and because the office of defendant The National Rifle Association of America, Inc. is in New York County as set forth in its certificate of incorporation, pursuant to N-PCL §§ 1110 and 102(a)(11).

Dated: New York, New York
       August 6, 2020

LETITIA JAMES
Attorney General of the State of New York
*Attorney for Plaintiff*

By: _____
James Sheehan
Charities Bureau Chief
28 Liberty Street
New York, New York 10005
Tel. (212) 416-8401

THE NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.
11250 Waples Mill Road
Fairfax, Virginia 22030


WAYNE LAPIERRE
c/o The National Rifle Association of America, Inc.
11250 Waples Mill Road
Fairfax, Virginia 22030


WILSON PHILLIPS
*Address withheld for privacy reasons


JOHN FRAZER
c/o The National Rifle Association of America, Inc.
11250 Waples Mill Road
Fairfax, Virginia 22030


JOSHUA POWELL
*Address withheld for privacy reasons

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PEOPLE OF THE STATE OF NEW YORK, BY
LETITIA JAMES, ATTORNEY GENERAL OF
THE STATE OF NEW YORK,

                    Plaintiff,

          v.

THE NATIONAL RIFLE ASSOCIATION OF
AMERICA, INC., WAYNE LAPIERRE,
WILSON PHILLIPS, JOHN FRAZER, and
JOSHUA POWELL

                  Defendants.

Index No.

**Verified Complaint**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

PART ONE - THE PARTIES.................................................................................................6

PART TWO - JURISDICTION AND VENUE........................................................................8

PART THREE - APPLICABLE LAW....................................................................................9

I.  Attorney General's Statutory Authority to Bring Actions to Dissolve Not-for-Profit Corporations, to Remove Board Members, and to Seek an Accounting of Misspent Funds ......................................................................................................................... 9

II.  Legal Requirements for New York Not-for-Profit Corporations and their Officers, Directors and Key Persons................................................................................. 10

III.  Registration and Reporting Requirements for New York Not-for-Profit Corporations ...... 13

IV.  Legal Obligations Under the New York Prudent Management of Institutional Funds Act........................................................................................................................ 14

PART FOUR - THE NRA'S HISTORY AND INTERNAL GOVERNANCE ...........................15

I.  The NRA's History .................................................................................................. 15

II.  The NRA's Internal Structure and Governance.................................................... 16

    A.  The NRA's Organizational Structure..................................................................... 16

    B.  The NRA's Bylaws .............................................................................................. 17

    C.  The NRA's Policy and Procedures on Hiring, Spending, Procurement, Travel Reimbursement, Conflicts of Interest, and Related Party Transactions ................... 25

PART FIVE - DEFENDANTS' VIOLATIONS OF NEW YORK LAW....................................34

I.  Widespread Violations of Law of the NRA's Senior Management under the Leadership and Direction of Wayne LaPierre .......................................................................... 34

    A.  LaPierre's Improper Spending and Expensing ......................................................... 35

    B.  Wilson "Woody" Phillips's Conflicts of Interest, Related Party Transactions, and Self-Dealing ...................................................................................................... 52

    C.  Joshua Powell's Conflicts of Interest, Related Party Transactions, and Negligence.. 58

    D.  John Frazer's Negligence and Certifications of False or Misleading Annual Filings 65

    E.  Improper Expenditures by LaPierre's Senior Assistant and Direct Report ............... 68

II.  The NRA's Use of Longtime Vendors and Consulting Agreements to Hide Improper Expenditures, Self-Dealing, and Related Party Transactions ............................................. 71

    A.  Ackerman McQueen and Mercury Group ............................................................... 71

    B.  Consulting Agreements with Former Employees ..................................................... 80

    C.  Related Party Transactions with Board Members .................................................... 86

III.  The Individual Defendants Received Excessive Compensation that the NRA Did Not Accurately Disclose ................................................................................................. 93

i

A.  The NRA Board Failed to Follow an Appropriate Process to Determine Reasonable Compensation for NRA Executives ................................................... 93

B.  The Officers Compensation Committee and the NRA Board Failed to Consider or Approve LaPierre's and Phillips's Complete Compensation Prior to Making Compensation Determinations ....................................................... 98

C.  LaPierre Failed to Properly Determine Powell's Compensation ............................ 101

D.  The NRA's Compensation Disclosures to the Attorney General and the Internal Revenue Service Were False or Misleading ............................................ 102

IV.  The NRA's Retaliation Against Dissidents on the Board ................................. 106

A.  Dissident No. 1 .................................................................................. 106

B.  Dissident Board Members ..................................................................... 113

V.  The NRA Board's Failures Resulting in Violations of Law ............................... 114

A.  Audit Committee's Failure to Respond Adequately to Whistleblowers ................. 116

B.  Audit Committee's Failure to Appropriately Review and Approve Related Party Transactions and Conflicts of Interest ..................................................... 119

C.  Audit Committee's Failure to Oversee Adequately the External Auditors ............. 125

D.  The Audit Committee Acted *Ultra Vires* in Indemnifying Officers, Directors, and Employees ...................................................................................... 128

VI.  The NRA's Failure to Institute an Effective Compliance Program ..................... 129

VII.  The NRA's False Regulatory Filings ...................................................... 131

VIII.  The NRA's Violation of its Duties under the New York Prudent Management of Institutional Funds Act ...................................................................... 135

CAUSES OF ACTION ................................................................................ 138

PRAYER FOR RELIEF ............................................................................... 161

VERIFICATION ...................................................................................... 164

ii

The People of the State of New York, by their attorney, Letitia James, Attorney General of the State of New York, respectfully allege as follows:

## PRELIMINARY STATEMENT

1.      For 149 years, the National Rifle Association of America, Inc. (the "NRA" or the "Association") has operated as a New York not-for-profit, charitable membership corporation. As a New York charity, the NRA is legally required to serve the interests of its membership and advance its charitable mission.

2.      For nearly three decades, Wayne LaPierre has served as the chief executive officer of the NRA and has exploited the organization for his financial benefit, and the benefit of a close circle of NRA staff, board members, and vendors. Contrary to his statutory duties of care, loyalty and obedience to the mission of the charity, LaPierre has undertaken a series of actions to consolidate his position; to exploit that position for his personal benefit and that of his family; to continue, by use of a secret "poison pill contract," his employment even after removal and ensuring NRA income for life; and to intimidate, punish, and expel anyone at a senior level who raised concerns about his conduct. The effect has been to divert millions of dollars away from the charitable mission, imposing substantial reductions in its expenditures for core program services, including gun safety, education, training, member services and public affairs. During the period 2015 to 2018, the NRA has reported a reduction in unrestricted net assets by $63 million.

3.      In his role as Executive Vice President, LaPierre has significant discretion and authority in hiring, promoting, and retaining NRA employees, in nominating directors to the NRA Board, and in contracting with vendors. LaPierre has a fiduciary obligation to exercise that discretion and authority in the best interests of the organization. Instead, LaPierre often hired and retained individuals in senior positions at the NRA, or as NRA contractors, whom he believed

1

would aid and enable him to control the organization, regardless of their skills, experience, integrity or contribution to the charitable mission.

4.     Among the senior executives that LaPierre handpicked to facilitate his misuse of charitable assets were Defendants Wilson "Woody" Phillips, Joshua Powell, and John Frazer (together with LaPierre, the "Individual Defendants"). LaPierre hired and retained each of them despite their lack of skills or experience for their respective roles and responsibilities. Despite their lack of experience, LaPierre entrusted them with substantial authority for managing and administering the NRA's charitable assets and bearing responsibility for the NRA's legal compliance. In accordance with the NRA bylaws, each of them was under LaPierre's authority and within the scope of his responsibility. Like LaPierre, each of them regularly ignored, overrode or otherwise violated the bylaws and internal policies and procedures that they were charged with enforcing. As a result of these repeated violations, charitable assets were diverted to benefit NRA insiders and favored vendors.

5.     At LaPierre's direction, Phillips, the former Treasurer and Chief Financial Officer, instituted a practice whereby millions of dollars in entertainment and travel expenses incurred by NRA executives were billed to the NRA as disbursements by the NRA's largest vendor. This practice evaded both the NRA's own accounting and Board-established expense reimbursement process, and IRS requirements for proper expense reimbursement. LaPierre, Phillips, and Powell regularly used this pass-through arrangement to conceal private travel and other costs that were largely personal in nature, wasting substantial charitable resources and exposing the NRA to millions of dollars of potential liability for violation of IRS reporting requirements.

6.     Powell, Chief of Staff and the Executive Vice President of Operations, was given pay increases, at LaPierre's direction, that nearly tripled his salary in a less than three years, despite

2

complaints of abusive behavior, and evidence of illegal conduct and inappropriate spending. Within a year after LaPierre designated Powell to lead the NRA's compliance program, he was fired for falsifying his travel expenses.

7.      LaPierre's choice as General Counsel, Frazer, had only a brief 18-month tenure in private practice and was unprepared to manage the legal and regulatory affairs of the NRA. Frazer also serves as the corporation's Secretary but has little apparent knowledge of the requirements of New York law governing not-for-profit corporations. For example, Frazer repeatedly failed to ensure that the NRA's many related party transactions with NRA insiders were being reviewed or properly considered by NRA officers and directors in accordance with New York law. He also failed to maintain and enforce whistleblower and conflict of interest policies that met the requirements of applicable law.

8.      With the assistance of Phillips, Powell and Frazer, LaPierre abused his position as a fiduciary to the NRA to obtain millions of dollars in personal benefits in the form of undisclosed, excessive compensation, which includes in-kind benefits and reimbursements from the NRA and its vendors. For example,

   a.   LaPierre has spent millions of dollars of the NRA's charitable assets for private plane trips for himself and his family, including trips for his family when he was not present.

   b.   In the last five years, LaPierre and his family have visited the Bahamas by private air charter on at least eight occasions, at a cost of more than $500,000 to the NRA. On many of those trips, LaPierre and his family were gifted the use of a 107-foot yacht owned by an NRA vendor.

   c.   LaPierre received hundreds of thousands of dollars in gifts from another NRA vendor in the form of complimentary safaris in Africa and other world-wide locations for himself and his spouse.

9.      LaPierre, with the aid of Phillips, Powell and Frazer, procured personal financial benefits for board members, vendors and even former employees. In doing so, they violated NRA

3

policy on contracting and business ethics, as well as legal mandates on conflicts of interest, related party transactions, and prohibitions on *ex gratia* payments. For instance, LaPierre and Phillips entered into post-employment agreements with departing officers and employees that provided excessive payments in exchange for little, if any, services and non-disclosure/non-disparagement agreements. Powell secured contracts that benefited his family members without disclosure of his familial relationship. And Frazer permitted the NRA to secretly pay millions of dollars to several board members through consulting arrangements that were neither disclosed to, nor approved by, the NRA Board.

10. Efforts to question or challenge LaPierre's leadership were quashed or ignored. LaPierre retaliated against the NRA President after personally lobbying him to take on the position. LaPierre withdrew his critical support after the President began to independently assess the governance of the NRA upon learning of complaints by whistleblowers, senior staff and donors. Senior members of the NRA's financial staff jointly made a formal whistleblower complaint to the Audit Committee of the NRA Board in 2018 itemizing numerous practices that abused NRA assets. Employees also complained about Powell's practices and behavior, which LaPierre, himself, described as "abusive." But these complaints were never properly investigated or meaningfully addressed. Defendants failed to comply with, maintain, and ensure compliance with whistleblower policies consistent with New York law and permitted or personally retaliated against those who questioned their wrongdoing.

11. As a result of these failures, the NRA, at the direction of the Individual Defendants and with a series of failures of required oversight by its Board, has persistently engaged in illegal and unauthorized activities in the conduct and transaction of its business. Individual Defendants— in their roles as officers and directors—routinely circumvented internal controls; condoned or

partook in expenditures that were an inappropriate and wasteful use of charitable assets; and concealed or misreported relevant information, rendering the NRA's annual reports filed with the Attorney General materially false and misleading. Defendants abdicated all responsibility for ensuring that the NRA's assets were managed prudently and in good faith.

12.     As a result of these persistent violations of law by the Defendants, the Attorney General seeks a finding by this Court that the NRA is liable to be dissolved pursuant to (a) N-PCL § 1101(a)(2) based upon the NRA's pattern of conducting its business in a persistently fraudulent or illegal manner, abusing its powers contrary to public policy of New York and its tax exempt status, and failing to provide for the proper administration of its trust assets and institutional funds; and/or (b) N-PCL § 1102(a)(2) because directors or members in control of the NRA have looted or wasted the corporation assets, have operated the NRA solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner. The Attorney General requests that this Court determine, in the exercise of its discretion under Section 1109(b)(1) of the N-PCL, that the interest of the public and the members of the NRA supports a decision to dissolve the NRA.

13.     The Attorney General also seeks an order, pursuant to the Not-for-Profit Corporation Law ("N-PCL"), Estates Powers & Trusts Law ("EPTL"), and Executive Law ("Exec. Law") (i) directing the Individual Defendants to account, make restitution and pay all penalties resulting from the breach of fiduciary duties and their misuse of charitable assets for their own benefit and interests; (ii) removing LaPierre for cause as a director and as Executive Vice President of the NRA; (iii) removing Frazer for cause as a director and Secretary of the NRA; (iv) enjoining the Individual Defendants from future service as an officer, director or trustee, or in any other capacity as a fiduciary of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York, or which solicits charitable donations in the State

of New York, or which holds charitable assets in New York; (v) rescinding related party transactions by the Defendants and directing the Individual Defendants to account for their profits and to pay the NRA up to double the value of each benefit improperly bestowed by such transactions; (vi) directing the NRA to account for its official conduct with respect to management of the NRA's institutional funds; and (vii) ordering restitution from the Individual Defendant to recover illegal, unauthorized or *ultra vires* compensation, reimbursements, benefits or amounts unjustly paid to the Individual Defendants.

## **PART ONE - THE PARTIES**

14.     The Attorney General is responsible for overseeing the activities of New York not-for-profit corporations and the conduct of their officers and directors, in accordance with the N-PCL, the EPTL, the New York Prudent Management of Institutional Funds Act ("NYPMIFA"), and the New York Executive Law.

15.     The National Rifle Association of America, Inc. is a charitable not-for-profit corporation chartered by a special act of the State of New York Legislature on November 17, 1871. Throughout its history, it has been legally domiciled in the State of New York and is subject to New York law in the governance of its internal affairs. The NRA has members and engages in fundraising throughout the United States, including in New York, where it is registered with the Charities Bureau of the Office of the Attorney General to conduct business and solicit donations.

16.     The NRA's principal place of business is at 11250 Waples Mill Road, Fairfax, Virginia 22030. The NRA is recognized as tax-exempt under Section 501(c)(4) of the Internal Revenue Code.

17.     As set forth in its bylaws, the NRA's stated mission is comprised of five purposes and objectives:

6

a.  "To protect and defend the Constitution of the United States, especially with reference to the God-given inalienable right of the individual American citizen guaranteed by such Constitution to acquire, possess, collect, exhibit, transport, carry, transfer ownership of, and enjoy the right to use, keep and bear arms, in order that the people may exercise their individual rights of self-preservation and defense of family, person, and property, and to serve in the militia of all law-abiding men and women for the defense of the Republic and the individual liberty of the citizens of our communities, our states and our great nation;

b.  To promote public safety, law and order, and the national defense;

c.  To train members of law enforcement agencies, the armed forces, the National Guard, the militia, and people of good repute in marksmanship and in the safe handling and efficient use of small arms;

d.  To foster, promote and support the shooting sports, including the advancement of amateur and junior competitions in marksmanship at the local, state, regional, national, international, and Olympic levels; and

e.  To promote hunter safety, and to promote and defend hunting as a shooting sport, for subsistence, and as a viable and necessary method of fostering the propagation, growth and conservation, and wise use of our renewable wildlife resources."

18.    Defendant Wayne LaPierre is the Executive Vice President ("EVP") of the NRA and has held that position since the early 1990s. He acts as the Chief Executive Officer of the NRA. As EVP, LaPierre is responsible, pursuant to the NRA bylaws, Article V, Section 2(c), to "direct all of the affairs of the Association in accordance with the programs and policies established by the Board of Directors." Defendant LaPierre is and has been at all relevant times an *ex officio* member of the Board of Directors, and of the Executive Committee. LaPierre maintains an office address at National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22030.

19.    Defendant Joshua Powell was formerly and at all times relevant herein an officer, *de facto* officer or "key person" within the meaning of N-PCL § 102(a)(25), of the NRA and held the positions of Chief of Staff, Executive Director of General Operations, head of Compliance, and "Senior Strategist." As Executive Director of General Operations, Defendant Powell served

7

as an *ex officio* member of the Board of Directors. Defendant Powell's employment with the NRA was terminated in January 2020. Powell retains a residence in Michigan.

20.     Defendant Wilson "Woody" Phillips served as *ex officio* Director, Treasurer and Chief Financial Officer and key person of the NRA between 1993 and 2018, when he retired. Phillips maintains a residence in Texas.

21.     Defendant John Frazer has been the Secretary and General Counsel and *ex officio* director of the NRA since 2015 and has worked at the NRA since 1993. Frazer maintains an office address at National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22030.

## PART TWO - JURISDICTION AND VENUE

22.     The Attorney General brings this action on behalf of the People of the State of New York under the EPTL, the N-PCL, NYPMIFA, and the Executive Law.

23.     This Court has personal jurisdiction over the NRA because it is a New York not-for-profit corporation and has purposely availed itself of the opportunity to do business, solicit funds, recruit members and serve its charitable mission and beneficiaries in New York.

24.     This Court has personal jurisdiction over Defendants LaPierre, Powell, Phillips and Frazer pursuant to N-PCL § 309 because "by becoming a director, officer, key person or agent of a corporation [each Individual Defendant] is subject to the personal jurisdiction of the supreme court of the state of New York, and in an action or proceeding by the attorney general under [the N-PCL] the process may be served….as provided in [CPLR § 313]."

25.     This Court also has personal jurisdiction over the Individual Defendants pursuant to CPLR § 302(a). Each of the Individual Defendants, in their roles as officers, directors and key persons of the NRA, has transacted business within the state on behalf of a New York chartered corporation and purposefully availed themselves of the privileges and protections, and assumed the obligations, of New York law. Plaintiff's claims in this matter, as alleged herein against each

8

of the Individual Defendants, including for breach of their fiduciary duties to the NRA, waste of the NRA's charitable assets, participation in prohibited related party transactions, and causing false and materially misleading filings to be made in New York State, among others, arise out of the Individual Defendants' purposeful conduct and transaction of business in New York, and each of the Individual Defendants' conduct has caused harm in New York.

26.     Venue is properly set in New York County pursuant to (a) CPLR § 503 because the Attorney General has an office in the county; and (b) N-PCL §§ 1110 and 102(a)(11), because the office of the NRA is in New York County as set forth in the NRA's certificate of incorporation.

## PART THREE - APPLICABLE LAW

### I.     Attorney General's Statutory Authority to Bring Actions to Dissolve Not-for-Profit Corporations, to Remove Board Members, and to Seek an Accounting of Misspent Funds

27.     The Attorney General has a wide range of supervisory powers over charitable corporations, and over the trustees of property held for charitable purposes, including over a not-for-profit corporation, such as the NRA, organized in New York as a charity. The NRA, as a 501(c)(4) corporation under the Internal Revenue Code, is a charity under the N-PCL, subject to the authority of the Attorney General. *Citizens United v. Schneiderman*, 882 F. 3d 374 (2d Cir. 2018)

28.     The Attorney General's regulatory oversight of charitable nonprofit corporations, and their officers, directors, and key persons, includes the authority to bring actions under Section 112 and Article 7 of the N-PCL, to dissolve a corporation, remove officers and directors, obtain relief as a result of prohibited related party transactions, ensure adequate protections for whistleblowers, to enforce any right given to members, or an officer or a director of a charitable corporation and, under Section 623(a) of the N-PCL, to bring a derivative action "in the right of a

domestic or foreign corporation" to procure a judgment in favor of the corporation and against officers, directors, or third parties.

29.    New York law further provides the Attorney General with authority over any "trustee" of any not-for-profit corporation organized under the laws of New York for charitable purposes. EPTL § 8-1.4. The Individual Defendants are each a trustee under New York law. The Attorney General has the legal authority "to institute appropriate proceedings…to secure the proper administration of any trust, corporation, or other relationship to which this section applies." EPTL § 8-1.4(m).

30.    In addition, the EPTL provides that the Attorney General is authorized to regulate and investigate trustees and the trustees' administration of property held for charitable purposes, and that authority "shall apply regardless of any contrary provisions of any instrument and shall be liberally construed so as to effectuate its general purposes of protecting the public interest in charitable uses, purposes, and dispositions." EPTL § 8-1.4(n).

## II.    Legal Requirements for New York Not-for-Profit Corporations and their Officers, Directors and Key Persons

31.    New York law sets forth the duties and powers of the NRA as a charitable not-for-profit corporation, and the duties, powers, and liabilities of the NRA's officers, directors, key persons, and members.

32.    The NRA's use of its assets and institutional funds, and the fiduciary duties of its officers and directors with respect to those assets and institutional funds are governed by the N-PCL and the EPTL. The governance and fiduciary duties of its officers and directors generally are governed by the N-PCL; oversight of its charitable assets is generally governed by the EPTL; and its fundraising activities by the Executive Law.

10

33.     Pursuant to N-PCL §§ 701, 713 and 714, a not-for-profit corporation "shall be managed by its board of directors," which has the power to elect officers and remove them, with or without cause.

34.     Pursuant to N-PCL § 717(a), directors, officers and key persons of not-for-profit entities such as the NRA are required to "discharge the duties of their respective positions in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances."

35.     In addition, N-PCL § 552 require directors and officers of a not-for-profit corporation such as the NRA to act with undivided loyalty to the corporation in the management and investment of the institutional funds of the corporation.

36.     Under N-PCL § 720, directors, officers, or key persons may be compelled to explain or be liable for the "neglect of, or failure to perform, or other violation of [ ] duties in the management and disposition of corporate assets committed to his charge" or "[t]he acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties."

37.     As a New York not-for-profit corporation, the NRA may only pay "compensation in a reasonable amount" to officers, directors, or members for services actually rendered. N-PCL § 515(a).

38.     As a New York not-for-profit corporation, the NRA is barred by law from paying dividends and from distributing "any part of its income or profit to its members, directors, or officers." N-PCL § 515(a). Such distributions exceed the authority conferred upon the NRA by law, is beyond the capacity or power of the NRA under the N-PCL, and could subject it to annulment or dissolution under Sections 112(a)(1) and 1101(a)(2) of the N-PCL.

11

39.     Under N-PCL § 715 and EPTL § 8-1.9, the NRA is prohibited from entering into any related party transaction unless the transaction is determined and documented by the Board or an authorized committee of the Board to be fair, reasonable, and in the corporation's best interest at the time of the determination in compliance with that section.

40.     In addition, every director, officer, trustee, or key employee who has an interest in a related party transaction must disclose in good faith to the Board or an authorized committee of the Board "the material facts concerning such interest," and the corporation must conduct a process before approving a related party transaction and document that process. N-PCL § 715; EPTL § 8-1.9

41.     Similarly, the NRA's Board is required to adopt, implement and assure compliance with a conflict of interest policy that ensures that the NRA's trustees, directors, officers and key persons act in the corporation's best interest and comply with applicable legal requirements, including those concerning related party transactions. N-PCL § 715-a; EPTL § 8-1.9. The policy must provide for annual conflict of interest disclosures by trustees and directors, and procedures for the disclosure and determination of conflicts of interest, which must prevent the person with the conflict from influencing the determination. *Id.* The policy also imposes recordkeeping requirements on the existence and resolution of conflicts. *Id.*

42.     The NRA and its Board of Directors are also legally required to adopt, oversee and ensure compliance with a policy providing for an effective process to receive and consider whistleblower concerns and for protecting whistleblowers. N-PCL § 715-b; EPTL § 8-1.9. This policy must provide that no director, officer, trustee, employee or volunteer of a corporation who in good faith reports any action or suspected action taken by the corporation that is illegal, fraudulent, or in violation of any adopted policy of the corporation shall suffer, intimidation,

12

harassment, discrimination, or other retaliation. *Id.* The law further requires that a trustee, director, officer or employee be designated to administer the whistleblower policy and to report to the board or an authorized committee. *Id.*

## III. Registration and Reporting Requirements for New York Not-for-Profit Corporations

43. Under New York law, certain not-for-profit organizations, including the NRA, holding charitable assets and operating in New York must register and file accurate and complete reports with the Attorney General. *See* EPTL §§ 8-1.4(d) and (f). The Charities Bureau oversees that function on behalf of the Attorney General. In addition to these registration requirements, charitable organizations soliciting contributions in New York must also register and file accurate and complete annual reports under Article 7-A of the Executive Law. These annual reports, commonly referred to as CHAR500s, must include copies of an organization's annual information return, the IRS Form 990, and, for organizations like the NRA, copies of the organization's audited financial statements.

44. The annual reports filed with the Charities Bureau must also include the identities of the fundraisers with whom an entity contracts, as well as information about the services they provide and the compensation they receive.

45. CHAR500s must be signed by: (i) the organization's President or Authorized Officer and (ii) its Chief Financial Officer or Treasurer, both of whom, by their signatures expressly certify, under penalties of perjury, that the report, including all attachments, is true and accurate.

46. Registration with the Charities Bureau enables the Attorney General to exercise her statutory oversight of not-for-profit entities that conduct activities, hold charitable assets, or solicit charitable contributions in New York. Registration is further required to ensure that any funds

13

entrusted to such organizations are properly administered and to discourage and prevent misuse of charitable assets and fraud.

47.     In addition, the Attorney General's registry serves as an important source to the public of information concerning not-for-profit organizations. The failure of an organization to file accurate reports impedes the Attorney General's exercise of her statutory authority to oversee such organizations and further deprives New Yorkers of access to truthful information about not-for-profits operating in this State.

48.     Pursuant to Executive Law § 172-d, no person shall "[m]ake any material statement which is untrue in…[a] financial report or any other forms or documents required to be filed" with the Attorney General's office pursuant to Executive Law, Article 7-A.

49.     Pursuant to Executive Law § 175(2), the Attorney General is authorized to bring an action against a charitable organization or any other persons acting for or on its behalf, to, in relevant part, "enjoin such organization and/or persons from continuing the solicitation or collection of funds," whenever "the [A]ttorney [G]eneral shall have reason to believe that the charitable organization or other person has made a material false statement in an application, registration or statement required to be filed pursuant to this article."

## IV.     Legal Obligations Under the New York Prudent Management of Institutional Funds Act

50.     Article 5-a of the N-PCL, NYPMIFA establishes the standard of conduct applicable to the NRA in managing and investing an institutional fund. The NRA is an "institution" as that term is used in NYPMIFA, which holds and manages "institutional funds" as that term is used in NYPMIFA. N-PCL § 551(d) & (e).

51.     Under NYPMIFA, the obligations of the NRA are also imposed upon the governing Board of Directors of the NRA.

52. In managing institutional funds, pursuant to NYPMIFA, the NRA, through its directors and officers, (a) must, subject to the intent of a donor expressed in a gift instrument, consider the purposes of the NRA and the purposes of its institutional funds; and (b) shall manage institutional funds "in good faith and with care an ordinarily prudent person in a like position would exercise under similar circumstances. N-PCL § 552. Each person responsible for the management of institutional funds also has a duty of loyalty to the mission of the corporation, imposed by law. *Id.*

53. In managing institutional funds, under NYPMIFA, the NRA and the governing Board shall make a reasonable effort to verify facts relevant to management of the fund.

54. The "institutional funds" of the NRA include investments, cash balances, funds derived from pledging NRA assets or credit, income derived from rents to third parties, and funds held by or paid out to vendors. "Institutional funds" also include funds in the hands of third parties in which the NRA has a valid claim, such as improper payments of personal expenses, funds diverted from the NRA, and funds paid *ultra vires*.

## PART FOUR - THE NRA'S HISTORY AND INTERNAL GOVERNANCE

I. **The NRA's History**

55. The NRA was founded in 1871, immediately following the Civil War "to promote the introduction of a system of army drill and rifle practice, as part of the military drill of the National Guard of this and other states, and for those purposes to provide a suitable range…In the vicinity of the City of New York."

56. In addition to creating the NRA's corporate existence by a special act, the New York Legislature provided a grant to the NRA of $25,000 of public funds for purchase in 1872 of the Creed farm in Queens County, New York, later known as Creedmoor, as a rifle range for the NRA and the New York National Guard.

15

57.     Over the course of 149 years, the NRA established itself as one of the largest, and oldest, social-welfare charitable organizations in the country. The NRA is exempt from federal and certain state taxation pursuant to Section 501(c)(4) of the Internal Revenue Code and New York law. This tax exemption is conditioned upon compliance with certain statutory requirements. As relevant here, the NRA, as a 501(c)(4) organization, cannot be organized for profit; must be operated exclusively or primarily to further the common good and general welfare of the community; and cannot permit its income to inure to the benefit of any private individual. 26 U.S.C § 501(c)(4).

58.     The NRA has four affiliated tax-exempt charitable organizations that were set up under Section 501(c)(3) of the Internal Revenue Code: the NRA Foundation, the Civil Rights Defense Fund, the Freedom Action Foundation, and the Special Contribution Fund. As 501(c)(3) organizations, each of these affiliated entities must be organized and operated exclusively for charitable purposes and must refrain from engaging in political activities. 26 USC § 501(c)(3). The NRA also has a political action committee, the Political Victory Fund, which contributes money to political candidates.

59.     The NRA's history as an organization is well documented and need not be recited here. For purposes of this complaint, the focus is on the governance of the organization under the leadership of Wayne LaPierre, who over the course of his nearly 30-year tenure as the chief executive of the organization, has consolidated his power and control over the organization.

## II.     The NRA's Internal Structure and Governance

### A.     The NRA's Organizational Structure

60.     The NRA is comprised of several divisions, all of which are overseen by the Executive Vice President. The NRA divisions are: (a) Membership; (b) Affinity and Licensing Programs; (c) Information Services; (d) Publications; (e) Public Affairs; (f) Advancement;

16

(g) Office of the Treasurer; (h) Institute for Legislative Action ("NRA-ILA"); (i) General Operations; (j) Office of the General Counsel, and (k) Human Resources.

61.     NRA-ILA has "sole responsibility to administer the legislative, legal, informational and fundraising activities of the Association relating to the defense or furtherance of the right to keep and bear arms." Funds donated to or designated to be used by NRA-ILA are kept separate from the NRA's General Operations accounts. NRA-ILA is prohibited from making contributions to political campaigns, candidates, and political committees.

### B.  The NRA's Bylaws

62.     Not-for-profit corporations in New York may adopt bylaws under the N-PCL. N-PCL § 602. Bylaws govern the internal affairs of the corporation. For membership organizations like the NRA, bylaws are both a contract between the organization and its members, and among the members themselves. Once properly adopted, bylaws carry the force of law with respect to the corporation's internal affairs. Officers and directors have a legal duty to adhere to a corporation's bylaws. Failure to do so constitutes a breach of the fiduciary duties owed to the corporation and the corporation's members and violates New York law. N-PCL § 717,

63.     Under its bylaws, the NRA has established the following governance structure. The description below is current with the bylaws, as amended, adopted by the NRA Board in September 2019 and annexed as Exhibit 1 to this complaint. The provisions of the bylaws are materially the same from the period of 2014 to 2019, unless otherwise indicated:

### i.  Board of Directors

64.     In accordance with the N-PCL § 701 and the NRA's certificate of incorporation, the NRA is managed by a Board of Directors comprised of 76 directors, 75 of whom are elected for three-year terms, and one of whom is elected for a one-year term at the annual meeting of NRA

members. The Board "shall formulate the policies and govern and have general oversight of the affairs and property of the Association."

65.     The NRA bylaws provide that "[n]o director or member of the Executive Council shall receive any salary or other private benefit unless specifically authorized by resolution of the Board of Directors or an authorized committee thereof, but all such persons shall be entitled to reimbursement for expenses incurred on behalf of the [NRA]."

### ii.  NRA Officers

66.     The NRA's bylaws establish a leadership structure consisting of eight officers: a President, two Vice Presidents, an Executive Vice President, a Secretary, a Treasurer, and an Executive Director each of General Operations and NRA-ILA. With the exception of the two Executive Directors, the officers are elected annually by the Board.

67.     The Executive Vice President, the Secretary, the Treasurer, the Executive Director of General Operations, and the Executive Director of NRA-ILA are *ex officio* members, with voice but without vote, on all Board committees, except for the Nominating Committee, the Committee on Hearings, the Officers Compensation Committee, and the Committee on Elections.

68.     Officers must "conduct the affairs of their organization…in accordance with their organization bylaws, and such programs and regulations … adopted by the organization." Officers must also "maintain proper records and shall properly render such reports concerning membership, finances, facilities, and activities as may be requested … by the NRA."

### a.       Executive Vice President

69.     The Executive Vice President is functionally the chief executive of the NRA and is elected annually by the NRA Board. The bylaws provide that the Executive Vice President "shall direct all the affairs of the Association in accordance with the programs and policies established by the Board of Directors." The Executive Vice President is empowered to appoint, suspend, or

18

remove the Executive Directors of General Operations and NRA-ILA; to suspend with pay the Secretary or Treasurer; and to employ, suspend, or dismiss any employee. The Executive Vice President is an *ex officio* member, but without voting power, of the NRA Board and its Committees except for the Nominating Committee, the Committee on Hearings, the Officers Compensation Committee, and the Committee on Elections.

70.     In 2016, the NRA bylaws were amended to expressly provide the Executive Vice President with the authority to set the compensation for the Executive Directors of General Operations and NRA-ILA. Before 2016, there was no explicit statement regarding the Executive Director compensation in the bylaws.

71.     Wayne LaPierre has been the Executive Vice President since he was elected by the Board of Directors to that position in the early 1990s. He has been with the NRA since 1978, where he started with NRA-ILA, the NRA's lobbying arm. LaPierre started out as a state liaison and was subsequently promoted to be NRA-ILA's Director of State & Local Affairs and then its Director of Federal Affairs. In 1986, LaPierre became the Executive Director of NRA-ILA.

72.     In his almost thirty years of leadership, LaPierre has established himself as the individual who is responsible for the affairs of the NRA at every level. Among other responsibilities, LaPierre oversees the charitable assets that the NRA is responsible for managing, in accordance with New York law. On its most recent audited financial statement, the NRA reported responsibility for $197,212,080 in total assets as of December 31, 2018, which, as a New York charity, it is required to use to serve the interests of its membership and to advance its charitable mission.

### b.     President

73.     The President is an *ex officio* member, with voting power, of the NRA Board and its Committees with the exception of the Nominating Committee, the Committee on Hearings, and

the Committee on Elections. The President is empowered, with some exceptions, to appoint members of all of the NRA Board's standing and special committees, and to "establish such special committees…as may be deemed necessary." The President also serves as the Chair of the Officers Compensation Committee, which determines, on an annual basis, the compensations of the Executive Vice President, Secretary, and Treasurer.

74.     The President is also responsible for designating members of the Committee on Elections.

75.     The President serves in an unpaid capacity and has responsibility for oversight of the NRA management, including the Executive Vice President, who manages the day-to-day affairs of the organization.

### c.     Vice Presidents

76.     The NRA's Vice Presidents perform the President's duties in his or her absence or at the request of the President, and, in the event that the Presidency is vacant for whatever reason, the First Vice President takes the Presidency until the next election. The Vice Presidents also serve as *ex officio* members, with voting power, of all committees except the Nominating Committee, the Committee on Hearings, and the Committee on Elections.

### d.     Treasurer / Secretary / Executive Directors

77.     The Treasurer is an *ex officio* member of the NRA Board, and "operate[s] in accordance with the financial policies set forth by the Board of Directors or the Executive Committee, and shall have charge of the books of account and financial operations of the [NRA]." The Treasurer is obligated to regularly report to the NRA Board, Finance Committee, Executive Vice President, and Executive Committee on the financial affairs of the NRA and must also assist the NRA's external auditor with the annual audit. The Treasurer is also required to perform an

20

internal audit of the NRA-ILA once per year and report on its financial condition. Defendant Phillips served as the Treasurer until 2018.

78.     The Secretary is elected by the Board annually and serves under the Executive Vice President. The Secretary is an *ex officio* member of the NRA Board, tasked with having "charge of the archives" of the NRA and attending "to the proper publication of official notices and reports," and also serves as the secretary of the NRA Board's Executive Committee, Nominating Committee, and Committee on Elections. Defendant Frazer has served as the Secretary since 2015.

79.     The Executive Director of General Operations is under the supervision of the Executive Vice President and has "such powers and duties as delegated to him from time to time by the Executive Vice President."

80.     The Executive Director of NRA-ILA is charged with conducting the "legislative, legal, informational, fund raising activities, operational, administrative and financial affairs" of the NRA-ILA under the direction of the Executive Vice President and in accordance with the programs and policies established by the Board. The Executive Director of NRA-ILA also is charged with appointing a fiscal officer to oversee NRA-ILA's finances, which are segregated from the NRA's General Operations accounts, and assist in the annual audit of the NRA.

81.     Both Executive Directors are *ex officio* members, but without voting power, of the Board of Directors and of all NRA Board Committees except for the Nominating Committee, Committee on Hearings, Officers Compensation Committee, and Committee on Elections. They are also not authorized to attend the executive session of any committee unless invited to do so.

### iii.  Standing and Special Committees

82.     The NRA has dozens of standing and special Committees of the Board, but a select few hold the primary governing authority.

### a.    Officers Compensation Committee

83.    The Officers Compensation Committee, which consists of the President and Vice Presidents, must establish by resolution each Fall the authorized compensation for all "elected salaried officers." That is, the Executive Vice President, the Secretary, and the Treasurer. All deliberations by the Board about the compensation for these officers "shall be held in an executive session, at which none of the officers whose compensation is to be or is being established may attend, except for the limited time and limited purpose of answering questions asked by any member of the Board of Directors at the meeting."

### b.    Executive Committee and Executive Council

84.    The Executive Committee is composed of the President, Vice Presidents, and 20 board members nominated by the Nominating Committee or from the floor at any meeting of the Board. The members are elected annually. The Executive Committee exercises all of the powers of the full Board—with exceptions for powers that are restricted to the full Board, such as the power to repeal or amend the bylaws or authorize indemnification of officers or directors. These limitations are extended to all standing and special committees of the Board.

85.    The Executive Council serves an advisory role to the Executive Committee and is composed of "[a]ny member of [the NRA] whose advice and counsel, in the opinion of the Board of Directors, will be valuable to the continuing welfare of the [NRA]." Members are elected by the Board for life, subject to removal for cause.

### c.    Nominating Committee

86.    The NRA Board's Nominating Committee is composed of nine members—only six of whom can be members of the Board or the Executive Council—elected by the Board by secret ballot after the NRA's annual meeting of members.

22

87.     The Nominating Committee is responsible for receiving recommendations from the NRA membership for candidates for the Board, and ultimately prepares the ballot from which the NRA membership votes on board members. Members may also petition to have a candidate added to the ballot by having a sponsor obtain the signatures from members totaling 0.5% of the number of ballots cast in the most recent election.

### d.    Audit Committee

88.     The Audit Committee's responsibilities are set forth in N-PCL § 712, the Audit Committee Charter, the NRA's bylaws, and internal policy. Among the Audit Committee's primary responsibilities are managing external audits, overseeing internal controls, evaluating potential conflicts of interest, and addressing whistleblower complaints.

89.     The Audit Committee Charter, which was adopted by Board resolution, prescribes that the Committee "shall be comprised of five NRA Directors." Members of the Committee are to be independent and should possess a "working familiarity with basic finance and accounting practices." Members are selected annually by the NRA President.

90.     Pursuant to the Audit Committee Charter Mission Statement, "the primary function of the Audit Committee is to assist the Board of Directors in its oversight of the integrity of financial information, its review of the adequacy of the system of internal controls established by the Association, and it's monitoring of the audit process."

91.     In carrying out these functions, the Audit Committee must "review the Association's financial reporting process and internal controls, review and appraise the audit efforts of the Association's independent auditors, and provide open means of communication between the Directors, the independent auditors, and the financial and senior management of the Association." The Charter also sets forth the Audit Committee's responsibility for overseeing compliance with both regulatory and business ethics requirements.

23

92.     Pursuant to the Audit Committee's charter and the NRA's Policy Manual, the Audit Committee is charged with the oversight of conflicts of interest and related party transactions. "The NRA Audit Committee will review all transactions that involve potential conflicts of interest and determine whether to approve or ratify such transactions."

93.     The Audit Committee is also responsible for collecting and reviewing disclosures of financial interests of officers and directors on a regular basis. NRA policy requires that such disclosures be made "in advance, before any action is taken on the matter." In its 2017 IRS 990, the NRA represents that "Regardless of how they are reported, related party issues and issues of apparent conflict of interest are presented to the body designated by the Board of Directors (the Audit Committee) for approval, disapproval, or precautionary measures as needed."

94.     The Audit Committee is designated as one of several recipients of whistleblower complaints within the NRA under the Statement of Corporate Ethics. The Statement provided the following: "Employees who in good faith believe that an officer or a member of the Board of Directors is engaged in any financial irregularity affecting the Association or has a conflict of interest are encouraged to bring the information on which their belief is based to the attention of the Audit Committee." It also provides that whistleblowers may contact either the Head of Human Resources or the General Counsel.

### iv.  Disclosure Requirements and Prohibitions on Private Benefits and Reimbursements Absent Board Approval

95.     The NRA's bylaws require "[a]ny Director, officer, or employee of [the NRA] who is also a member of the governing body of any business, corporate, or other entity (whether as trustee, director, sole-owner, officer, partner, or the like) which receives from [the NRA] any payment(s) for goods or services which total in excess of $2,000 either within a year or pursuant to any contract or contracts originating within a year shall immediately file a written statement of

24

all such business as to the nature and amount thereof, to the best of his or her knowledge, with the Secretary who shall transmit such statement to the Board of Directors at its next meeting and who shall include all such statements in the Secretary's report at the next Annual Meeting of Members."

96.     The NRA's bylaws further provide that "[n]o Director or member of the Executive Council shall receive any salary or other private benefit unless specifically authorized by resolution of the Board of Directors or an authorized committee thereof, but all such persons shall be entitled to reimbursement for expenses incurred on behalf of the Association, to such extent as may be authorized or approved by the Board of Directors."

97.     Under the NRA's bylaws, officers, directors, and members of the Executive Council "shall be entitled to reimbursement for expenses incurred on behalf of the Association," but only "to such extent as may be authorized or approved by the Board of Directors."

### C. The NRA's Policy and Procedures on Hiring, Spending, Procurement, Travel Reimbursement, Conflicts of Interest, and Related Party Transactions

98.     Most of the NRA's policies and procedures are found in one of two documents— the NRA Employee Handbook or the NRA Policy Manual. (A copy of each of the Employee Handbook and the Policy Manual are annexed as, respectively, Exhibits 2 and 3). The Employee Handbook sets out the NRA's policies and procedures on employee selection, compensation, time off, work environment standards, and insurance and pension benefits. The Policy Manual is a compendium of resolutions passed by the NRA Board since the 1960s. Annexed to the Policy Manual are several policies ratified by the Board, including the Audit Committee Charter, Statement of Corporate Ethics, NRA Purchase Policy, and Officer and Board of Directors Policy on Disclosure of Financial Interests.

25

### i. Contract Review Policy

99. In a series of resolutions between 1988 and 1998, the Board adopted a policy on contracts and agreements entered into by the NRA and its agents. ("Contract Review Policy"). Under this policy, beginning in 1988, any agreement by the NRA or NRA-ILA in excess of $50,000—later raised in 1991 to $100,000—cannot be executed without the "approval" of the President and one of the two Vice Presidents.

100. In 1997, the Board adopted a policy that "all contracts involving over $100k in a 12-month period are required to have a business case analysis performed and no contract will begin before the required sign-off approval as is required."

101. In 1998, the Board adopted a policy that "[a]ll purchase agreements or contracts requiring payments greater than $100,000 in any twelve-month period, must have the prior written approval of the President and the First or Second Vice Presidents before execution or renewal." Certain exceptions exist for routine expenses, but the President, Vice President(s), and Finance Committee chair must be provided with updates about any such exceptions on a quarterly basis.

102. In 2012, LaPierre issued a memorandum to all NRA staff codifying the procedures for complying with these Board resolutions:

   a. When a contract is in excess of $100,000, "a packet consisting of a copy of the contract, a completed business case analysis, and a contract review signature sheet will be prepared."

   b. Once all of the appropriate in-house approvals are secured, the packet will be presented by the Office of the Secretary to the President and the First and Second Vice Presidents.

   c. The packet will then be returned to the responsible NRA officer for finalization and distribution of the original and/or copies of the packet to (1) the Office of General Counsel; (2) the Office of the Treasurer; (3) the Chief of Staff; and (4) the Office of the Secretary.

103. These requirements have not changed since the memorandum was issued in 2012.

26

### ii. Employment Policies

104.    The NRA has several policies on hiring, evaluating, and retaining employees. As relevant here, these policies provide:

a.  Only the Executive Vice President and the Human Resources Division (with approval of the Executive Vice President) has the authority to extend job offers.

b.  The NRA policy is to "conduct reference checks on applicants who are under serious consideration for employment." In certain cases, credit and full background checks of the applicant will also be conducted, depending on the duties and responsibilities of the position.

c.  The reimbursement of relocation expenses for new hires is expressly limited to a 30-day temporary living allowance and $7,500 in moving expenses.

105.    The NRA has no written policy on employee bonuses. Bonuses are generally awarded on a discretionary basis.

### iii. Independent Contractors

106.    NRA policy provides that an independent contractor should only be retained when (i) the existing staff does not have the requisite skills to achieve the task; (ii) the nature of the assignment can be paid by the project, day, or hour; and (iii) the General Counsel has been consulted and has established that they qualify after being provided a draft contract agreement for review and sign-off.

### iv. Travel and Business Expense Reimbursement Policy

107.    The stated purpose of the NRA's Travel and Business Expense Reimbursement Policy is to "incur the lowest practical and reasonable expense while completing the travel process in an efficient and timely manner. Persons traveling on NRA business have the duty to exercise care and avoid impropriety, or even the appearance of impropriety in any travel expense." This policy applies to all employees and non-employees (including volunteers and paid consultants) traveling on NRA business.

27

108.     Under this policy, expenses must be business related—that is, "necessary to meet organizational objectives"—and must be in the NRA's interest. The person authorized to approve an employee's expense report is responsible for understanding the need for the expense, substantiating the expense, and determining whether it is appropriate and correctly reported. Furthermore, "[t]ravelers are expected to use the same care in incurring expenses that a prudent person would use while traveling for personal reasons, considering the purpose and amount of the expenditure."

109.     With respect to airfare, "[o]nly coach class tickets … are generally reimbursable for domestic travel." Exceptions must be explained, approved in writing and submitted with the expense report.

110.     With respect to rental cars, "[e]mployees should use public transportation (taxicabs, airport limousines, and local transits) in preference to renting a car when such means of transportation is cost-effective, and there are no other business reasons for renting a car."

111.     As to lodging and meals, "[d]aily expenses are reasonable charges for lodging, meals, tips and other incidental expenses necessary to sustain an employee while…is away from home." Original receipts for expenses over $50.00 must be attached to the expense report.

112.     Reimbursable entertainment expenses "must be directly and principally related to NRA's business, expected to produce a specific business benefit, and attended by both the employee and business associate."

### v.  Statement of Corporate Ethics

113.     Adopted in 2006, the Statement of Corporate Ethics prohibits conflicts of interest, illegal or unethical actions, and requires the maintenance of accurate books and records. The policy requires "[e]mployees who are officers, directors, division directors or activity supervisor[s]" to "insure that these policies are annually communicated to the employees reporting to them";

28

"clarify and explain said policies when necessary"; "monitor compliance there with"; and "report all known (or suspected violations of said policies to the Executive Vice President of the Association, the Treasurer of the Association, and to other persons whom they designate as appropriate."

114.   The policy, which the NRA considered to be its whistleblower policy, provides that "[e]mployees who in good faith believe that a fellow employee, supervisor, manager, or director is in violation of this policy are encouraged to bring the information on which their belief is based to the attention of the General Counsel. Employees who in good faith believe that an officer or member of the Board of Directors is engaged in any financial irregularity affecting the Association or has a conflict of interest are encouraged to bring the information on which their belief is based to the Audit Committee…The taking of such action in good faith will not result in retribution or reprisal against the employment of any employee."

115.   In January 2020, nine months after the Attorney General commenced its investigation, the NRA Board adopted a new version of the Statement of Corporate Ethics that separated out and expanded upon the whistleblower protections therein. Until it did so, the policy was missing provisions required by N-PCL § 715-b regarding whistleblower policies, such as a procedure for maintaining the confidentiality of whistleblower complaints and a requirement that the person who is the subject of a whistleblower complaint not be present during discussions of the complaint. The updated policy is annexed as Exhibit 4.

### vi. Purchasing Policy

116.   Adopted in 2006, the Purchasing Policy was created to "provide[] general policy guidance for efficient and cost-effective procurement of goods and services necessary to support the goals, objectives and work of the [NRA] while ensuring [NRA] resources are protected and maximized." The policy's stated goal is to provide a system that delivers reasonably priced, high-

quality goods and services to end users, while preserving organizational, financial and ethical responsibility."

117.    The policy prohibits NRA employees, officers, and directors from using "their position with the [NRA] in a manner that may create a conflict, or the appearance of a conflict, between the individual's personal interest and those of the Association," and directs that they "refrain from knowingly engaging in any outside matters of financial interest incompatible with the impartial, objective, and effective performance of their duties." The policy also prohibits related party transactions without written authorization by the NRA.

118.    It also provides that "[a]nyone who suspects violations of this code has an obligation to report their concerns to their immediate supervisor, the Office of the Treasurer, the Audit Committee Chair or NRA's General Counsel," and that "[n]o adverse action shall be taken or permitted against anyone for communicating legitimate concerns to the appropriate persons. However, malicious and unfounded accusations will not be tolerated and will be dealt with accordingly."

119.    The policy is missing provisions required by N-PCL § 715-a regarding conflict of interest policies, such as:

    a.   The policy does not require that the person with a conflict of interest not be present at or participate in Board or committee deliberations or vote on the matter giving rise to the conflict of interest;

    b.   The policy does not contain a prohibition against any attempt by the person with the conflict of interest from improperly influencing the deliberation or voting on the matter giving rise to the conflict of interest.

120.    The policy requires the use of a "request for proposal" process when a purchase is contemplated that is equal to or above $100,000, but certain types of purchases are exempt from that process—namely, "[p]urchases or services directly related to legal counsel, political strategy,

public relations, membership, fundraising and marketing." Exempt purchases and services do not require a request for proposal or competitive bid, but must "be reported to Finance Committee on an annual basis."

121.    The Purchasing Policy also sets out levels of approval necessary for contracts exceeding certain thresholds:

a.  If the contract requires payments equal to or greater than $100,000 in any twelve month period, it must have the written approval of the appropriate NRA division director, the Executive Vice President, and the Treasurer, with signatures acknowledging the contract by the President and one Vice President.

b.  If the contract requires payments between $50,000 and $100,000, it must have the written approval of the appropriate NRA division director and one officer (the Executive Vice President, Treasurer, Secretary, or one of the Executive Directors of NRA-ILA or General Operations).

c.  If the contract requires payments under $50,000, it requires the approval of the appropriate NRA division director or his or her staff designated with such approval authority.

### vii.   Officers and Board of Directors Policy – Disclosure of Financial Interests

122.    Adopted in 2007, the "Officers and Board of Directors Policy – Disclosure of Financial Interests" requires NRA officers, board members, and members of the Executive Council to file with the Audit Committee a disclosure of their own and their immediate family members' financial interests.

123.    The Policy requires disclosure of the following:

a.  Any remuneration received from the NRA other than for routine expense reimbursements;

b.  Any relationship with an entity that has a business relationship with, or receives any funds from, the NRA that does or could result in the receipt of remuneration other than routine expense reimbursements;

c.  Any relationship with an entity that is seeking to have a business relationship with or receive funds from the NRA;

31

d. Any gift, gratuity, personal favor or entertainment with either a retail price or fair-market value in excess of $300 received from any entity or person associated with any entity that has a business relationship with, or is seeking to do business with, or receives any funds from the NRA;

e. Any ownership interest in excess of 10% of its class in any entity that has or is seeking to have a business relationship with, or that does or is seeking to receive funds from, the NRA.

124.   The policy requires that disclosures related to any of the above be filed in January of each year. Since at least 2008, the NRA has required all officers and directors to fill out and submit a standard questionnaire each year reporting any related party transactions or conflicts of interest that require disclosure under this policy ("Financial Disclosure Questionnaire"). In addition to these annual disclosures, the Executive Vice President has an independent obligation to "report to the Audit Committee any financial interest of an officer or director (or immediate family member) that comes to his knowledge or the knowledge of his office as well as any financial transactions between the NRA…and other individuals and/or organizations that present or might present the possibility of a conflict of interest."

125.   The NRA has represented in public filings that the Secretary and General Counsel is responsible for receiving and reviewing the annual conflict of interest questionnaires.

126.   The policy does not comply with the requirements of N-PCL § 715-a regarding conflict of interest policies for the same reasons as described in Part Four, Section II(C)(vi) above regarding the NRA's Purchasing Policy.

### viii.   Conflict of Interest and Related Party Transaction Policy

127.   It was not until January 2016 that the NRA Board adopted a comprehensive Conflict of Interest and Related Party Transaction Policy. The policy is not included in the NRA's Employee Handbook and, upon information and belief, is not provided to new employees at the time of hire.

32

128.    With respect to related party transactions, the 2016 policy hews closely to the requirements of N-PCL § 715, and defines conflicts of interest more broadly as any situation where "the interests of the NRA come into conflict with a financial or personal interest of [an officer, director, or key employee], or otherwise whenever [an officer, director, or key employee's] personal or financial interest could be reasonably viewed as affecting his or her objectivity or independence in fulfilling their duties to the NRA."

129.    The policy provides that "[t]he NRA Audit Committee is responsible for providing oversight of the adoption and implementation of, and compliance with this policy."

130.    Under the policy, the Audit Committee must "review all transactions that involve potential conflicts of interest" to "determine whether to approve or ratify such transactions," and "may only approve the [] transaction if it determines that such transaction, under the terms and within the circumstances presented, is fair, reasonable, and in the best interests of the NRA."

131.    The Audit Committee must document its consideration of any conflicts of interest and related party transactions, including, but not limited to, (1) "[a]lternative transactions to the extent available," (2) "[t]he NRA's mission and resources," (3) "[t]he possibility of creating an appearance of impropriety that might impair the confidence in, or the reputation of, the NRA (even if there is no actual conflict or wrongdoing)," and (4) "[w]hether the conflict may result in any private inurement, excess benefit transaction, or impermissible private benefit under laws applicable to tax-exempt organizations."

132.    The Audit Committee's meeting minutes are required to contain certain information concerning the consideration of conflicts of interest and related party transactions, including "the name of the [officer, director, or key employee], the nature of the conflict, and details of the deliberations of the disinterested directors (such as documents reviewed, any alternatives

33

considered, comparative costs or bids, market value information, and other factors considered in deliberations)."

## **PART FIVE - DEFENDANTS' VIOLATIONS OF NEW YORK LAW**

### I.   **Widespread Violations of Law of the NRA's Senior Management under the Leadership and Direction of Wayne LaPierre**

133.   Wayne LaPierre has been the Executive Vice President of the NRA since the early 1990s. As the Executive Vice President, LaPierre is responsible for overseeing all of the divisions and the day-to-day affairs of the NRA.

134.   The head of each NRA division reports directly to LaPierre. LaPierre's direct reports include the Treasurer, the Executive Director of NRA-ILA; the Executive Director of General Operations; the Secretary; the General Counsel; the Executive Director of Advancement; the Executive Director of Publications; the Managing Director of Public Affairs; the Executive Director of Membership & Affinity Licensing Programs; the Director of Security; and the Executive Director of Human Resources.

135.   Until recent cuts to its workforce, the NRA had approximately 550 full-time employees.

136.   One of LaPierre's first acts as Executive Vice President was to hire Defendant Wilson "Woody" Phillips to serve as Treasurer—a position that Phillips would hold for the next 26 years, until his retirement in 2018. At all times, LaPierre was responsible for oversight of Phillips.

137.   LaPierre also hired Defendant John Frazer as the NRA's General Counsel in 2015. Frazer was elected Secretary of the NRA by the NRA Board that same year. At all times, LaPierre has been responsible for oversight of Frazer who continues in the role of General Counsel.

34

138.     LaPierre hired Defendant Joshua Powell as his Chief of Staff in 2016 and appointed him the Executive Director of General Operations in January 2017. In December 2018, LaPierre gave Powell the newly created title of "Senior Strategist." Powell was employed by the NRA until he was terminated in January 2020. At all times, LaPierre was responsible for oversight of Powell.

139.     LaPierre, together with his direct reports, including Defendants Phillips, Frazer and Powell, instituted a culture of self-dealing, mismanagement, and negligent oversight at the NRA. They overrode and evaded internal controls to allow themselves, their families, favored board members, employees and vendors to benefit through reimbursed expenses, related party transactions, excess compensation, side deals, and waste of charitable assets without regard to the NRA's best interests.

### A.  LaPierre's Improper Spending and Expensing

140.     LaPierre routinely abused his authority as Executive Vice President of the NRA to cause the NRA to improperly incur and reimburse LaPierre for expenses that were entirely for LaPierre's personal benefit and violated NRA policy, including private jet travel for purely personal reasons; trips to the Bahamas to vacation on a yacht owned by the principal of numerous NRA vendors; use of a travel consultant for costly black car services; gifts for favored friends and vendors; lucrative consulting contracts for ex-employees and board members; and excessive security costs.

141.     LaPierre's misuse of NRA funds involve the Women's Leadership Forum, a special recognition society within the Office of Advancement. LaPierre's wife is the founder and permanent co-chair of the Women's Leadership Forum. LaPierre testified that his wife has served in this role as a volunteer for 15 years. In December 2015, at his wife's behest, LaPierre hired his niece to work on Women's Leadership Forum events and projects.

35

142.     LaPierre had access to, and abused, the budget allocated to the Office of the Executive Vice President ("EVP Office") to fund personal expenses and consulting contracts for NRA insiders. The EVP Office, like each division of the NRA, has its own budget, cost center, and staff. The EVP Office includes LaPierre, his Chief of Staff, and a handful of senior advisors and office assistants. Expenditures associated with the EVP Office, such as EVP Office staff salaries, are allocated to the EVP Office budget. In 2018, the overall EVP Office budget was approximately $16 million.

### i.  LaPierre's Private Flights

143.     The NRA incurs substantial costs for LaPierre's private air travel. LaPierre testified that it is NRA policy that he travel by private aircraft at all times for security reasons. He testified further that he is not aware of any limits under this policy on the kind of plane he can charter, how far he can go, or the amount of money he can spend on the flights.

144.     NRA records show that between June 2016 and February 2018, the organization paid for numerous private flights for LaPierre's wife and extended family when he was not a passenger. LaPierre admitted that he authorized at least some of these flights. Upon information and belief, none of these flights was approved for security reasons, nor were they approved by the NRA Board. Several examples of these flights are highlighted below:

145.     In August 2016, LaPierre authorized a private flight for his niece and her husband to fly from Dallas, TX, to North Platte, NE. LaPierre's niece and her family live in Nebraska about 60 miles from North Platte. Asked why he authorized this flight, LaPierre did not identify any security issues, but testified "I think it's hard. There are not many flights to Kearney….She had a child and I think that [the travel agent] had -- probably NRA, probably me, said that, okay, in this instance, it's okay to get her back that way. Our annual meeting was coming up down there. She

36

was working on the Women's Leadership Forum with people in Dallas and … it's the advantage of the NRA to have her … do that work." The cost of the flight was more than $11,435.

146.     In July 2017, LaPierre authorized a private flight for his niece and her daughter to fly from Dallas, TX, to Orlando, FL. LaPierre testified that this "was another example where I was getting [my niece] together with my wife to work on the Women's Leadership Forum events. She had tried to travel commercial. All the commercial flights they had – there was a mechanical problem. She was stuck there at the airport until 12:30 or 1:00 at night with a child trying to fly commercial." The cost of the flight was more than $26,995.

147.     In October 2016, LaPierre authorized a private flight for his wife to fly alone from Madison, WI, to Kearney, NE. Asked why she did not use a commercial airline, LaPierre testified "I think it was probably easier to fly private, more convenient, and probably the flights -- there probably are not many flights into Kearney from that area and we wanted to get her there, and I thought it was appropriate given the return NRA is getting on" the Women's Leadership Forum program. The cost of the flight was more than $8,800.

148.     In January 2017, LaPierre authorized a private jet to pick up his niece's husband in North Platte, NE, on the way to Las Vegas for a Safari Club convention. LaPierre testified that his niece "was working the entire time" attending various donor meetings at the convention, so he authorized a flight to bring her husband "over [to] help babysit the child while the mother was working because there was nobody else to do it." LaPierre also authorized a private flight to fly his niece's husband back to Nebraska two days before his niece was ready to return. Asked whether this flight, which cost about $15,000, was in the NRA's best interest, LaPierre testified that it was. "[I]t's really almost very hard to get commercial flights back," LaPierre explained, and his niece's

37

husband "had to get back to work." LaPierre later authorized a private jet to fly his niece back to Nebraska two days later.

149.    In February 2017, LaPierre authorized a private flight for his niece and her daughter to fly from Atlanta, GA, to Kearney, NE. LaPierre testified his niece was in Atlanta for a "planning meeting on the Women's Leadership Forum," and he is "sure [he] authorized it … to get them back." The cost of the flight was more than $15,000.

150.    LaPierre has also repeatedly directed private aircraft to make additional stops in Nebraska to pick up or drop off family members. Upon information and belief, additional stops and additional passengers on a private flight usually increase the cost of the flight.

151.    For example, in November 2018, LaPierre and his wife took a private roundtrip flight from Washington D.C. to Dallas, TX, and stopped in North Platte, NE, on each leg of the trip to pick up and drop off LaPierre's niece and grandniece. These flights cost $59,790.

152.    In March 2019, LaPierre and his wife took a private flight from Washington D.C. to Orlando, FL, and stopped in North Platte, NE, on the way back to drop off his niece and grandniece. These flights cost $78,900. In April 2019, LaPierre and his wife took a private flight from Washington D.C. to Tulsa, OK, making additional stops in Omaha and North Platte, NE. These flights cost $49,535.

153.    The current Treasurer testified that he did not know of any NRA business purpose that would be served by private flights to or from North Platte, NE.

154.    LaPierre has also authorized private flights for NRA employees when he was not a passenger. For example, in February 2018, LaPierre authorized a private flight for an NRA spokesperson, her husband, and an employee of a vendor from Dallas, TX to Fort Lauderdale, FL and Washington D.C. These flights cost $107,775.

155. From May 2015 to April 2019, the NRA incurred over one million dollars in expenses for private flights when LaPierre was not a passenger. Upon information and belief, these expenditures were neither authorized by nor consented to by the NRA Board.

156. The current Treasurer testified that, in the fall of 2018, the NRA eliminated "all non-mission-critical travel" to reduce the NRA's expenses. Following the elimination of non-mission critical travel, payments to LaPierre's Travel Consultant dropped by nearly 50%—from $2.9 million in 2017 to $1.5 million in 2019.

157. In its annual filings with the Attorney General for 2014 to 2018, the NRA asserted that it required substantiation prior to reimbursing these expenses. The Attorney General has not found any evidence that the private flights and related business uses were substantiated prior to reimbursement.

158. In fact, the current Treasurer learned for the first time that LaPierre's wife travels alone by private charter at the NRA's expense when counsel informed him the night before he was examined by the Attorney General in June 2020.

### ii. LaPierre's Bahamas and Yachting Trips

159. Since June 2015, LaPierre and his family took private flights to and from the Bahamas on at least eight occasions. On most of those trips, LaPierre stopped in Nebraska on each leg of the trip to pick up and drop off his niece and her family. The NRA paid over half a million dollars for these flights.

160. LaPierre testified that he often visits the Bahamas in December to attend a "celebrity retreat" organized by an individual who is, upon information and belief, the principal stakeholder in several businesses that have business relationships with the NRA ("MMP Principal"). These businesses include Associated Television International, Inc. ("ATI"),

39

Membership Marketing Partners ("MMP"), Allegiance Creative Group ("Allegiance"), and Concord Social & Public Relations ("Concord").

161. Upon information and belief, MMP, Allegiance, and Concord entered into contracts with the NRA on the same day in December 2011. They also share the same Chief Executive Officer and business address, which is located in the same Fairfax, VA office building where the NRA is headquartered.

162. Together, MMP, Concord, Allegiance, and ATI have received over $100 million from the NRA.

163. In recent years, MMP and Concord have been among the NRA's largest vendors. Since 2014, the NRA has paid MMP over $60 million for fundraising, printing, and mailing services. Over the same period, the NRA paid Concord over $22 million for public relations services.

164. Allegiance has been reported as a professional fundraiser in the NRA's regulatory filings for many years. In its 2018 Form 990, the NRA described Allegiance's services as providing "counsel and promotion planning for marketing and direct response mail and phone programs." Since 2014, the NRA has paid Allegiance over $4.5 million.

165. ATI partnered with the NRA from 1997 to 2019 to produce and distribute a television series called Crime Strike. Since 2014, the NRA has paid ATI nearly $17 million. For most of its run, Crime Strike was hosted by LaPierre. LaPierre testified he last hosted the program in 2017 or 2018. From January 2018 to May 2019, the NRA paid ATI $4.7 million.

166. From 2012 to 2018, the NRA paid MMP, Allegiance, Concord, and ATI more than $10 million in fees not contemplated by the terms of the underlying contracts. LaPierre denied

40

having any role in negotiating the contracts with these businesses, but he personally signed most of the contracts on behalf of the NRA.

167.    LaPierre frequently meets with the MMP Principal. According to his reimbursement requests, LaPierre took private flights to California on at least 20 occasions between late 2013 and early 2017—usually staying several days at a five-star historic hotel on Sunset Boulevard in Beverly Hills—to meet with the MMP Principal, often over lunch or dinner. Between 2013 and 2016, the MMP Principal, his wife, and their daughter received over $6,700 in Christmas and birthday gifts from the LaPierres, at the NRA's expense.

168.    LaPierre also regularly attends "celebrity retreats" organized by the MMP Principal. When LaPierre attends these retreats, which are normally held annually in the Bahamas in December, he stays at the Atlantis resort on Paradise Island. His lodging is paid for by the MMP Principal. LaPierre testified that the MMP Principal does not pass these expenses on to the NRA.

169.    LaPierre often visits the Bahamas in the summer as well. During these trips, he stays on a 108-foot yacht owned by the MMP Principal. The yacht, named Illusions, is equipped with four staterooms, a 16-foot jet boat, and two jet skis. LaPierre described Illusions as "a big, big yacht" with a crew that includes a chef. LaPierre testified that "[o]ccasionally one of our other family members" has stayed on the yacht with him and his wife, including his sister and her husband, and perhaps others.

170.    LaPierre has never disclosed his use of the MMP Principal's yacht on the NRA Financial Disclosure Questionnaires that he, as an officer and *ex officio* director of the NRA, must submit to the NRA Secretary annually. Question 4 of this questionnaire asks:

> Have you or any relative received, or do you or any relative expect to receive, any gift, gratuity, personal favor, or entertainment with either a retail price or fair market value in excess of $250 from any person or entity that has or is seeking to have a business relationship with, or received funds from, NRA or any NRA Entity?

41

171.    LaPierre answered no to this question in every questionnaire he submitted from 2008 to 2018 (the most recent questionnaire produced by the NRA to the Attorney General). LaPierre similarly testified that he has never received a gift of value in excess of $250 from an NRA contractor or employee of an NRA contractor.

172.    LaPierre's use of the MMP Principal's yacht constituted a gift from an NRA contractor in excess of $250 requiring disclosure under NRA policy. It also constituted a private benefit to LaPierre in violation of NRA policy.

173.    In his testimony to the Attorney General, LaPierre said that the reason he failed to disclose the use of the yacht was for security reasons and because he considered the yacht to have been used for a legitimate business purpose. Though LaPierre acknowledged that the NRA questionnaires only go to the NRA Secretary, he said he "was concerned about everybody on security, everything leaks." LaPierre also testified that he considered the use of the yacht as "a safe place to do [business], and [] didn't consider it a gift." LaPierre further testified that these trips to the Bahamas were beneficial to the NRA because they provided an opportunity for his wife and niece to discuss the Women's Leadership Forum:

> … any time I get the two of them together anywhere, there is a benefit for the NRA. It could be in Nebraska, it could be like a corporate retreat in Aspen. It could be a -- you know, I mean, I consider it a good thing to get them together. Yeah, they got together in the Bahamas. They – it could have been in Washington. It just -- it's -- it -- but keeping [his wife's] head [in] the game on this and getting her with [my niece], there is a substantial benefit to the NRA that is -- that is in the -- proof is in the dollars that come into the NRA. I mean, did they enjoy being there, yeah. I mean, on the other hand, did NRA get a benefit of them being together, yes, absolutely.

174.    LaPierre testified that neither he nor the NRA paid the MMP Principal for the use of Illusions. He also testified that he has stayed on Illusions during two European trips for the purpose of recruiting celebrities for the NRA.

175.    LaPierre claimed without identifying any evidentiary support that many of the costs incurred in connection with his travel and entertainment expenses—like the trips to the Bahamas and other locations with his wife, niece and family members—were justified as an investment in donor cultivation.

### iii.   LaPierre's Personal Travel Consultant

176.    LaPierre uses his own personal travel consultant to arrange his private air travel and other accommodations. This practice deviates from NRA policy and results in substantial additional expenses to the NRA.

177.    The NRA Travel Policy provides that employees must use the NRA's official travel agent to make travel reservations unless otherwise approved by the Executive Vice President.

178.    Since being elected Executive Vice President, LaPierre has not used the NRA's official travel agent to make his travel arrangements for decades, if ever. Instead, since the 1990s, LaPierre has booked his travel through a travel consultant based in Woodland Hills, CA. The travel consultant bills the NRA through two companies: Inventive Incentive & Insurance Services Inc. and GS2 Enterprises (collectively, "LaPierre's Travel Consultant"). LaPierre testified that when his travel consultant bills services to the NRA, it is for NRA business and in furtherance of the NRA's mission.

179.    Upon information and belief, LaPierre, one of his senior advisors, and the Executive Director of Advancement are the only current NRA employees who have used LaPierre's Travel Consultant to make travel arrangements. LaPierre testified that "some of the [NRA-ILA] people have used her," as well as some board members and donors, but he did not recall who specifically. Asked who would need to authorize that, LaPierre testified "I would usually."

180.    For several years, the NRA has paid LaPierre's Travel Consultant on a fixed-fee basis. In 2014, the fixed fee for the travel agent's services was $15,000 a month, which was billed

43

through separate monthly invoices to the NRA (for $10,000) and NRA-ILA (for $5,000). Upon information and belief, these invoices were for the same travel booking services. Beginning in May 2015, LaPierre's Travel Consultant's monthly fee increased to $19,000, which continued to be billed through separate monthly invoices to the NRA ($12,000) and NRA-ILA ($7,000). Upon information and belief, the nature and scope of the travel consultant's services remained unchanged during this period.

181.    Upon information and belief, no competitive bidding process was conducted for the services provided by the LaPierre's Travel Consultant until 2019, and no written contract was executed memorializing this increase in her compensation until 2020. From 2016 to early 2019, the NRA paid LaPierre's Travel Consultant a fixed fee of $19,000 a month. The Director of Purchasing testified that, under NRA policy, the procurement of transportation services should go through a competitive bidding process administered by the Purchasing Department, but that during her 27 years at the NRA, that had never occurred.

182.    From 2005 to 2019, the NRA paid LaPierre's Travel Consultant more than $100,000 annually without a written contract, and without written authorization from the NRA President or a Vice President. This arrangement violated the NRA Purchasing Policy. Upon information and belief, LaPierre and Phillips were aware of this arrangement.

183.    From February 2013 to July 2018, Ackerman McQueen ("Ackerman"), the NRA's public relations and advertising marketing firm, also paid LaPierre's Travel Consultant a $4,000 monthly fee at the direction of LaPierre and Phillips, which was in addition to the monthly fees the NRA paid to her directly. Ackerman passed these expenses on to the NRA. Upon information and belief, LaPierre was repeatedly told that his travel consultant charged excessive fees for the services she provided and for the vendors she engaged on behalf of the NRA.

44

184.     After Defendant Phillips stepped down as Treasurer, in March 2019, the NRA entered into a one-year contract with LaPierre's Travel Consultant increasing her annual pay to $318,000. Upon information and belief, this was the first written contract the NRA entered into with LaPierre's Travel Consultant. In an accompanying business case analysis, it provides that "[f]or the security of our principals, in this sensitive environment we sometimes face, we believe there is no other company that can provide the service and discretion that [LaPierre's Travel Consultant] offers." There is no evidence that the NRA considered bids from competing companies.

185.     The analysis does not address the increase in LaPierre's Travel Consultant's monthly fixed fee from $19,000 to $26,500. Services under the contract "include making travel arrangements as directed by the NRA's Executive Vice President or his designee." On March 15, 2019, LaPierre authorized this contract.

186.     Less than a year later, in early 2020, the NRA conducted a competitive bidding process for the services offered by LaPierre's Travel Consultant. Upon information and belief, the NRA accepted LaPierre's Travel Consultant's bid, under which she provides the same services she previously provided for a fixed monthly fee of $7,000.

187.     LaPierre testified that he was not involved in the business case analysis prepared in early 2019, or the competitive bidding process that was conducted. "[T]he treasurer's office handled it. … I stayed completely, completely out of it."

188.     From August 2014 to January 2020, the NRA paid LaPierre's Travel Consultant more than $13.5 million. In 2018, the NRA paid LaPierre's Travel Consultant $2,630,531.71. In the first six months of 2019 alone, the NRA paid LaPierre's Travel Consultant $1,007,597.80.

### iv. LaPierre's Personal Expense Reimbursements

189.    At LaPierre's instigation, the NRA reimbursed him for other expenses that were personal, including gifts to friends and favored employees.

190.    Between 2013 and 2017, LaPierre was reimbursed for more than $1.2 million in expenses.

191.    From 2013 to 2017, LaPierre was reimbursed over $65,000 for Christmas gifts for his staff, various donors, and friends. Most of his direct reports and executive staff would receive an ice cream gift basket each year from a retailer called Graeters. But those in his inner circle received gifts from retailers like Neiman Marcus and Bergdorf Goodman. For example, at the NRA's expense, in December 2015, LaPierre sent gifts from Neiman Marcus to his travel consultant ($648.55), his senior assistant ($349.80), and his prior Chief of Staff ($413.40). In December 2016, LaPierre sent Christmas gifts to the co-founder of Ackerman ($1,590), his travel consultant ($350), his senior assistant ($350), and Phillips ($377.79). In November 2017, LaPierre expensed gifts to his travel consultant ($443.48), his prior Chief of Staff ($310.65), Phillips ($282.53), and his senior assistant ($238.50), among others. Each of these gifts was substantially in excess of the $25 limit permitted by the IRS for business gifts, and reimbursement for such gifts should have been reported as W-2 income to LaPierre.

192.    Gifts were especially common for those affiliated with the Women's Leadership Forum. In December 2014, for example, the executive assistant to LaPierre's spouse received a $381 birthday gift expensed to the NRA. In September 2016, LaPierre expensed $1,500 in birthday, wedding anniversary, and baby shower gifts for five Women's Leadership Forum volunteers. In May 2017, LaPierre expensed a $418.70 gift for the wife of the MMP Principal for her support of the Women's Leadership Forum.

193.    In May 2017, LaPierre's wife was appointed to the Board of Directors of the National Park Service Foundation (NPSF). Over the next few months, LaPierre submitted expense reports for $13,874.46 in expense reimbursements for trips taken with his wife and niece to NPSF events in Alaska and Arizona. This was in addition to the private flights used to get them to the NPSF events, which cost in excess of $150,000.

194.    LaPierre has routinely submitted expense reports seeking reimbursements for his niece's lodging and airfare for events that are allegedly related to NRA business. As an NRA employee, LaPierre's niece was required to follow NRA policies and procedures for seeking approval and reimbursement for her work-related expenses. Instead, LaPierre submitted reimbursement requests for his niece's travel expenses on numerous occasions. For example, in early 2017, LaPierre expensed $12,332.75 for his niece's 8-night stay at the Four Seasons Hotel in Dallas, TX. The nightly rate for the room was $1,350. In 2016 and 2017, LaPierre was reimbursed over $38,000 in expenses for his niece's airfare and lodging.

195.    LaPierre has also been reimbursed for expenses incurred travelling to and from film shoots for Under Wild Skies—a television program discussed in detail in Part V, Section II(A) below—in Europe and Africa. LaPierre had a decades-long friendship with the principal of Under Wild Skies, Inc. ("UWS"), the corporate entity that produces the program. For example, in 2013, LaPierre was reimbursed by the NRA $37,084.66 for airfare, lodging, and related expenses that he and his wife incurred travelling to Botswana and Mozambique for an Under Wild Skies film shoot on safari.

196.    Between 2009 and 2017, LaPierre expensed over a hundred thousand dollars in membership fees for a golf club located in the Washington D.C. area. LaPierre testified that he uses the golf course for both personal and business reasons. In its annual filings with the Attorney

47

General for 2014 to 2018, the NRA asserted that it required substantiation prior to reimbursing these expenses. The Attorney General has not found any evidence that the golf membership fees and related business uses were substantiated prior to reimbursement.

197.    In early 2019, the current Treasurer learned from LaPierre that LaPierre's expense reimbursements were historically handled by NRA-ILA, regardless of whether they related to the activities of that division. Pursuant to the bylaws, NRA-ILA's finances are maintained separately from those of NRA General Operations. LaPierre's expenses were also processed by a lower level employee in NRA-ILA. Because that employee was out of the office on sick leave, the current Treasurer took the opportunity to "reengineer" the process for reviewing LaPierre's expenses to "make it as robust and appropriate" as possible.

198.    But this new process does not capture any personal expenses incurred by LaPierre that are billed by vendors directly to the NRA. So, when LaPierre's travel expenses are billed directly to the NRA, such as by LaPierre's Travel Consultant, as discussed above in Part Five, Section I(A)(iii), they are only subject to review by a lower level employee.

### v.    LaPierre's Consulting Budget

199.    Since at least 1999, the EVP Office has had its own consulting budget ("EVP Consulting Budget"). Historically, this budget has included 20 to 30 consulting arrangements the NRA has entered into at the direction of LaPierre or Phillips, while Phillips was Treasurer. In recent years, the budget has included consulting arrangements totaling $2 to $3 million in annual expenditures.

200.    Upon information and belief, the EVP Consulting Budget is prepared each year by the Financial Services Division ("FSD") based on historical data on what the consultants were paid in the previous calendar year, and guidance from the Finance Director and the Treasurer on what LaPierre wants to keep in the budget for the upcoming calendar year.

48

201.   Under the NRA Contract Policy in effect since 2012, copies of all contracts in excess of $100,000 annually must be distributed to the Office of the General Counsel and the FSD. Upon information and belief, during Woody Phillips's tenure as Treasurer, such contracts were routinely withheld from the FSD. Consequently, the FSD processed invoices without having access to or knowledge of the terms of the underlying contract, if a contract existed at all. Upon information and belief, when staff in the FSD requested copies of contracts, Phillips often directed his staff to refuse the request on privacy grounds, or on the basis that there was no requirement to furnish them.

202.   For this reason, during Woody Phillips's time as Treasurer, the FSD did not have copies of several consulting agreements that were included in the EVP Consulting Budget.

203.   Upon information in belief, the invoices for several consultants included in the EVP Consulting Budget were processed and paid for several years without written contracts in place or access to contracts if they existed. EVP Office consultants who were regularly paid without written contracts included the consulting firm, McKenna & Associates, Inc. ("McKenna"), several board members, consultants who worked with LaPierre's wife on Women's Leadership Forum-related events, and LaPierre's Travel Consultant. LaPierre disclaimed knowledge of several of the consulting arrangements in the EVP Consulting Budget during his examination by the Attorney General, testifying that the budget and negotiations for those agreements were handled by Phillips.

204.   The EVP Consulting Budget includes several Women's Leadership Forum staff members who worked closely with LaPierre's wife. For example, from 2014 to 2018, a Women's Leadership Forum staff member serving as the executive assistant to LaPierre's wife was paid $594,711.53 for consulting services. From 2016 to 2018, a Women's Leadership Forum staff

49

member with the title of "Communications Consultant/NRA Special Projects" was paid approximately $250,000 for consulting work.

205.    The EVP Consulting Budget also includes consulting arrangements with several former NRA presidents and board members, which are discussed in detail in Part Five, Section II(C) below. In several instances, the board members were paid for consulting services without a written contract in place. These arrangements were not reviewed and approved by the Audit Committee in advance of their execution, as required by New York law governing related party transactions and NRA policy.

### vi.  LaPierre's Security Costs

206.    From 2013 to 2018, the EVP Office budget allocated several million dollars each year to LaPierre's personal and home security. LaPierre testified that he does not "control the people that manage my security … I let the Director of Security run that and make the decisions." The Director of Security reports directly to LaPierre. LaPierre testified that he does not "know everything [the Director of Security]'s spending money on," but that the "treasurer does."

207.    Upon information and belief, the Director of Security procured an armored vehicle for LaPierre without notifying the Purchasing Division or complying with the NRA Purchasing Policy. The Director of Purchasing testified that this was not the first time the Director of Security had made procurements in contravention of NRA policy, noting that he "has a habit of—he will just go and do whatever he needs to get done."

208.    LaPierre testified that, after the Parkland, FL shooting in February 2018, his Director of Security advised him to leave the Washington D.C. area because of a number of threats that had been made against him. Shortly thereafter, according to LaPierre, the co-founder of Ackerman proposed having a real-estate investment company that he owned purchase a house that LaPierre and his wife could "use … as a safe house from time to time."

50

209.    Over a three-week period in April 2018, LaPierre and his wife looked at several homes in the Dallas, TX area with a realtor and an Ackerman executive. LaPierre and his wife identified a home in the suburb of Westlake that, at the time, was valued at approximately $6.5 million.

210.    On May 11, 2018, Phillips and an Ackerman executive executed an agreement to establish a limited liability company named WBB Investments, LLC. Under this agreement, the NRA agreed to invest $6,500,000 for a 99% interest in the company.

211.    On May 21, 2018, an Ackerman executive sent an email to the Ackerman CFO, copying LaPierre's wife, stating "[LaPierre's wife] (copied here) and I spoke this morning. Following are my notes from the conversation to assist you in the offer document." The email lists "Equipment/Furnishings to retain as part of offer" on the Westlake home and then provides:

> Also, can we request from owner **a listing of all service vendors** for various aspects of the house. When we last looked, it appeared the homeowner was making a binder of all relevant information-we would like that documentation.
>
> **Home Improvements Prior to move-in:**
>
> - This wouldn't affect the offer, but a security gate needs to be designed and installed for the driveway.
> - The men's master bathroom and closet need some changes. There isn't much closet space and the cabinetry needs to be changed. [LaPierre's wife] will have specific input here and can probably work with the eventual Interior Designer to get this work accomplished.
>
> We need to discuss how to acquire a **Social Membership to the Club**. Is a **July 1 Closing** possible so that an **August move-in** could be anticipated (time to get some rooms furnished and the above improvements completed prior to move-in). **Two vehicles** will need to be purchased prior to move in as well.

212.    The same day, WBB Investments, LLC sent an invoice to the NRA for $70,000 for "Investment in Security Assets." Under NRA policy, the FSD cannot issue payment to a vendor without having a valid Form W-9 on file.

51

213.    Upon receipt of the invoice from WBB Investments, LLC, on May 25, 2018, staff in the FSD informed staff in the Treasurer's Office that a W-9 was needed for WBB Investments before the invoice could be processed.

214.    In response, Phillips and his successor, who had become the CFO by that time, told FSD staff, in sum and substance, that payment was urgent, and to cut the check immediately. The Director of Financial Reporting and Accounting wrote in an email, "[a]s we discussed, cut without w9 for now even though it's against policy per treasurer's office."

215.    On May 30, 2018, WBB Investments, LLC deposited the NRA's check for $70,000. Shortly thereafter, the deal was called off, and the money was returned. LaPierre and Ackerman dispute the reasons why the house sale was not completed. LaPierre claims that it was because he realized that Ackerman wanted the NRA to pay for the house. LaPierre did not explain why Ackerman would have invested in the property for his use.

### B. Wilson "Woody" Phillips's Conflicts of Interest, Related Party Transactions, and Self-Dealing

216.    From 1992 to 2018, Phillips served as the Treasurer of the NRA. The Treasurer is responsible for overseeing the financial affairs of the NRA. In addition to his own staff, the Treasurer oversees several divisions, including Purchasing, Financial Services, and Information Services. At all times during his tenure at the NRA, Phillips was supervised by and reported directly to LaPierre. As detailed below and throughout this complaint, Phillips failed as Treasurer to adhere to internal financial controls and misused NRA assets to enrich himself and other NRA officers and directors.

217.    In the course of Phillips's successor's transition into the position of Treasurer, he found that Phillips was an absentee Treasurer, and felt that the NRA did not have "boots on the ground as it relates to finance." Phillips's successor also described his predecessor as having a

52

"non-robust process" for reviewing NRA employees' credit card expenditures, which included having junior employees responsible for reviewing and signing off on the expenses of more senior employees.

218.    In early 2018, an FSD staffer reported to her supervisor that she was worried about being fired for requesting missing receipts from certain NRA staff, and that she would frequently be told, "Woody said to pay this as submitted," or "Josh [Powell] will throw a fit," or "We don't want this to reach Wayne [LaPierre]." Her supervisor handed this report to the head of Human Resources, but was not aware of any action taken by Human Resources in response.

219.    Under Phillips, FSD staff had complaints about being frequently directed to process payments in contravention of NRA policy on the basis that "Woody wants this done," or "Wayne [LaPierre] or Woody or Josh [Powell] said that these are okay."

220.    Ultimately, and as detailed in Part Five, Section V below, several of Phillips's staff became whistleblowers in the summer of 2018, disclosing to the NRA Audit Committee longstanding failures by NRA senior executives, including Phillips and Powell, to comply with NRA financial policies and procedures, and to ensure adequate internal controls. These whistleblowers are collectively referred to hereafter as the "NRA Whistleblowers."

### i.  Phillips's Conflict of Interest with Respect to HomeTelos

221.    From 2014 to 2017, the NRA paid $1.4 million to HomeTelos, L.P, an information technology company based in Dallas, TX. At the time of the contract, Phillips had a longstanding personal relationship with HomeTelos's CEO. Phillips did not disclose that relationship despite NRA policy, which requires that all material facts related to conflicts of interest be disclosed in good faith and in writing to the Audit Committee before any related action.

53

222.    In September 2014, LaPierre and Phillips authorized the HomeTelos contract. Neither LaPierre nor Phillips disclosed Phillips's potential conflict of interest to the Board before the contract was executed.

223.    LaPierre and Phillips similarly failed to disclose Phillips's potential conflict of interest to those tasked with vetting the HomeTelos contract. Upon information and belief, LaPierre and Phillips failed to disclose this conflict to the then NRA President and First Vice President at the time they provided written authorization for the contract. The Managing Director of Information Services, who assisted Phillips in the contract negotiation, was unaware of the relationship between Phillips and the HomeTelos CEO when he agreed to engage HomeTelos.

224.    Phillips also failed to disclose his personal relationship with the HomeTelos CEO on his conflict of interest disclosure forms for 2016, 2017, and 2018. Phillips answered 'no' to the form's question, "To the best of your knowledge, is there any transaction…in which the NRA is a participant and in which you might have a conflicting interest."

225.    The NRA first questioned the propriety of the HomeTelos contract in spring 2018, after the current Treasurer replaced Phillips as CFO and the agreement ended.

226.    In July 2018, the NRA Whistleblowers identified Phillips's relationship with the HomeTelos CEO as an example of a "'Financial Conflict of Interest at the Senior Management and Board of Directors Level."

227.    Upon information and belief, Phillips disclosed this relationship for the first time in September 2018. On September 6, 2018, the Audit Committee retroactively approved the NRA's engagement of HomeTelos for the period from September 2014 to May 2017, for total compensation of approximately $1.36 million. The Audit Committee acknowledged that Phillips's

54

relationship with the HomeTelos CEO "posed [a] potential conflict of interest" and "should have been disclosed and approved in advance."

### ii. Phillips's July 2018 Trip on Grand Illusion

228.    In July 2018, while Phillips was still the NRA Treasurer, he organized a trip with several people he knew in the Dallas/Fort Worth area. Part of this trip involved spending one week (July 12-19, 2018) on the Grand Illusion—a yacht owned by the MMP Principal. Although LaPierre testified that Phillips negotiated the millions of dollars of contracts with the MMP Principal's companies, Phillips neither disclosed nor received Board approval for this trip in advance.

229.    In August 2018, after the trip had already occurred, Phillips disclosed the trip in his annual Financial Disclosure Questionnaire, stating that in July 2018 he organized a trip involving the use of "a boat belonging to [the MMP Principal], a contractor in our membership renewal programs." Phillips explained that "[t]he boat is not available for charter," but that he "purchased its use through a $25,000 donation to the MS (Multiple Sclerosis Society)."

230.    Phillips's references to a "boat" in his Financial Disclosure Questionnaire was to the Grand Illusion. In September 2018, the Audit Committee retroactively ratified and approved Phillips's "participation in the July 2018 sailing trip." However, the Audit Committee's approval did not disclose any material details about the trip, including the name of the contractor, the length of the trip, or the value of the trip.

### iii. Phillips's Consulting Agreement

231.    In 2017, the NRA began to plan for Phillips's retirement and the introduction of his replacement. As *ex officio* director, Treasurer and CFO, Phillips's compensation was required to be set by the NRA Board or an authorized committee. He was not permitted to receive any additional compensation without specific Board authorization. However, the NRA's President and

55

Case MDL No. 2979   Document 1-4   Filed 10/20/20   Page 62 of 170

First Vice President gave Phillips a post-employment compensation benefit in the form of a consulting agreement without such authorization.

232.    On May 5, 2018, while Phillips was still the Treasurer of the NRA, Phillips entered into an independent consulting agreement to continue to be paid by the NRA following his retirement. The contract was executed by the NRA President and First Vice President. Pursuant to the contract, the NRA agreed to pay Phillips $30,000 per month for five years for consulting services. In exchange for this monthly payment, Phillips was to "provide advisory services and the benefit of his expertise in all appropriate areas, including, but not limited to, areas related to his prior duties as CFO and Treasurer of the Organization." As a consultant, Phillips would "coordinate activities with the NRA's Executive Vice President, Treasurer and CFO, and Executive Director, Office of Advancement to build and maintain relationships with major gifts donors, identify and cultivate relationships with fundraising partners, and identify prospective high net worth individuals to solicit for major gifts." The contract was signed by the NRA President and one Vice President.

233.    There is no evidence that the Audit Committee reviewed or approved Phillips's consulting contract prior to its execution. The Vice Chair testified that he did not recall the contract coming before the Audit Committee for approval. The Chair did not recall seeing the contract either; he testified that he believed that "it would not be a related party transaction…so, it would not come to the Audit Committee vis-à-vis that." He further testified, "If, in fact, that were a related party transaction…and come to the Audit Committee, I can guarantee you my committee would not have approved that."

234. Upon information and belief, Phillips has provided no consulting services to the NRA under this agreement. Payments made to Phillips under this agreement are *ex gratia* payments and a waste of charitable assets.

235. The current Treasurer testified, "[Woody] wasn't my consultant…Woody never consulted for me….I don't have direct conversations with Woody about anything." His understanding was that Phillips was being paid to consult with the Office of Advancement. LaPierre, for his part, claimed he "didn't even know about" the contract until his lawyers told him about it several months after Phillips's departure, and that he did not know whether Phillips provided any consulting services under the contract. The Vice Chair of the Audit Committee testified that Phillips was engaged as a consultant because "he has a lot of institutional knowledge, and that is helpful to… the current treasurer," but admitted that he did not know whether the current Treasurer actually consults with Phillips. He acknowledged that he did not have any knowledge of work performed under the contract.

236. The Chair of the Audit Committee also testified that Phillips is not paid a flat monthly rate as the May 2018 agreement suggests, but is instead paid a minimal hourly fee that is only for work performed. He testified, "I personally don't like flat-rate contracts unless someone is going to be working a lot…if someone has a flat-rate contract and someone is going to be…working a good number of hours to justify that, that's okay. But as I understood Woody's deal, it was going to be—he was going to be there as—as a consultant for [the Current Treasurer] if and when he ran into issues." The Chair's understanding was that the flat-rate contract was "never triggered," and that it was replaced by an hourly contract.

237. Phillips has continued to submit monthly invoices to the NRA for $33,500 to be paid to Phillips through a corporate entity called WHIP LLC. These invoices specify that they are

57

for monthly billing under the original contract dated May 5, 2018. In the first 7 months of 2019, NRA records reflect payments to WHIP LLC for $170,692.37.

### C.  Joshua Powell's Conflicts of Interest, Related Party Transactions, and Negligence

238.    In 2016, LaPierre hired Powell—who had been a board member of the NRA shortly before he was hired—to be his Chief of Staff. Powell was hired to oversee business practice changes and improvements within the NRA. LaPierre testified that he hired Powell as a "change agent" who would "modernize the NRA" and "improve business practices." LaPierre explained that his "former chief of staff had retired and we were specifically looking for someone with a business background to bring in to work on the … various business aspects of the NRA …." LaPierre believed Powell had good ideas on potential areas of growth for the NRA, and that "along with [his] other business experience," Powell was a "good choice for the NRA." Asked about this other business experience, LaPierre testified that Powell "had a catalog that he had worked with and … as far as I knew, [it] was successful." The catalogues were not successful. Upon information and belief, both ventures were short-lived, neither was profitable, and Powell has been sued numerous times in connection with the catalogues over the non-payment of debt.

239.    Powell came to be—along with NRA outside counsel Brewer, Attorneys & Counselors (the "Brewer firm")—in charge of the NRA's compliance efforts. This was despite Powell's routine disregard for and violation of NRA policies and procedures regarding contracts and expenses, as well as his abusive behavior towards NRA and vendor staff.

240.    Powell held the position of Executive Director of General Operations until December 2018, when he was removed from that position. At that time, he was named "Senior Strategist"—a newly created position—to coordinate with the Brewer firm "in its campaign

58

against the State of New York." Upon information and belief, Powell retained his then salary, and also retained his position as LaPierre's Chief of Staff.

241.　LaPierre acknowledged that, by the end of 2018, it had become "obvious to [him] that" Powell was "abusive to the way he was treating some employees, and he was not well liked among a lot of employees based on that treatment." But instead of terminating Powell, LaPierre gave him the position of Senior Strategist, which LaPierre described as a promotion in a firmwide announcement.

242.　In January 2020, Powell was terminated for, among other things, misappropriating NRA funds during his entire tenure at the NRA.

### i. Powell's Compensation

243.　Powell's salary was set at the discretion of LaPierre. When he first joined the NRA in June 2016, Powell's salary was set at $250,000. A month later, it was retroactively increased to $500,000 by Phillips and LaPierre. A revised employment agreement memorializing the $500,000 salary was signed by Powell, Phillips, and LaPierre in November 2017. In comparison, Powell's predecessor as Chief of Staff, who had been at the NRA for over 35 years, had a base salary of approximately $350,000 at the time of her retirement.

244.　Powell's November 2017 employment contract included a housing allowance to be negotiated by the NRA and Powell annually. From August 2016 to June 2019, the NRA paid or reimbursed Powell for over $130,000 in rent for his Virginia residence. In 2018 alone, Phillips approved lease payments of $54,000 to Powell's landlord. Powell was also regularly reimbursed for his cellphone, as well as his utilities, parking, cable, and internet charges for his Virginia residence. The NRA policy on relocation expenses provides for a maximum temporary living expense allowance of thirty days and a maximum $7,500 in relocation expense reimbursement.

245. After Powell had been at the NRA for approximately a year, in the third quarter of 2017, Powell's salary was increased to $650,000, again by Phillips and LaPierre.

246. In March 2018, Phillips and LaPierre retroactively raised Powell's salary again to $800,000 as of January 1, 2018. There was no change in his position at that time.

### ii. Powell's Spending and Reimbursement Requests

247. Powell routinely violated the NRA's expense reimbursement requirements and policies concerning travel expenses, both on his NRA-issued credit card and by passing expenses through NRA vendors.

248. Powell charged expenses for travel and entertainment to his NRA-issued credit card. For example, between mid-February and mid-March 2019 alone, Powell charged approximately $13,000 in lodging, food, and travel to his NRA credit card.

249. One of the NRA's vendors, Ackerman, in a letter to the current Treasurer also detailed approximately $32,000 in food and travel expenses incurred by Powell—the vast majority of which were incurred at a high-end Italian restaurant in Alexandria, VA—that Ackerman passed through to the NRA between October 2016 and December 2018. After receiving this letter, the current Treasurer sent it to the Brewer firm and did nothing to follow up on the spending allegations.

250. It was not until October 2019 that the current Treasurer began examining Powell's expenses himself, which, upon information and belief, he did independently of any investigation the Brewer firm was conducting in response to the allegations of excessive spending and reimbursement alleged in the press and the May 2019 Ackerman letter.

251. The NRA terminated Powell in January 2020 after it claims to have found that, between 2016 and 2019, Powell had charged the NRA over $33,000 in improper travel expenses, including travel for his wife and children; an average of approximately $500 per month in AT&T

60

expenses; and over $4,000 in improper technology expenses, in addition to miscellaneous improper housing, parking, relocation, utility, and other expenses.

252.    Powell ultimately paid the NRA $40,760.20 to settle the dispute over his expenses.

### iii.    Powell's and Phillips's Negligence in Entering into Multimillion-Dollar Verbal Contracts

253.    In or about mid-2017, Powell, Phillips, and LaPierre engaged in discussions with longtime NRA fundraising consultant McKenna about a large-scale project that would encompass (1) a search for a new NRA CFO in anticipation of Phillips's retirement in 2018; (2) a search for a new or refreshed banking relationship for the NRA; and (3) a possible restructuring of the NRA's corporate structure and advancement of its affinity insurance program. The name for the project that encompassed all of this work ultimately became "Project Ben-Hur."

254.    At the direction of Powell, the NRA engaged McKenna to perform the services contemplated by Project Ben-Hur without entering into a written contract or obtaining written approval in advance from the NRA President or Vice Presidents.

255.    McKenna was a consultant for the NRA from approximately 2012 until 2019. Up until the Project Ben-Hur discussions in 2017, McKenna's consulting for the NRA had mostly consisted of donor cultivation work with high net worth individuals. Between 2013 and 2017, the NRA paid McKenna anywhere from approximately $800,000 to $1.8 million per year. In or about June 2017, the NRA and McKenna entered into an amended agreement that lowered the monthly consulting fee paid to McKenna from $40,000 to $20,000 per month.

256.    The fees paid under that written agreement, however, represented a small fraction of what the NRA was paying McKenna.

257.    Upon information and belief, most of the services that McKenna performed for the NRA (and the fees that it charged) were based on oral agreements entered into by LaPierre,

61

Phillips, and Powell. For example, no written contract regarding Project Ben-Hur was ever executed—instead, Powell and Phillips entered into an oral contract to pay McKenna between $160,000 and $250,000 per month in 2018, in violation of the NRA's contract approval and conflict of interest policies. This monthly fee did not include an additional, approximately $375,000 in legal fees and $200,000 in food, travel, and other out of pocket expenses that McKenna requested reimbursement for from the NRA in 2018.

258.    In 2018, Powell also approved a verbal contract with LookingGlass, a cybersecurity firm that McKenna recommended to him—and in which McKenna is an investor. That verbal contract violated the NRA's contract approval requirements and was for services that were later found to be overpriced. The contract ultimately cost the NRA approximately $500,000 before it could be terminated.

### iv.  Powell's Conflict of Interest Concerning His Wife's Employment

259.    After Powell became an NRA executive, his wife was employed by McKenna.

260.    As the Project Ben-Hur discussions described above in Part Five, Section I(C)(iii) progressed, on or about December 15, 2017, McKenna hired Powell's wife as an independent contractor, through a newly formed company called SPECTRE, to assist with the project. Although Powell's wife worked on McKenna client accounts apart from the NRA, her monthly consulting fee of $30,000 was passed through in its entirety to the NRA with a $5,000 markup for McKenna beginning in or about January 2018 through approximately December 2018.

261.    Shortly after Powell's wife was hired as an independent consultant for McKenna, Powell authorized a contractual amendment to increase McKenna's monthly retainer for donor cultivation from $20,000 to $25,000 per month for 2018. That written amendment was signed by Phillips and Powell in January 2018.

262.     Prior to signing the amendment, Powell did not disclose the conflict of interest posed by his wife's work for McKenna to the NRA General Counsel or the Audit Committee. In fact, upon information and belief, Powell instructed his wife not to attend meetings when Frazer would be present to avoid drawing Frazer's attention to the fact that she worked at McKenna. In doing so, Powell not only disregarded his disclosure obligations under the NRA's conflict-of-interest policy, but took affirmative steps to hide the conflict from the NRA officer he was supposed to disclose it to.

263.     Upon information and belief, it was not until the current Treasurer confronted Powell about the relationship in mid-2018—as the NRA Whistleblowers were preparing to disclose the conflict to the Audit Committee—that Powell disclosed it to Frazer.

264.     On July 26, 2018—four days before the NRA Whistleblowers presented the NRA Audit Committee with evidence of Powell's conflicts of interest—Powell introduced a "refresher" presentation to NRA upper management on compliance and governance issues, which included training on conflicts of interest and related party transactions.

265.     While NRA officers and board members are required by NRA policy to disclose conflicts of interest on at least an annual basis, Powell did not submit a completed Financial Disclosure Questionnaire for 2018 until September 6, 2018—the date that the NRA Audit Committee discussed and voted on Powell's conflicts.

### v. Powell's Related Party Transaction with His Father

266.     In 2017, Powell requested that Ackerman add his father, a photographer based in Colorado, to its photographer rotation for NRA events. Ackerman complied with Powell's request, and proceeded to pass through at least $93,000 in expenses for his father's services to the NRA. Shortly thereafter, in or about September 2017, Powell instructed NRA personnel to pay his father for his services directly, ultimately resulting in approximately $10,000 being paid to his father.

63

According to NRA personnel, Powell's father's services were more expensive than the quote provided by another photographer. It was not until the NRA Whistleblowers brought the relationship to the attention of the Audit Committee in July 2018 that it was disclosed as a conflict. The Audit Committee then summarily ratified the transaction in September 2018.

### vi. Powell's Record of Alleged Sexual Harassment and Discrimination

267. On June 8, 2017, after having been terminated a week earlier, a former NRA employee, through counsel, lodged a sex discrimination complaint against Powell with the NRA Human Resources Director. The NRA Human Resources Director forwarded the complaint to the General Counsel's Office for investigation.

268. The complainant, a former NRA employee, alleged that Powell disparaged her in front of her colleagues by stating that she sounded like Powell's wife when she asked a question during a meeting. The complainant also alleged that Powell had frozen her out of the NRA by outsourcing her job duties to vendors after she raised concerns about Ackerman's fees during a meeting with its CEO. According to the complainant, Powell directed her to meet him at a bar the following day, where he berated her, accused her of being "emotional," and told her that Ackerman could spend as much money as it wanted, even if the charges were "made up."

269. In or about June 2018, the NRA settled the potential sexual discrimination claim made against the NRA for Powell's conduct for $89,000.

270. Powell was also accused by at least one Ackerman employee of sexual harassment in or about October 2018. That Ackerman employee raised her accusation with LaPierre, which resulted in Powell being removed as the NRA's designated point of contact for Ackerman but otherwise, upon information and belief, did not result in any investigation or disciplinary action regarding Powell's behavior.

64

### D. John Frazer's Negligence and Certifications of False or Misleading Annual Filings

271.   John Frazer has been the Secretary and General Counsel of the NRA since 2015. LaPierre hired Frazer as General Counsel in January 2015 and the Board appointed him as Secretary in April 2015. In his capacities as Secretary and General Counsel, Frazer reports directly to LaPierre.

272.   Frazer began his career with the NRA in 1993 as an information specialist in the research and information division of NRA-ILA. Frazer was not a lawyer at the time and he was primarily responsible for "answering mail and phone calls from members and the general public about legislative and Second Amendment issues."

273.   Frazer obtained his law degree in 2008 from George Mason University and became licensed to practice in Virginia that same year. While attending law school, Frazer continued his non-legal work for the NRA. Once he became a licensed attorney in 2008, Frazer remained in a non-legal position at the NRA until 2013. During that period, Frazer served as the Director of the research and information division of NRA-ILA.

274.   In September 2013, Frazer left the NRA to work in private practice as a solo practitioner. He practiced independently for approximately a year-and-a-half. During his brief time working in private practice, Frazer practiced firearms-related law. Frazer left private practice in January 2015 and returned to the NRA full-time as General Counsel. Frazer was subsequently appointed by the NRA Board as Secretary in April 2015. At that time, Frazer received a salary of $272,578, along with additional compensation of $55,870. In or around September 2017, Frazer's salary was increased to $360,000, with additional compensation of $54,100.

275.   At the time of his appointment as Secretary and General Counsel, Frazer had been licensed as an attorney for seven years, and had been in private practice in his own firm for 18

65

months. There is no indication from Frazer's seven years with a law license—only 18 months of which entailed representing clients—that he had relevant legal experience in corporate governance, corporate compliance, tax exempt organization requirements, not-for-profit organization requirements, or the law governing boards and board procedure. There is also no indication that Frazer, based on his experience, had familiarity or legal experience with the N-PCL, the governance requirements of the New York Nonprofit Revitalization Act, the EPTL, the requirements of the Internal Revenue Code with respect to 501(c)(3) or (c)(4) nonprofits, reporting, transactions with disqualified persons, or excise tax reporting and payment obligations.

276.   LaPierre hired Frazer as General Counsel without reviewing his qualifications or determining whether he had sufficient legal expertise and experience for the role. LaPierre admitted that he "didn't know" that Frazer hadn't graduated from law school until 2008. LaPierre further admitted that he did not know how familiar Frazer was with New York nonprofit law, or with the law governing tax exempt organizations. LaPierre did not make any inquiry of Frazer to determine whether he had those areas of expertise when hiring him as General Counsel. Instead, LaPierre "assumed, as any other attorney, he would be aware of…general things like that."

277.   LaPierre did not consult an executive search firm to assist in identifying qualified candidates for the General Counsel position prior to hiring Frazer. LaPierre did not ask that a search be conducted of Frazer's prior legal writings or of lawsuits in which he was involved. Nor did LaPierre take steps to ensure that a credit or social-media check was conducted for Frazer before hiring him as General Counsel. LaPierre testified, "I assumed that stuff is done by our human resources department. I didn't do it."

### i. Failure to Comply with Relevant Governance Requirements

278.   As of July 1, 2014, the New York Nonprofit Revitalization Act of 2013 imposed significant governance requirements on New York charitable corporations, including the NRA.

These requirements concerned, among other things, audit oversight by a committee of independent directors, the substance and procedures for addressing related party transactions, and requirements to have conflict of interest and whistleblower policies. In his capacity as Secretary and General Counsel, Frazer had the duty to be aware of these legal requirements, determine what the NRA was required to do to comply with these governance requirements, and ensure that appropriate changes were timely made in the NRA's governance procedures to comply with these requirements.

279.    From 2014 to 2018, Frazer failed to make the necessary changes to board governance procedures, or to advise officers and directors of the needed changes. Frazer repeatedly failed to ensure that related party transactions were being addressed by NRA officers and directors in accordance with N-PCL § 715; failed to enforce compliance with the NRA's Conflict of Interest Policy for years; and failed to ensure that the NRA was in compliance with laws and policies governing whistleblowers. For example, in connection with related party transactions, the Audit Committee Chair testified, "there were some [related party transactions] that should have been given to us, should have been captured into the [disclosure of financial interest] forms, should have been presented to us by Frazer and they weren't."

### ii. Certification of False or Misleading Annual Filings

280.    In his capacity as Secretary, Frazer is responsible for executing and certifying the NRA's annual CHAR 500, which includes the NRA's IRS Form 990, with the New York Charities Bureau. On an annual basis, Frazer certified under penalty of perjury that he "reviewed this report, together with all attachments," and that to the best of his knowledge and belief "they are true, correct, and complete in accordance with the laws of the State of New York applicable to this report."

67

281.    In each year from 2015 until the NRA's most recent filing in 2019, Frazer executed an identical certification attesting to the accuracy of the NRA's annual filings. As detailed in Part Five, Section VII below, the NRA made materially false and misleading statements and omissions in its 2016 and 2017 filings with the Attorney General, which Frazer falsely certified were true, correct, and complete. Frazer either knew or negligently failed to learn that the filings of the NRA with the New York Charities Bureau were not "true, correct, and complete in accordance with laws of State of New York applicable to this report."

### E.  Improper Expenditures by LaPierre's Senior Assistant and Direct Report

282.    LaPierre hired one of his longest serving and key employees in 1995 to work in the EVP Office as his assistant. For the last 25 years, this employee has been one of LaPierre's closest and most trusted advisors. This employee is hereinafter referred to as "LaPierre's Senior Assistant."

283.    LaPierre's Senior Assistant joined the NRA with a criminal record of embezzling from a non-profit where she had worked in the 1980s.

284.    LaPierre's Senior Assistant has held various job titles during her NRA career, all of which have entailed working closely with and reporting directly to LaPierre. In general, LaPierre's Senior Assistant acts as a liaison between LaPierre and the NRA Board, attends meetings with LaPierre and also speaks about the NRA or acts as a representative of the NRA at events around the country. LaPierre's Senior Assistant's current salary is $250,000.

285.    At some point in the 2000s, LaPierre's Senior Assistant was accused of diverting money from the NRA to use for personal expenses. This prompted an investigation by the NRA Board and an external auditor, which resulted in LaPierre's Senior Assistant's NRA credit card being taken away. However, even though her corporate credit card was taken away, she continued to have access to and use of other NRA employees' corporate credit cards, including the CFO's.

286.    After LaPierre's Senior Assistant's credit card privileges were revoked, LaPierre and Phillips tasked an executive assistant in the Treasurer's Office ("Executive Assistant No. 1") with the responsibility of reviewing LaPierre's Senior Assistant's expenses and reimbursement requests. Executive Assistant No. 1 was more junior than LaPierre's Senior Assistant and lacked sufficient supervision and institutional authority to rein in LaPierre's Senior Assistant's inappropriate spending.

287.    LaPierre's Senior Assistant still had the authority to incur up to approximately $15,000 to $20,000 per month for business travel expenses, sponsorships, and event attendance.

288.    In 2012, upon information and belief, LaPierre's Senior Assistant had the NRA pay for approximately $18,000 in expenses incurred in connection with her son's wedding in Minnesota. Executive Assistant No. 1, who was responsible for processing these expenses, testified that this was consistent with LaPierre's Senior Assistant's longstanding practice of expensing personal items to the NRA that she would later ostensibly reimburse. According to Executive Assistant No. 1, these wedding expenses never were reimbursed by LaPierre's Senior Assistant. In fact, LaPierre's Senior Assistant directed Executive Assistant No. 1 to remove information from the wedding invoices that would identify them as being personal in nature.

289.    LaPierre also authorized his Senior Assistant to book flights and black car services through LaPierre's Travel Consultant, which she frequently did. LaPierre's Senior Assistant abused this privilege and violated the NRA's travel policy. She routinely hired black cars to ferry her to and from airports and NRA events at substantial expense, and often extended this courtesy to her family as well.

290.    As one example, on a single day, LaPierre's Senior Assistant incurred over $1,100 in black car bills for her husband's trips to and from airports.

291.    On another occasion, the employee incurred almost $1,300 in black car bills on a single day for her son, to transport him from New York to Washington D.C.

292.    In August 2018, over the course of a two-week fundraising excursion in France, LaPierre's Senior Assistant authorized approximately $100,000 in black car expenses for two chauffeured vehicles.

293.    In January 2019, the Audit Committee learned that LaPierre's Senior Assistant's son had been paid on two occasions as a sound stage manager for the NRA's annual conventions in 2017 and 2018, and on one occasion as a performer at an NRA Advancement event. While the Audit Committee retroactively approved that arrangement—along with approving her son's future services on similar terms—there is no evidence that the Committee reviewed any information that would support its determination that his employment was "fair, reasonable, and in the best interest of the NRA." For example, the Report of the Audit Committee fails to document any review of the usual and customary price for these services, or the price for LaPierre's Senior Assistant's son's travel in connection with his work for the NRA.

294.    LaPierre's Senior Assistant's expenditures were recently called into question again. The current Treasurer learned that LaPierre's Senior Assistant used other NRA employees' credit cards—including the CFO's—to charge personal expenses. When asked about this, LaPierre admitted that there "are some things right now that we are investigating that look to be suspicious."

295.    For the past 25 years, LaPierre's Senior Assistant has reported directly to LaPierre. Her salary and expenses are included in the budget for EVP Office, and she has never answered to a different supervisor. In his role as his Senior Assistant's direct supervisor and the chief executive of the NRA, LaPierre has a fiduciary duty to oversee her. LaPierre's Senior Assistant's

70

misconduct, including her long history of inappropriate spending, reflects negligent oversight on the part of LaPierre.

## II. The NRA's Use of Longtime Vendors and Consulting Agreements to Hide Improper Expenditures, Self-Dealing, and Related Party Transactions

296. For decades, LaPierre has retained vendors and contractors without appropriate oversight of contract performance, expenses, or payments. During Phillips's tenure at the NRA, he aided and supported LaPierre in these efforts.

### A. Ackerman McQueen and Mercury Group

#### i. The NRA's Decades-Long Relationship with Ackerman

297. The NRA worked with Ackerman, an Oklahoma-based advertising and public relations firm, for over three decades. The NRA also worked with Mercury Group, a wholly owned subsidiary of Ackerman that is headquartered in Alexandria, VA, since the mid-1990s.

298. From 1992 to 2018, Ackerman was the NRA's largest vendor. The NRA reported paying Ackerman $20,324,364, in 2017, and $31,994,168, in 2018 for "public relations and advertising" services. Mercury Group separately received over $5.5 million from the NRA in 2017. The NRA did not publicly disclose the fees it paid the Mercury Group in 2018.

299. In addition, the NRA paid Ackerman $11,739,668 in 2017, and $6,337,508 in 2018 for "out of pocket expenditures" on behalf of the NRA for "media, outside vendor costs, and reimbursement of travel and business expenses." These expenses were incurred in violation of NRA policy, without proper oversight, and in many instances for the personal benefit of NRA insiders.

300. At the heart of this business relationship was the personal relationship between LaPierre and the co-founder of Ackerman. For decades, LaPierre relied on the Ackerman co-founder for advice on organizational branding, strategic communication, and crisis management.

Until the co-founder's death in 2019, he and LaPierre would often speak on a daily basis and, depending on current events, they might speak multiple times per day.

301.    LaPierre similarly had a close relationship with the president of Mercury Group, who was a personal friend and advisor of LaPierre, dating back 30 years. LaPierre considered him a "brother" and enjoyed a lucrative business relationship with him for years through the entities he led, including Mercury Group and UWS. LaPierre also hired him as a paid consultant to the NRA.

302.    In mid-to-late 2018, the relationship between the NRA and Ackerman/Mercury Group eroded and the NRA and Ackerman/Mercury Group are now engaged in litigation.

### ii.    The NRA's Practices Concerning Ackerman's Budgeting and Invoicing

303.    For at least two decades, the relationship between the NRA and Ackerman was formalized through a written agreement (the "Services Agreement"). The most recent iteration of the Services Agreement was entered into in April 2017 and amended in May 2018.

304.    The Services Agreement provided that LaPierre or his designee were the "only persons within the NRA" with the authority to issue written communications upon which Ackerman was authorized to act.

305.    Upon information and belief, LaPierre was directly involved in managing the scope and cost of Ackerman's services. Upon information and belief, he met annually with Ackerman's co-founder to negotiate the budget for the upcoming fiscal year and Phillips typically joined these meetings.

306.    Ackerman would then develop a budget document that would govern its relationship with the NRA for the upcoming fiscal year. Upon information and belief, the budget was reviewed and approved each year by LaPierre and Phillips.

72

307. Once the annual budget was finalized, Ackerman initiated projects and invoiced the NRA monthly for services rendered. Upon information and belief, LaPierre requested that invoices from Ackerman to the NRA FSD contain very little detail about the work performed or services rendered.

308. Upon information and belief, the NRA failed to conduct adequate oversight of Ackerman's activities and billing. As the NRA itself pleaded in its complaint against Ackerman, "[o]ver the parties' decades-long course of dealing, underlying receipts and other support for [Ackerman's] expenses were not transmitted to the NRA alongside [Ackerman's] invoices, but, rather, were supposedly maintained at [Ackerman's] offices." The NRA agreed to the arrangement, abrogating its oversight responsibility over its primary vendor and facilitating a process whereby it paid invoices with minimal detail and little supporting documentation.

### iii. NRA Executives' Misuse of Out of Pocket Expenses

309. In addition to the services that Ackerman provided to the NRA pursuant to the Services Agreement, Ackerman also paid for a variety of unrelated out of pocket expenses and passed those expenses through to the NRA. The NRA used this arrangement to conceal expenditures by NRA executives—including LaPierre and Powell—many of which were personal or lacked documentation required by IRS publication 463 to permit the NRA to avoid reporting such expenses as taxable income.

310. Upon information and belief, the practice of passing expenses through Ackerman started decades ago as an informal agreement between LaPierre and Ackerman's co-founder, and continued until the two companies severed ties in 2019.

311. Ackerman billed the NRA for out of pocket expenses by submitting non-particularized invoices that aggregated the expenses into a lump sum amount and provided no details on the nature or purpose of the expenses. The invoices that Ackerman submitted to the

73

NRA typically included a one-line description that read "Out of Pocket Expenses" and a total amount. Upon information and belief, Ackerman took no steps to verify whether the out of pocket expenses were compliant with NRA policies governing travel and entertainment.

312.    The expenses billed to the NRA for out of pocket expenses did not comply with IRS requirements governing "accountable plans." As a result, all such expenses should have been included by the NRA in the taxable personal income for each recipient.

313.    The NRA's annual budget with Ackerman included an aggregate line-item for "Pass-through Expenses." The amount earmarked for this purpose in the Ackerman/NRA budget increased over time. In 2018, the annual budget allocated $950,000 exclusively for this purpose.

314.    The effect of the pass-through expense arrangement was that these expenses would be paid for by the NRA without written approvals, receipts, or supporting business purpose documentation in accordance with NRA policies and procedures, and without disclosure to or internal review by the NRA FSD. Payment of these expenses also violated IRS rules governing reporting of income for each of the recipients on their W-2 forms, exposing the NRA to penalties for false filings and for under-withholding of taxes due. In addition, with respect to LaPierre, the false reporting exposed the NRA to tax and penalty liability for 21% of the amount of his income exceeding $1 million pursuant to the Tax Cuts and Jobs Act, and permitted him to file false personal tax returns with the IRS.

315.    Under the umbrella of "Pass-through Expenses," the NRA paid for millions of dollars in entertainment and travel expenses incurred by NRA executives and associates—including LaPierre and Powell—without scrutiny from within the organization. Examples of this practice include, without limitation, the following:

74

316.    The NRA used the pass-through arrangement with Ackerman to pay for expensive meals for NRA executives at an upscale Italian restaurant in Alexandria, VA. NRA executives—including Powell and the Executive Director of Advancement—regularly charged these meals to the Mercury Group president's account. The charges were then passed on to the NRA. The NRA also directed Ackerman to purchase several memberships to a members-only cigar bar affiliated with the upscale Italian restaurant in Alexandria, VA.

317.    Upon information and belief, over a five-year period, Ackerman paid, and the NRA reimbursed, more than $250,000—at a rate of $4,000 per month—in access fees to LaPierre's Travel Consultant. Like the other expenses passed through Ackerman, this $4,000 monthly fee was unrelated to the services that Ackerman provided to the NRA under the Services Agreement. Upon information and belief, Ackerman itself rarely used LaPierre's Travel Consultant's services.

318.    The NRA used the pass-through arrangement to pay for extensive travel expenses, including via private aircraft, incurred by the president of Mercury Group on behalf of LaPierre. Upon information and belief, when the president of Mercury Group travelled with LaPierre, he travelled by private aircraft at the direction of LaPierre. LaPierre would also direct the president of Mercury Group to incur various charges—including hotel rooms, meals, cars, tips, and gifts for himself and VIP donors—and to submit those expenses to the NRA for reimbursement through the 'out of pocket' arrangement.

319.    In relation to the NRA annual meetings, LaPierre asked the president of Mercury Group to pay for LaPierre and others—including LaPierre's family—to stay at a luxury private hotel, apart from the host hotel at which NRA employees and board members were staying. These costs were paid for by Ackerman and billed to the NRA as pass-through expenses. For example, in 2016, the president of Mercury Group—at LaPierre's direction—paid $37,337 for "Guest

Lodging confidential per WLP" at a boutique hotel in Louisville, KY for LaPierre's family, guests, and his security guards.

320.    LaPierre also used the pass-through arrangement to conceal private travel and trips that were largely personal in nature. Upon information and belief, LaPierre directed Ackerman to pay for expenses related to NASCAR events, country music events, and even medical visits, and bill those through to the NRA. For example, in 2018, LaPierre asked the president of Mercury Group to accompany him on a visit to a medical clinic. In connection with this visit, the president of Mercury Group and LaPierre flew on a private charter and stayed at the Four Seasons for several days. The cost of this hotel for both the president of Mercury Group and LaPierre was paid for by Ackerman, but ultimately borne by the NRA. The lodging alone cost the NRA $9,550. The NRA also directly paid for the private travel associated with this visit to the medical clinic.

321.    The NRA also directed Ackerman to pay for a variety of other costs in connection with LaPierre's travel and bill those costs to the NRA as pass-through expenses. When he travelled, LaPierre often required an individual from Ackerman to travel with him to provide logistical and administrative support. That individual would be responsible for the payment of meals and gratuities for waiters, drivers, bellhops, hotel concierges, housekeepers, and others. Upon information and belief, the individuals who travelled with LaPierre instituted a practice of taking large cash advances—often several thousand dollars each at a time—to cover the cost of gratuities that LaPierre would direct him to pay.

322.    The NRA's Executive Director of Advancement used the pass-through arrangement to pay for travel and entertainment-related expenses. He possessed an Ackerman-issued corporate credit card and the charges that he incurred on this card were billed to Ackerman and passed through to the NRA. Among other charges, the credit-card statements for the Executive

76

Director of Advancement frequently included stays at luxury hotels like the Four Seasons, the St. Regis, the Ritz Carlton, and the Beverly Hills Hotel. He routinely stayed in suites costing over $1,500 a night. Upon information and belief, LaPierre was aware of and endorsed these expenses being billed through Ackerman.

323.    In connection with NRA annual meetings and Women's Leadership Forum meetings, LaPierre's wife would incur thousands of dollars of expenses per event for hair and makeup services, which were billed through Ackerman as out of pocket expenses. For example, between May 2016 and May 2017, the NRA paid one artist $16,359 for three events for LaPierre's wife. Upon information and belief, both LaPierre and his wife were aware of the cost of these makeup services.

324.    The NRA also used the pass-through arrangement with Ackerman to pay for expenses related to a charity whose affiliation to the NRA was not through its mission, but rather through LaPierre's wife, who served as the president of its Board of Trustees in 2017 and 2018.

### iv.  The NRA's Failure to Conduct Proper Oversight of Ackerman Billing

325.    Upon information and belief, LaPierre, Phillips, and Powell were fully aware of both the process of passing expenses through Ackerman to the NRA and the nature of the charges that fell into this category of expenses.

326.    Upon information and belief, the NRA's oversight of the out of pocket expenses routed through Ackerman was limited to annual audits by Phillips and the Managing Director of Finance at Ackerman's headquarters in Oklahoma City, OK. This review was conducted off-site at the direction of LaPierre. The NRA did not inform its Audit Committee or its external auditors about the out of pocket arrangement.

### v. The Benefits of Under Wild Skies Television Programming

327.    The president of the Mercury Group was also the president of UWS.

328.    UWS produces a television program of the same name that is focused on hunting and is hosted by the president of Mercury Group and UWS. Upon information and belief, since 2010, the NRA has paid UWS over $18 million.

329.    In 2016, the NRA entered into concurrent advertising and sponsorship agreements with UWS that would govern the relationship for the next nine years. These agreements were both negotiated and executed by LaPierre. These agreements provided for significant payments to UWS in exchange for sponsorships and various forms of advertising during the televised program. For the fiscal year 2019 alone, the NRA's internal records report that it paid UWS $1,957,500 for advertising and sponsorship of the program. UWS also enjoyed the right to free airing of Under Wild Skies on NRA-TV.

330.    LaPierre and his wife regularly appeared in episodes of Under Wild Skies, traveling to and participating in big game hunts in the United States, Botswana, Tanzania, South Africa, Zimbabwe, Mozambique, Argentina, and Uruguay. The expenses associated with these trips—including professional hunter costs, camps, chartered in-continent travel, food and beverages, hunting licenses, trophy fees, and taxidermy—were incurred by UWS. According to the president of Mercury Group and UWS, a single game hunt of this nature could cost upwards of $100,000.

331.    LaPierre also directed the president of Mercury Group and UWS to pay for various NRA board members and officers and their spouses—including the former Executive Director of NRA-ILA and his spouse, current board members, and the Executive Director of Advancement—to participate in big game hunts around the world. Upon information and belief, these trips were not authorized by resolution of the NRA Board or an authorized committee.

78

332. These expenses constituted private benefits and gifts in excess of authorized amounts pursuant to NRA policy to LaPierre and his wife. These expenses also constituted private benefits to NRA board members in violation of Article V, Section 5(a) of the NRA bylaws.

### vi. The NRA's Supplemental Income Payments to Under Wild Skies' Principal

333. In addition to payments related to the Under Wild Skies program, the NRA, with the knowledge and consent of LaPierre and Phillips, also paid the president of Mercury Group and UWS close to $50,000 a month, or approximately $600,000 annually, in "supplemental" fees to identify and cultivate high dollar donors for the NRA. Upon information and belief, the president of Mercury Group and UWS received these fees from approximately 2009 to 2019.

334. At the instruction of Phillips, this supplemental payment was made to the president of Mercury Group and UWS through the UWS entity, even though the services did not relate to the Under Wild Skies program.

335. Upon information and belief, this supplemental agreement was never formalized as a written contract. The amount paid to the president of Mercury Group and UWS under this agreement was negotiated exclusively between the president of Mercury Group and UWS, LaPierre and Phillips. No formal bidding process was conducted for the services that the president of Mercury Group and UWS provided under this oral agreement, and the agreement was never approved in writing by either the NRA President or the Vice Presidents.

336. Payments to the president of Mercury Group and UWS under this supplemental agreement were made every two months, in installments of $97,500. Upon information and belief, Phillips instructed the president of Mercury Group and UWS as to the language to use in the invoices for such payments. The invoices each contain a one-line description that reads "Supplemental Invoice."

337.    In negotiating and approving this arrangement, LaPierre and Phillips violated the NRA's internal policy concerning contracts over $10,000, which are required to be in writing.

### B.  Consulting Agreements with Former Employees

338.    In the last 15 years, LaPierre has directed the NRA to pay officers, directors, and former employees millions of dollars in "consulting" agreements without Board approval and in violation of the bylaw prohibition on salary or other private benefits to directors without Board authorization. In some instances, officers executed such agreements without Board authorization. Such agreements were frequently entered into in violation of NRA policy concerning contract approvals, independent contractors, and procurement and without proper documentation and sign-off. In some cases, former employees were paid far in excess of reasonable compensation and did not actually provide the NRA with corresponding consulting services. In other cases, the NRA failed to properly disclose the compensation in its regulatory filings.

### i.  Consulting Agreement with Former Executive Director of General Operations

339.    In late 2016, Powell, with the authorization of LaPierre, terminated the then Executive Director of General Operations, who had been in that role from 2012 to 2016. Upon information and belief, NRA security personnel publicly escorted him out of the building.

340.    After the Executive Director was terminated, LaPierre directed the NRA to enter into an agreement under which the NRA agreed to pay the former Executive Director $60,000 a month over a two-year period (January 2017 to December 2018) for "consulting services." The agreement also provided for a "final payment for consulting services" of $240,000 to be made by January 31, 2019. In all, the Executive Director was paid approximately $1.8 million under the agreement.

341.     The agreement did not define what the term "consulting services" entailed, nor did it provide any justification for the engagement of the former Executive Director to provide such services, in violation of the NRA's policy on independent contractors, which specifies that such contracts "should be well defined in content, duration and outcome."

342.     The agreement did not undergo a competitive bid process, in violation of the NRA Purchasing Policy, which requires buyers and users "to solicit competitive bids/pricing for goods or services valued at or above $5,000" unless an exception applies, in which case the contract must still be reported to the Finance Committee on an annual basis.

343.     The agreement was signed by Phillips on November 8, 2016. Upon information and belief, the agreement was not supported by a business case analysis and was not approved by the NRA's President and one of the two Vice Presidents, in violation of NRA policy. It also did not receive written approval of the Executive Vice President, as required by NRA policy.

344.     The agreement states: "NRA agrees to make twenty-four (24) monthly payments, payable January 2017 through December 2018, in the amount of $60,000 per month for consulting services." LaPierre, however, testified that he was under the impression that it was a severance agreement, and that he authorized it out of concern that the former Executive Director might disparage the NRA. The agreement had a non-disparagement clause, binding the former NRA officer, his spouse and children, and also imposed a confidentiality obligation. The agreement expressly provided that "Confidentiality and Non-Disparagement are among the important terms of this Agreement. Violation by the Executive Director of [these] terms…shall require [the former Executive Director] to return all payments made" under the agreement. LaPierre explained, "even though…I didn't think he was the right guy, I wanted to treat him fair, so we retained goodwill with him." When asked about the $1.8 million paid under this agreement, he maintained, "I think

it…was a prudent use of NRA funds to retain that goodwill on the part of [the former Executive Director] and prevent damage from happening that he could have done in the outdoor community to the NRA."

345.    LaPierre was not aware of any consulting services provided to the NRA pursuant to this agreement. When asked directly whether the former Executive Director provided services after his termination, LaPierre testified, "I don't know whether he did or didn't. I think it was just more of a severance." When the current Treasurer was asked the same question about what consulting services, if any, were provided to the NRA in 2018, he testified, "I don't know if that was consulting or some sort of severance or what it was. I just don't know." Upon information and belief, no consulting services were provided to the NRA under this agreement.

### ii.  Consulting Agreement with Former NRA Employee / NRA Foundation Executive Director

346.    H.W.S. Consulting, Inc. ("H.W.S.") is an entity through which the NRA paid a former NRA employee, who assumed the role of Executive Director of the NRA Foundation after he retired from the NRA in 2008 after more than 35 years as an employee (the "Foundation Executive"). Under a post-retirement consulting agreement, the NRA paid the Foundation Executive $30,000 a month, as a fundraising consultant through H.W.S. In addition to the monthly payment, the consulting agreement provided for a "Variable Success Fee." The minimum amount of the Variable Success Fee was $125,000 annually, according to the consulting agreement. The Foundation Executive was unaware of how this fee was calculated but understood that it was paid to him every year during the term of the agreement. Additionally, the Foundation Executive's "actual reasonable and necessary expenditures, which are directly related to the consulting services" were to be reimbursed.

82

347.    The consulting agreement was entered into without engaging in a competitive bidding process, without proper approval or sign-off, and in violation of NRA policy concerning contract approvals for independent contractors or consultants.

348.    The payments made under the consulting agreement were not disclosed on the NRA's IRS Form 990 as fundraising expenses between 2008 and 2015. The payments made under the agreement were first disclosed on the NRA's IRS Form 990 for the year 2016.

349.    The consulting agreement states that the Foundation Executive was engaged to "provide services in connection with fundraising efforts of the NRA … to build relationships with major gifts donors, identify and cultivate relationships with fundraising partners and identify prospective high net worth individuals to solicit for major gifts."

350.    On July 25, 2016, for the first time, H.W.S. filed a Fundraising Counsel Registration Statement on Form CHAR014 with New York State as a Fundraising Counsel. A fundraising counsel is retained to advise with respect to strategy of fundraising but not to conduct actual solicitation.

351.    The Foundation Executive testified that he conducted fundraising and solicited contributions. He identified three major areas of duties: (1) relationship maintenance or development, (2) strategy around fundraising, and (3) fundraising itself.

352.    The Foundation Executive admitted that he did not keep accurate records of fundraising he conducted. He agreed that his position was not subject to quantifiable outcomes or any form of metrics even though he was paid a success fee.

353.    At the direction of Phillips, from the outset of his consulting agreement, the Foundation Executive would submit a form for expense reimbursements without providing specific receipts (other than a credit card statement) or business purpose for the expense. H.W.S.

83

did not prepare invoices to the NRA, instead, an NRA employee would prepare the invoice and pay H.W.S. for the amount identified in the invoice. The monthly payments would also be paid in advance of each month.

354.    Under the consulting agreement, "actual reasonable and necessary expenditures, which are directly related to the consulting services" were to be reimbursed. As an example, in 2016, according to H.W.S.'s records, $148,314 worth of expenses were submitted and reimbursed by the NRA. The NRA reimbursed H.W.S for expenses including monthly truck leases, internet service at the Foundation Executive's home, the costs of membership in fraternal organizations including the International Order of St. Hubertus and the Camp Fire Club, and the costs and expenses of attending various hunting trips both domestically and internationally.

355.    When the expense reimbursement policy changed in 2018, the Foundation Executive had difficulty providing receipts for expenses incurred prior to the change in policy. Despite not providing receipts for certain expense reimbursement requests in mid-2018, his expense reimbursements were never denied, only delayed. Finally, the Foundation Executive decided to end his consulting agreement at the conclusion of 2018.

### iii.    Consulting Agreement with Former NRA Managing Director of Affinity and Licensing

356.    The NRA entered into a post-employment incentive compensation agreement with its Managing Director of Affinity and Licensing, which provided for him to receive payments from both the NRA and Lockton Affinity LLC ("Lockton Affinity"), the insurance broker that the NRA had engaged for various purposes over many years, including to administer its Carry Guard program. While at the NRA, the Managing Director was responsible for overseeing the NRA's relationship with Lockton Affinity.

357.     The Managing Director retired from the NRA in January 2016. According to the NRA's Form 990 for that year, he was paid a full year's salary—approximately $630,000. He was also paid by the NRA after his retirement—$713,000 in 2017 and $535,000 in 2018.

358.     During this same period, the Managing Director was also being paid by Lockton Affinity. In 2016, Lockton Affinity paid the Managing Director $455,753, and in 2017, he was paid $522,426.

359.     Payments from the NRA were made pursuant to a July 2014 agreement with the Managing Director. This agreement, which was signed by Phillips, superseded an agreement from October 2012 (signed by both LaPierre and Phillips) and was entered into over a year before the Managing Director retired. The draft of the agreement had a signature line for LaPierre, which was removed prior to being finalized. The agreement provided for an "Employment Longevity Incentive" where the Managing Director would receive "3% of gross affinity revenue for a five year period." In exchange, he agreed to "give assistance to the Director, Affinity and Licensing programs or other related associates at their request, not to exceed 7.5 hours a month." The agreement also recognized that the "NRA has encouraged [you] to and recognizes that you will be consulting for Lockton Affinity on the NRA Program for a 5 year period after your official retirement" and provided that a portion of the money owed under his agreement with the NRA would "be paid monthly to [the Managing Director] by Lockton Affinity under [his] consulting arrangement with them."

360.     This agreement was amended twice and ultimately entitled the Managing Director to receive $43,000 per month starting in February 2018 and ending in January 2022. It also confirmed that prior payments had been "made by Lockton Affinity at our direction."

361.     Payments from Lockton Affinity to the Managing Director were made pursuant to an agreement between Lockton and the NRA that was executed on January 7, 2016. That agreement acknowledged that Lockton Affinity entered into an agreement with the Managing Director to pay him fees and provided that "Client [the NRA] agrees that Lockton shall receive credits against amounts it owes client pursuant to [this agreement] in amounts equal to the [Managing Director's] Fees at such times as [such] Fee is paid to [the Managing Director]."

362.     When LaPierre was asked whether he thought it was prudent for a charitable nonprofit organization to have an executive negotiate with a vendor while also being paid by that vendor, he admitted, "there are serious questions surrounding that type of situation." He further testified, "I think there were problems with that whole area [with the Managing Director]."

363.     In November 2017, the NRA's external tax preparer reviewed the agreement with the Managing Director and commented, "This agreement is not a good agreement and I have never seen such an agreement before and I bet [the NRA employee] who preps the 990 knows nothing about this agreement either…..I think that they got a lot bigger issues than trying to get out of NY State with this agreement alone…."

364.     In 2018, the NRA's external auditors tested the Managing Director's consulting contract as part of test work to see whether the NRA Purchasing Policy was being followed and found, "Approval signatures not identifiable. No business case support available."

### C.  Related Party Transactions with Board Members

365.     The NRA routinely entered into agreements with board members without adhering to applicable requirements under NRA policy and New York law requiring a Board determination in advance that the transaction was fair, reasonable and in the NRA's best interest. Some examples of the many related party transactions that the NRA executed with board members are discussed

86

below. Additional transactions with board members are discussed in Part Five, Section V below, addressing the Audit Committee's failures to comply with required procedures.

### i. Board Member No. 1

366.     Board Member No. 1 is a former professional football player who played in the National Football League from 1973 to 1988. Since his retirement from the NFL, Board Member No. 1 has worked as a freelance motivational speaker and product spokesperson.

367.     Board Member No. 1 has served as an NRA board member since at least 2009. For most of his tenure as an NRA director, Board Member No. 1 has been paid $150,000 per year as an "independent contractor." In addition to the flat fee, Board Member No. 1 was also reimbursed for expenses.

368.     The agreement between Board Member No. 1 and the NRA was entered into in 2002 and extended in 2016. The 2002 contract was signed by Phillips on behalf of the NRA. It provided that, in exchange for a monthly flat fee of $12,500, Board Member No. 1 would provide consulting services, including conducting fundraising activities and identifying and cultivating new or potential donors.

369.     Upon information and belief, Board Member No. 1 never registered as a professional fundraiser or fundraising counsel in New York State.

370.     Under the terms of the 2002 contract, Board Member No. 1 was supposed to provide the NRA with "Monthly Status Reports" on his fundraising activities. In response to a subpoena, the NRA failed to provide the Attorney General with any documentation regarding the services actually provided by Board Member No. 1 pursuant to the 2002 contract.

371.     Upon information and belief, Board Member No. 1's consulting agreement with the NRA was not approved in advance by the Audit Committee as a related party transaction or by

any other committee of the Board. The unapproved agreement violated the bylaw prohibition on salary or other private benefits to directors unless specifically authorized by the Board.

372. According to draft meeting minutes for a September 2016 Audit Committee meeting, the Audit Committee considered Board Member No. 1's contract as part of a review of "substantial" related party transactions. The draft minutes reflect the Committee's conclusion that Board Member No. 1 was "uniquely well suited" to perform the tasks set out in his annual contract with the NRA, which, according to the Committee, were "to provide services related to public relations, training, and outreach … to collegiate and professional athletes." The draft minutes do not reflect any discussion or consideration of Board Member No. 1's purported fundraising services. The draft minutes are also silent on the services Board Member No. 1 actually provided to the NRA and on the amount of the contract. The Audit Committee did not issue a resolution at the September 2016 meeting approving the agreement with Board Member No. 1.

373. In 2018, the NRA reduced Board Member No. 1's annual fee to $100,000.

374. In February 2019, the Audit Committee passed a resolution to modify Board Member No. 1's compensation from an annual flat-fee basis to a daily event fee of $7,000. According to the Audit Committee Report, "the officers of the NRA have evaluated [Board Member No. 1's] services and determined that a per-appearance fee is more suited to the variable need for [his] services." There is no evidence that the Audit Committee considered whether a daily fee of $7,000 was reasonable in light of the services being performed.

#### ii. Board Member No. 2

375. Board Member No. 2 is a retired police officer from Iowa. He has served as an NRA board member since at least 2009. Among other positions, Board Member No. 2 has served as Chair of the Gun Collectors Committee, Vice Chair of the Military and Veteran Affairs

88

Committee, and as a member of the Finance Committee. Board Member No. 2 was not re-nominated in 2020.

376.    Beginning in July 2009, Board Member No. 2 has been paid by the NRA for the provision of consulting services. Under his agreement with the NRA, Board Member No. 2's services were "limited to development activities with potential gifts of firearms on behalf of NRA's Office of Advancement and the National Firearms Museum." In exchange for such services, the NRA agreed to pay Board Member No. 2 a monthly flat fee of $7,500, along with payment for out of pocket business expenses. The agreement provided that, Board Member No. 2 would "act under the direction of and report to the NRA Executive Vice President and the Executive Director, Office of Advancement."

377.    While the NRA's contract with Board Member No. 2 provided for a term that began in January 2010, upon information and belief, it was not signed until January 2016.

378.    Upon information and belief, Board Member No. 2's consulting agreement with the NRA was not approved in advance by the Audit Committee as a related party transaction or by any other committee of the Board. The unapproved agreement violated the bylaw prohibition on salary or other private benefits to directors unless specifically authorized by the Board.

379.    Upon information and belief, the Audit Committee did not consider the Board Member No. 2 arrangement until a September 2016 review of related party transactions. The draft minutes from the meeting reflect the Committee's finding that Board Member No. 2 "has personal relationships in [the gun collecting community] that uniquely qualify him to provide these services, and that his services have been important to the NRA's outreach and related fundraising efforts." The Audit Committee did not issue a resolution at the September 2016 meeting approving the agreement with Board Member No. 2.

89

380.     At the January 11, 2018 Audit Committee meeting, the Audit Committee approved the following motion: "the Committee finds the transaction with [Board Member No. 2] for outreach to gun collectors is fair, reasonable, and in the best interests of the NRA."

### iii.   Board Member No. 3

381.     Board Member No. 3 is a political consultant and NRA Board member. Board Member No. 3 served as NRA president from 2011 to 2013.

382.     Beginning in March 2017, Board Member No. 3 received $4,000 per month for public speaking and consulting. The NRA reported that it paid [Board Member No. 3] $32,000 in 2017 and $40,000 in 2018.

383.     A Consultant List prepared by the NRA for 2019 allocated $48,000 from the EVP budget for Board Member No. 3 for 2019 and indicated that "no contract information" was available for the arrangement.

384.     Upon information and belief, the Audit Committee did not review the arrangement with Board Member No. 3 until after it was already under way. At the January 11, 2018 Audit Committee meeting, the Committee approved the minutes of the December 7, 2017 meeting at which the following motion was adopted: "The Committee finds the transaction with [Board Member No. 3] for public speaking appearances is fair, reasonable, and in the best interest of the NRA." The motion did not document a basis for the Committee's finding—other than the fact that [Board Member No. 3] was "frequently requested as a speaker by NRA-affiliated and outside groups"—and did not document whether any alternative transactions had been considered, as required under New York Law.

385.     On May 15, 2019, another Board Member reached out to the current Treasurer to ask, "What 'back up' is there for [Board Member No. 3's] monthly invoices of $4,000?" Executive Assistant No. 1 informed the current Treasurer, "I do not receive anything. It was reviewed by

90

Audit [Committee] and John Frazer told me we were good to pay. I assumed this had been discussed and he was providing info to the EVP's [O]ffice or Secretary's [O]ffice as to what he was doing each month." When the current Treasurer followed up to ask whether there was a contract between the NRA and Board Member No. 3, the assistant explained, "No contract that I have been privileged to see. That is why the invoice went to John [Frazer] originally when we began the compliance refresh."

### iv. Board Member No. 4

386.    Board Member No. 4 is a lawyer, lobbyist, and NRA Board Member. She has served on the Board since 1992 and is a former president of the NRA.

387.    From 2011 to 2016, the NRA paid Board Member No. 4 $45,180 per year for public speaking services. The NRA paid Board Member No. 4 $39,680 and $13,060 for public speaking services in 2017 and 2018 respectively.

388.    In May 2016, Frazer requested a copy of Board Member No. 4's compensation agreement which was "missing from the contracts safe." The accounts payable manager reported, "We were not furnished a copy of her contract. We pay her $3,765.04 monthly based on invoices submitted by the Treasurer's office, which are approved by Woody/[Woody's assistant]."

389.    Upon information and belief, the Audit Committee did not review the transaction before it was entered into by the NRA. The Committee reviewed the transaction in September 2016 and highlighted Board Member No. 4's "unique qualifications" as justification for why she was properly being compensated by the NRA. The Audit Committee did not issue a resolution at the September 2016 meeting approving the agreement with Board Member No. 4.

390.    At the January 11, 2018 Audit Committee meeting, the Audit Committee approved the minutes of the December 7, 2017 meeting at the following motion was adopted: "the Committee finds that the transaction with [Board Member No. 4] for public speaking services is

91

fair, reasonable, and in the best interests of the NRA." The Committee claimed that Board Member No. 4 had "unique qualifications to provide these outreach services to the NRA." The Committee did not document whether it considered alternative transactions.

391.    Board Member No. 4 also serves as a compensated member of the Board of Directors of Sturm, Ruger & Co. ("Ruger"), "a well-known manufacturer of firearms, which has dealt with the National Rifle Association for many years." Among its dealings with the NRA, Ruger purchases advertising in NRA publications and provides donations and support to NRA programs. The NRA also licenses its logo for use on special promotion Ruger firearms, which results in royalties to the NRA.

392.    At its meeting on April 28, 2019, the Audit Committee resolved that it had reviewed Board Member No. 4's relationship with Ruger and found "no conflict of interest in her continuing service on both Boards," so long as she exerts no control over decisions of the Ruger Board involving the NRA and recuses herself from relevant deliberations or voting.

### v. Board Member No. 5

393.    Board Member No. 5 is a past NRA President and current NRA board member and has been paid under the EVP Consulting Budget since 2004. From 2014 to 2017, Board Member No. 5 was paid an average of approximately $150,000 a year. In December 2017, LaPierre and Board Member No. 5 executed a one-year contract for $168,000 annually. In April 2018, LaPierre and Board Member No. 5 executed a 10-year contract for $220,000 annually. LaPierre testified that he negotiated these contracts.

394.    Upon information and belief, LaPierre did not notify or receive approval from the Audit Committee in advance of executing the April 2018 contract. Upon information and belief, LaPierre did not receive written approval in advance from the President or a Vice President before executing the December 2017 or April 2018 contracts. Board Member No. 5 also receives

92

compensation from NRA-ILA and through grants paid to an organization called the Unified Sportsmen of Florida. LaPierre testified that, combined, Board Member No. 5 receives about $400,000 in annual compensation from the NRA.

395.    LaPierre did not follow appropriate legal and internal procedures, including obtaining proper review and approval by the Audit Committee, in advance of executing contracts with Board Member No. 5.

## III.    The Individual Defendants Received Excessive Compensation that the NRA Did Not Accurately Disclose

### A.    The NRA Board Failed to Follow an Appropriate Process to Determine Reasonable Compensation for NRA Executives

396.    Pursuant to New York law, the NRA may only pay "compensation in a reasonable amount" to its employees for services actually rendered.

397.    Federal law similarly limits the NRA to payment of reasonable compensation. The NRA and individual defendants (defined as "disqualified persons") are subject to excise taxes pursuant to 26 U.S.C. § 4958 for compensation that is unreasonable, that is, where "the value of the economic benefit provided exceeds the value of the consideration (including the performance of services) received for providing such benefit."

398.    The Internal Revenue Service ("IRS") creates a rebuttable presumption that compensation is reasonable if (1) the authorized body within the organization made up of independent individuals approves the compensation in advance; (2) the authorized body relies on appropriate data as to comparability; and (3) the authorized body adequately and timely documents the basis for their determination concurrently with making that determination. The documentation "should include the terms of the transaction and the date of its approval, the members of the authorized body present during the debate and vote on the transaction, the comparability data

93

obtained and relied upon, the actions of any members of the authorized body having a conflict of interest, and documentation of the basis for the determination."

399.    The NRA bylaws require the NRA Board to set annually the authorized compensation for the Executive Vice President, Treasurer and Secretary. Under the bylaws, the Officers Compensation Committee ("OCC"), which consists of the NRA President and First and Second Vice Presidents, is responsible for making a recommendation as to the officers' compensation to the full Board at the fall board meeting each year. At that same meeting, the Board must establish by resolution the authorized compensation for the next budget year.

400.    In its official filings, the NRA made misleading representations regarding its practices for setting executive compensation. For example, in its IRS Form 990 for each year from 2015 to 2018, the NRA represented that "compensation of the NRA's top management officials is established by methods including independent compensation consultants, compensation surveys and studies, and comparability data." The NRA further represented in its filings that "[i]n addition, under the NRA Bylaws, compensation of certain elected officers (including the Executive Vice President) must be approved by the Board of Directors, based on recommendations by the compensation committee. All decisions are properly documented."

401.    Upon information and belief, contrary to the NRA's representations, the NRA Board set the compensation for LaPierre, Phillips and Frazer during the period 2015 to 2018 without relying upon or properly consulting a compensation consultant, considering reliable compensation surveys or obtaining appropriate comparability data. The Board also did not maintain adequate documentation of the process of determining officer compensation.

402.    For example, in or about late August 2017, the OCC hired an executive compensation consultant to prepare a report which would, among other things, compile

competitive market compensation levels for NRA executives based on comparable positions in comparable organizations. The report was to be completed for consideration by the OCC at its September 7, 2017 meeting in preparation for making 2018 officer compensation recommendations to the Board as provided in the NRA bylaws. The OCC, however, made a recommendation on salary and bonus awards for LaPierre, Phillips and Frazer without awaiting a report or even comparability data from the consultant prior to making a recommendation.

403.    On September 5, 2017, even though his own salary was being considered, defendant Phillips provided the OCC Chair with compensation information that he prepared for the OCC's analysis and consideration. Phillips's proposal consisted of a handful of trade and business-related entities that he selected for salary comparisons for each executive position. No charitable organizations were considered. Phillips provided his comparability data and "peer comparison" noting to the OCC Chair, "[f]or CEO, we can change some out if you like others instead."

404.    Phillips additionally prepared and provided to the OCC Chair talking points for the Board's consideration of the OCC's recommendations, including a statement that the OCC considered outside compensation consultant reports "[i]n developing its recommendation to the Board," without disclosing that it did not have an executive compensation consultant report for 2017. Upon information and belief, Phillips's proposals were used by the OCC in preparation of its recommendation and presentation to the Board, including the representation that in conducting its due diligence, the OCC relied upon executive compensation consultant reports.

405.    On September 7, 2017, the OCC met and recommended increases in cash compensation for each of LaPierre, Phillips and Frazer. It recommended that LaPierre's compensation be increased from approximately $1.43 million in 2017, to approximately $1.78 million in 2018, which included an increase in his bonus from $150,000, the amount he had been

awarded each year from 2015 to 2017, to $455,000 in 2018. The OCC recommended that Phillips's total compensation be increased from approximately $669,000 in 2017, to approximately $830,000 in 2018, which included a bonus of $210,000. It also recommended that Frazer's compensation be increased from 2017 levels, when his reported total compensation was $375,000 to approximately $414,000 for 2018, which included a bonus of $54,100. No benchmarks or specific performance achievements were set out in regard to the recommended bonuses. Furthermore, as detailed below, the amount reported as compensation in the NRA's IRS Form 990 for 2018 paid to LaPierre, Phillips, and Frazer was more than what was authorized by the OCC. In addition, as also discussed below, the reported amounts did not reflect the full compensation for LaPierre, Phillips, and Frazer.

406. At the September 9, 2017 meeting of the NRA Board, the directors went into executive session for 35 minutes to consider the reports of three committees: the OCC, the Committee on Hearings and the Finance Committee. Board minutes reflect merely that it entirely adopted the OCC's recommendations, including a pay raise of more than $300,000 for LaPierre. There is no evidence that LaPierre's, Phillips's, or Frazer's performance or the overall state of the NRA were considered or that the Board was presented with information about any other aspects of the officers' compensation beyond their base salary and bonus, such as reimbursement for personal expenses and in kind benefits, as discussed below.

407. Upon information and belief, the process that the OCC and the Board followed to determine 2018 officer compensation is just one example of the lack of due diligence, full disclosure, and proper documentation in regard to senior officer compensation at the NRA. Neither the OCC nor the Board performed adequate due diligence in assessing the reasonableness of NRA senior officer compensation or relied upon appropriate comparability data. Nor did they adequately and contemporaneously document the basis for their determinations.

408.     A review of NRA records between 2013 and 2018 demonstrates cursory OCC reports to the Board, usually less than a full page, pro forma approval of OCC recommendations, and little time for debate or consideration in executive sessions at Board meetings.

409.     The OCC did not carry out its duties under the NRA bylaws, New York or federal law in regard to ensuring that only reasonable compensation is paid, and exposed the NRA to liability for federal excise tax based upon unreasonable and excessive compensation and distributions to disqualified persons.

410.     Pursuant to the NRA bylaws, the Board has the obligation at the fall Board meeting to approve all compensation, emoluments, or other income paid to certain of its executives. The majority of the Board of Directors in each year alleged herein participated in, authorized, or approved the transactions described herein. Here, the NRA Board did not fully inform themselves about the executive compensation recommendations to the extent reasonably appropriate under the circumstances.

411.     The majority of the NRA Board disregarded their responsibilities under the bylaws and governing law concerning oversight of compensation of corporate officers for the purpose of accommodating defendant LaPierre and his senior officers. Upon information and belief, the NRA Board failed to inquire into excessive and inappropriate payments to LaPierre and Phillips.

412.     Furthermore, LaPierre effectively dominates and controls the NRA Board as a whole through his control of business, patronage and special payment opportunities for board members, and his public allegations to the NRA membership of a "criminal conspiracy" against board members and officers who question his activities.

**B. The Officers Compensation Committee and the NRA Board Failed to Consider or Approve LaPierre's and Phillips's Complete Compensation Prior to Making Compensation Determinations**

413. The OCC and the NRA Board also did not take into account the entirety of LaPierre's compensation when assessing the reasonableness of his compensation.

414. Reimbursement or payment for expenses for NRA employees, including officers, may only be treated as nontaxable if the NRA maintains and complies with an IRS-mandated "Accountable Plan." The plan must, at a minimum, (1) require that reimbursed expenses have a documented business connection; (2) require employees to account for such expenses within a reasonable period of time; and (3) require employees to return any excess reimbursements or allowance within a reasonable period of time.

415. When determining LaPierre's compensation during the period 2015 to 2018, the OCC did not consider the benefits that LaPierre received for the value of personal travel for LaPierre and his family to vacation on the yacht Illusions in the Bahamas, as described above, and other expense reimbursements to LaPierre or on LaPierre's behalf. As discussed above, the NRA paid these expenses without complying with the Accountable Plan requirements of documenting the business purpose of the expense, requiring LaPierre to account for the expense within a reasonable time and requiring him to return excess expense allowances within a reasonable time. The value of the benefit that LaPierre received for payment or reimbursement of these expenses, in whole or substantial part, constituted taxable compensation to LaPierre.

416. The NRA also failed to enforce a reasonable time period for LaPierre to submit other expense reimbursement requests. LaPierre was permitted to submit his expense reimbursement requests months or years after the fact. For example, in June 2019, the employee responsible for handling LaPierre's expenses was still waiting to receive receipts from April of

98

2018. These late reimbursements failed to meet the requirements of an Accountable Plan, and should have been considered taxable income to LaPierre.

417.    The OCC also did not consider payments or expense reimbursements to or on behalf of LaPierre that were passed-through Ackerman McQueen or the Mercury Group, as described in Part Five, Section II(A)(iii).

418.    In addition, the OCC did not consider or disclose the value of a post-employment contract that the NRA gave defendant LaPierre, which provides for payments in excess of $1 million per year after LaPierre's tenure as EVP ends due to retirement or losing a re-election bid.

419.    This post-employment contract was signed in 2013 by the then-NRA President, Phillips, and LaPierre (hereinafter, together with any subsequent amendments or reiterations, the "LaPierre Post-Employment Contract"). Neither the First nor Second Vice President signed the contract, as required by NRA policy governing procurement. There is no evidence that the NRA Board or a designated committee reviewed or approved the LaPierre Post-Employment Contract. LaPierre testified that he did not know whether his post-employment contract was approved by the OCC, or whether it was disclosed to NRA membership or the NRA Board.

420.    Under the terms of the LaPierre Post-Employment Contract, if LaPierre retired or lost reelection in 2014, his annual compensation from the NRA would increase. In each amendment to LaPierre's Post-Employment Contract, which extended the terms and the amount of compensation, the NRA was obligated to continue to pay LaPierre for years after he lost re-election or retired and at a higher rate than his compensation as Executive Vice President. LaPierre testified that he was aware of this feature of the contract: "I noticed that and kind of shook my head at it when I saw it," LaPierre recalled, "I didn't ask for this contract. It's what was presented to me and I signed it and it never went into effect because I stayed on as EVP."

99

421.    By letter agreement dated March 16, 2015, the NRA President extended the term of the LaPierre Post-Employment Contract by two years, to 2020, with annual compensation in 2019 of $1,150,000, and in 2020 of $1,200,000. The letter was signed by the NRA President and Phillips. There is no evidence that any other NRA officer, the NRA Board, the OCC, the Audit Committee or any other Board committee reviewed or approved this letter agreement.

422.    By memorandum dated April 30, 2018, the NRA President advised LaPierre that the NRA "would like to extend and modify" the LaPierre Post-Employment Contract due to, among other things, "security concerns." The memorandum proposes a 7-year compensation schedule paying $1,300,000 in 2019, and $1,500,000 for the next 6 years (2020-2025).

423.    The memorandum further provides that "we continue to believe it is in the best interest of the NRA that we maintain control over your name and likeness. For that reason we seek to contract with you for an additional five years (2026-2030) as a consultant. During this five year period, the NRA will have use of your name and likeness as mutually agreed upon. You agree to make personal appearances that are reasonable in terms of advance notice and convenience of the location." The annual compensation for these consulting services is $1,500,000 per year for three years (2026-2028), followed by $1,300,000 per year for two years (2029-2030). The memorandum agreement is signed by LaPierre, Phillips, the then NRA President, and then NRA Second Vice President. There is no evidence that any other NRA officer, the NRA Board, the OCC, the Audit Committee or any other Board committee reviewed or approved this 2018 extension of the memorandum agreement.

424.    LaPierre testified that this contract extension and modification was prompted by a desire to retain rights over his name and likeness. "They wanted to tie my likeness, my name, my brand, my signature up for years given the fact that the signature raises so much money in terms

of the identity with sportsmen and Second Amendment enthusiasts and all that." LaPierre testified that he did not have any plans to use his likeness for any other purpose after his departure from the NRA. The unapproved contracts, and their promise of post-employment payments, violated New York law and the NRA's bylaws and policies.

425.    The OCC did not consider or disclose the value of Phillips's post-employment contract with the NRA as described in Part Five, Section I(B)(iii) above. Like LaPierre, there is no evidence that the NRA Board, including by the OCC, the Audit Committee or any other Board committee reviewed or approved Phillips's post-employment contract.

426.    Phillips had an NRA-issued credit card, which he allowed other NRA employees to use to incur personal expenses. Upon information and belief, Phillips may have also used the credit card for personal uses that were inappropriately reimbursed by the NRA and not reported as taxable income.

427.    Because of the failure of the OCC and the NRA Board to consider the value of all of the components of LaPierre's and Phillips's compensation packages, the Board's approval of their compensation is not entitled to a presumption of reasonableness.

### C.  LaPierre Failed to Properly Determine Powell's Compensation

428.    Pursuant to the NRA bylaws, LaPierre was authorized to determine and approve Powell's compensation as Chief of Staff, Executive Director of General Operations and Senior Strategist.

429.    As discussed in Part Five, Section I(C)(i) above, in the course of less than a two-year period, Powell's salary increased from his June 2016 starting salary, which was $250,000 annually, to $800,000 annually. This salary does not include other benefits and compensation received by Powell, including those passed through Ackerman as described in Part Five, Section II(A)(iii) above.

101

430.    The NRA represented in Schedule O to the 2017 IRS Form 990, the first year that the NRA disclosed Powell's compensation as an NRA officer, that "compensation of NRA's top management officials is established by methods including compensation consultants, compensation surveys and studies, and comparability data." The NRA made a similar representation in its IRS Form 990 for 2018. There is no evidence that any such methodology was used by LaPierre in determining Powell's compensation, that all of his benefits and sources of compensation were considered, or that LaPierre adequately and timely documented the basis for his determination of Powell's compensation concurrently with making determinations to raise Powell's compensation.

### D.  The NRA's Compensation Disclosures to the Attorney General and the Internal Revenue Service Were False or Misleading

431.    As a charitable nonprofit, the NRA is required to "report [on the IRS Form 990] compensation for both current and former officers, directors, key employees, and highest compensated employees." The IRS compensation disclosure requirements include, without limitation, base salary, bonuses (paid or deferred during the reporting period), incentive compensation, contributions to retirement plans, the value of benefits such as health, disability, long term care, and life insurance (including split dollar plans), housing and automobile allowances, and taxable travel, meals and entertainment expenses.

432.    The NRA certifies the accuracy of its compensation disclosures in its annual CHAR500 filing with the Attorney General, which annexes the organization's annual IRS Form 990 and all accompanying schedules, including Schedule J, which specifically addresses aspects of the organization's compensation scheme.

102

433.    From 2015 to 2018, the NRA reported paying LaPierre $10,191,728 in total compensation, an average of $2,547,932 a year. In its annual IRS Form 990 filings, the NRA reported the following breakdown of LaPierre's compensation for 2015 through 2018:

| | Breakdown of W-2 and/or 1099-MISC compensation | | | Retirement & other deferred compensation | Nontaxable benefits | Total compensation |
|---|---|---|---|---|---|---|
| | Base compensation | Bonus & incentive compensation | Other reportable compensation | | | |
| 2015 | $1,090,515 | $150,000 | $3,810,734 | $19,605 | $40,131 | $5,110,985 |
| 2016 | $1,165,062 | $150,000 | $43,904 | $19,610 | $43,763 | $1,422,339 |
| 2017 | $1,172,166 | $150,000 | $44,522 | $19,680 | $47,609 | $1,433,977 |
| 2018 | $1,267,878 | $455,000 | $427,756 | $20,280 | $53,513 | $2,224,427 |

434.    But, as discussed in Part Five, Section I(A)(i), the NRA pays or reimburses LaPierre's personal travel by charter plane, and personal travel for family members. LaPierre is also reimbursed for other expenses that are not submitted within a reasonable time. The value of these travel and other reimbursed expenses constitutes taxable income to LaPierre that was required to be reported.

435.    With respect to Powell, from 2017 and 2018, the NRA reported paying Powell $1,699,035 in total compensation, an average of $849,517.50 a year. In its annual IRS Form 990 filings, the NRA reported the following breakdown of Powell's compensation for 2017 and 2018:

| | Breakdown of W-2 and/or 1099-MISC compensation | | | Retirement & other deferred compensation | Nontaxable benefits | Total compensation |
|---|---|---|---|---|---|---|
| | Base compensation | Bonus & incentive compensation | Other reportable compensation | | | |
| 2017 | $557,172 | $50,000 | $104,224 | $15,900 | $51,770 | $779,066 |
| 2018 | $782,739 | $0 | $61,398 | $16,500 | $59,332 | $919,969 |

436.    As noted above in Part Five, Section I(C)(ii), Powell similarly failed to provide sufficient justification for his reimbursement requests for travel and meal expenditures, and those

103

expenditures should have been included as taxable income in his compensation because they were paid or reimbursed without complying with an Accountable Plan.

437. From 2015 to 2018, the NRA reported paying Phillips $3,090,256 in total compensation, an average of $772,564 a year. In its annual IRS Form 990 filings, the NRA reported the following breakdown of Phillips's compensation for 2015 through September 13, 2018:

| | Breakdown of W-2 and/or 1099-MISC compensation | | | Retirement & other deferred compensation | Nontaxable benefits | Total compensation |
| | Base compensation | Bonus & incentive compensation | Other reportable compensation | | | |
|---|---|---|---|---|---|---|
| 2015 | $423,048 | $94,265 | $31,956 | $19,610 | $22,328 | $591,207 |
| 2016 | $524,396 | $100,000 | $172,490 | $19,610 | $23,788 | $840,284 |
| 2017 | $525,942 | $100,000 | $38,371 | $19,680 | $26,003 | $709,996 |
| 2018 (ending 9/13/2018) | $573,567 | $210,000 | $116,970 | $20,280 | $27,952 | $948,769 |

438. From 2015 to 2018, the NRA reported paying Frazer $1,702,798 in total compensation, an average of $425,699.50 a year. In its annual IRS Form 990 filings, the NRA reported the following breakdown of Frazer's compensation for 2015 through 2018:

| | Breakdown of W-2 and/or 1099-MISC compensation | | | Retirement & other deferred compensation | Nontaxable benefits | Total compensation |
| | Base compensation | Bonus & incentive compensation | Other reportable compensation | | | |
|---|---|---|---|---|---|---|
| 2015 | $264,879 | $0 | $7,697 | $15,208 | $40,662 | $328,446 |
| 2016 | $317,716 | $25,000 | $30,557 | $15,900 | $50,295 | $439,468 |
| 2017 | $318,621 | $25,000 | $31,711 | $15,900 | $53,999 | $445,231 |
| 2018 | $325,953 | $54,100 | $33,023 | $16,500 | $60,077 | $489,653 |

439. The NRA's compensation disclosures in its IRS Form 990s for the period 2015 to 2018 as they related to each of the Individual Defendants' compensation falsely represented the NRA Board's process and deliberations on setting their compensation as officers as described above.

104

440.    The NRA's filings included false or misleading statements relating to compensation and benefits conveyed to top employees and officers. For example, the IRS requires that certain employment benefits provided to persons listed on the IRS Form 990 Part VI as officers or highly compensated employees be reported on Schedule J. The benefits include "first class or charter travel", "travel for companions," and health or social club dues. On Schedule J to the 2018 IRS Form 990, the NRA represented that it provided "first class travel," "travel for companions," and "health or social club dues." For each such benefit the NRA represented that the "organization follow(ed) a written policy regarding payment or reimbursement or provision of all the expenses" listed. This representation, certified by defendant Frazer, was false.

441.    In another example of a false or misleading representation in the NRA's employee benefit disclosures, in the NRA 2017 IRS Form 990, the NRA acknowledged providing "first class or charter travel" and "health or social club dues." "Travel for companions" was not acknowledged as an employee benefit even though the NRA provided "travel for companions" during 2017. For each such benefit, the NRA represented on the 2017 IRS Form 990 that the "organization follow(ed) a written policy regarding payment or reimbursement or provision of all the expenses" listed. This representation, certified by defendant Frazer, was false.

442.    The IRS requires that any "diversion of assets" in excess of $250,000 be reported on IRS Form 990, Section VI. A "diversion of assets" under IRS rules includes "any unauthorized conversion or use of the organization's assets other than for the organization's authorized purposes." The IRS further notes that "[a] diversion of assets can in some cases be inurement of the organization's net earnings. … [I]t can also be an excess benefit transaction under section 4958 and reportable on Schedule L" of the IRS Form 990.

105

443.     During the period 2015 to 2018, the NRA has not reported on its IRS Form 990 a diversion of assets in the form of an excess benefit transactions despite having paid unreasonable compensation to some or all of the Individual Defendants, as alleged in Part Five, Section I above.

## IV.   The NRA's Retaliation Against Dissidents on the Board

### A.   Dissident No. 1

#### i.   LaPierre Recruits Dissident No. 1 as President and Negotiates Ackerman Contract

444.     In spring 2018, LaPierre recruited Dissident No. 1 to run for NRA President. At the time, the plan was for Dissident No. 1 to complete the remainder of the outgoing President's term. He would then be re-nominated by the Board to serve out a full term as President.

445.     At the time Dissident No. 1 was recruited by LaPierre, he had a contract at Fox News to provide multiple episodes of a program called "American Heroes" under which he received significant compensation and health benefits. The NRA bylaws did not permit Dissident No. 1 to receive a salary from the NRA as NRA President, and Fox News was unwilling to retain Dissident No. 1's contract for "American Heroes" if he became President of the NRA.

446.     To persuade Dissident No. 1 to accept the unpaid position, LaPierre negotiated a contract with Ackerman to take over the "American Heroes" program. Under this contract, Dissident No. 1 would be guaranteed a salary and benefits comparable to what he was receiving from Fox. In a December 2019 deposition, Dissident No. 1 testified, "LaPierre suggested as the means of making me the president of the NRA that I take the job with Ackerman McQueen." He further testified that, had he not received a contract from Ackerman providing the requisite benefits, "I would not have taken on the mantle of president of the NRA."

447.     On at least two occasions, LaPierre met with Dissident No. 1 about the request for him to become NRA President and the associated plan for him to be employed by Ackerman. On

106

April 22, 2018, Dissident No. 1 sent LaPierre's Senior Assistant a fax containing the "Deal Points for NRA & [Dissident No. 1]" and requested that the message be passed "only to the parties we agreed on 22 April 2018." The deal points articulated a "two phase plan" for Dissident No. 1 to become employed by Ackerman while also stepping into the role of NRA President, and included options for employment status, compensation, and benefits. In a December 2019 deposition, Dissident No. 1 testified that this term sheet "had been discussed twice now at that point with Wayne LaPierre," and "reflected what [he] wanted me to do for the specified amount of money as an employee of … Ackerman [] working for NRA-TV … these are the points that came out of those discussions with Wayne LaPierre in April [2018] before we got to the annual meeting in May [2018] and they were very well known to certainly the people closest to Wayne."

448.    Before entering into a contract with Dissident No. 1, Ackerman required the NRA to contractually guarantee it would pay the compensation owed under the contract. On May 6, 2018, the NRA and Ackerman amended their 2017 Services Agreement to provide: "All service fee billing under this Service Agreement for talent and employees who work through [Ackerman] for NRA and its affiliates, including, but not limited to [Dissident No. 1] shall be invoiced by Ackerman …which invoice shall be payable by NRA to Ackerman." The amendment was signed by Phillips and the outgoing President, and was attested to by the First and Second Vice Presidents.

449.    Eight days later, on May 15, 2018, Dissident No. 1 entered into an employment contract with Ackerman. Under the terms of the contract, Dissident No. 1 agreed to serve as the host of an NRA-TV documentary series also titled "American Heroes" for twelve episodes per year for three years. He would receive a base salary of $2,100,000 in year one, $2,300,000 in year two, and $2,500,000 in year three. As an employee, Dissident No. 1 would also be entitled to healthcare and life insurance benefits.

107

450.   Upon information and belief, Phillips and LaPierre were aware of the material terms of Dissident No. 1's employment agreement with Ackerman at the time it was executed.

451.   In May 2018, Dissident No. 1 was nominated, with LaPierre's support, to be NRA President and was elected by the Board. Dissident No. 1 did not immediately take office because he needed to address outstanding issues concerning his contracts with Fox and Ackerman. Between May 2018, when Dissident No. 1 was elected president, and September 2018, when he took office, an interim President served in his place.

### ii.  Dissident No. 1 Undertakes His Fiduciary Responsibilities as NRA President

452.   As duly elected President, Dissident No. 1 viewed it as his fiduciary duty to ensure that the finances of the NRA were being managed prudently. Almost immediately after taking charge as NRA President in September 2018, Dissident No. 1 started looking closely at the operations of the NRA. At this time, he was also alerted to certain problems by internal whistleblowers, NRA board members, and major donors.

453.   In October 2018, Dissident No. 1 convened a group of advisors to "provid[e] advice and recommendations to the President and Executive Vice President on matters crucial to the good governance of the Association." In an agenda for an October 24, 2018 meeting of its members, Dissident No. 1 identified a series of key questions, including: "(a) where did Josh [Powell] come from? who vetted Josh? are rumors about Josh and sexual harassment true; (b) what is the status of the 'whistleblower' accusations; and (d) how is [the current Treasurer] working out as Treasurer?" This agenda provides insight into the types of issues that Dissident No. 1 was trying to address in the performance of his responsibilities as President.

108

454.    As his presidency progressed, Dissident No. 1 became concerned about the fact that the NRA was paying the Brewer firm about $2 million per month in fees that were not properly authorized or reviewed.

455.    The Brewer firm was initially retained by the NRA in March 2018 to address issues involving NRA affinity partners.

456.    Later in 2018, LaPierre, with the assistance of Frazer and NRA Board Counsel, expanded the mandate of the Brewer Firm, selecting it to undertake a top-down "compliance review" of the NRA. LaPierre did not seek alternative bids to perform this work. LaPierre did not ask any other clients of the firm about their experience. He did not identify any metrics or analytics that he applied in making the decision to retain the Brewer firm for this compliance review. He did not review the financial terms of the Brewer engagement and did not "get into" any consideration of project-based pricing as opposed to hourly-based pricing. Instead, he left any inquiry into these issues to the discretion of the General Counsel's Office.

457.    Despite having less than two years of experience in private practice, and little experience engaging or negotiating with outside counsel for large-scale litigation and internal investigation work, Frazer was responsible for negotiating the engagement letter and the pricing. Frazer prepared the business case analysis, which estimated monthly charges of approximately $1.25 million, based on hourly billing, and indicated that there were no other bidders for the legal services. Frazer was also responsible for reviewing and approving the Brewer firm's invoices while the engagement was ongoing. Between March 2018 and February 2019, the Brewer firm charged the NRA approximately $19,000,000 in legal fees.

458.    By Board resolution adopted on March 8, 2019, the Audit Committee determined that the original contract between the NRA and the Brewer firm did not "comply with the internal

controls and policies established by the NRA." When executing the original engagement letter with the Brewer firm, Frazer did not obtain written approval from the President and a Vice President, as required by NRA policy. When asked why he did not comply with NRA policy in entering into this contract with the Brewer firm, Frazer testified, "It was an error on my part."

459.    In light of the internal control issues with the Brewer firm's engagements and the fees being charged and paid under those engagements, Dissident No. 1 began to demand more comprehensive reviews of the firm's retainer agreements and invoices.

460.    In March 2019, Dissident No. 1 sent a series of letters and memoranda to the NRA Board Counsel, Audit Committee, and General Counsel raising concerns about the Brewer firm's engagement and its billing practices. In a March 11, 2019 letter, Dissident No. 1 directed the NRA Board Counsel to notify the Brewer firm that none of its retainer agreements with the NRA had been reviewed or approved by the NRA's elected non-salaried officers. A few days later, Dissident No. 1 sent a similar letter to Frazer asking him to request from the Brewer firm copies of "all relevant engagement letters."

461.    On March 22, 2019, Dissident No. 1 sent a memo to the Audit Committee raising concerns about the reasonableness and basis of the Brewer firm's legal fees, and requesting that it "initiate an outside, independent review of these expenditures to ensure that such services and fees charged are reasonable and appropriate." And on April 18, 2019, Dissident No. 1, along with the First Vice President, wrote to Frazer and the Audit Committee Chair about the "extraordinary legal fees the NRA has incurred" by the Brewer firm, and reiterating his request that the NRA engage an outside, independent expert to review the payments to Brewer.

462.    Despite Dissident No. 1's demands, neither the Audit Committee nor others on the NRA Board were permitted to conduct a review of the Brewer firm's invoices. Instead, Frazer

retained an outside law firm to review the Brewer engagement. However, the firm's review was limited to determining whether NRA management had the authority to hire the Brewer firm. It did not examine the reasonableness of the legal fees that the firm was charging, or whether the legal services performed were consistent with the scope of the engagement. The firm concluded that the NRA's payments "to the Brewer firm and the services the Brewer firm have provided to the Association to date are … authorized, absent a finding that the legal services were not in fact performed or legal services were performed that exceeded the scope of the engagement." The firm also noted that the NRA "is entitled to review the services … incurred on its behalf by the firm to determine whether they are accurate and within the scope of the engagement," and advised "it may well be in the [NRA]'s interest to obtain a full accounting of the Brewer firm's time charges to date."

### iii. LaPierre Voices Concern about Dissident No. 1's Contract

463.    When Dissident No. 1 began making inquiries into the Brewer firm's billings and the operations of the NRA, LaPierre impeded his participation in the NRA's affairs, and took steps to ensure he would not be reelected as President.

464.    LaPierre believed that Dissident No. 1's inquiries into the NRA's affairs exceeded the purview of the NRA President, which LaPierre sees as a "largely ceremonial" position. LaPierre testified that Dissident No. 1 "started to interfere in … in a lot of things that weren't under the role of the president. They were actually more the day-to-day management stuff." In a September 2019 deposition, LaPierre recalled telling Dissident No. 1 that he "cannot keep interfering in all of the day-to-day affairs … of the NRA. That's my job. And you need to stay out of it to protect yourself, but it's also my job, not yours …."

465.    In late 2018, LaPierre started raising concerns about Dissident No. 1's relationship with Ackerman, which LaPierre had been instrumental in arranging. LaPierre claimed to have been

111

unaware of Dissident No. 1's employment at Ackerman, and ultimately used it to retaliate against Dissident No. 1 and to prevent any scrutiny of Brewer's legal fees.

466.    LaPierre repeatedly denied Dissident No. 1 access to Brewer's retention agreements and invoices. On at least two occasions, LaPierre sent cease-and-desist letters to Dissident No. 1 demanding he stop looking into the matter. LaPierre also repeatedly denied Dissident No. 1's request for an independent audit of Brewer.

467.    In a February 26, 2019 letter to Dissident No. 1, LaPierre wrote that it was his "duty as CEO and EVP to direct the day-to-day affairs of the Association," including to oversee the Brewer investigation, and that Dissident No 1's status as an Ackerman employee posed a "conflict of interest" that precluded him from seeking information about the Brewer engagement. One month later, in late March, LaPierre sent a follow-up letter demanding that Dissident No. 1, as a "highly compensated full-time employee of Ackerman McQueen" with an "obvious conflict of interest, … desist immediately" from his attempts to "burden or obstruct the NRA's engagement of outside counsel on matters pertaining to Ackerman."

468.    On April 24, 2019, LaPierre's Senior Assistant informed Dissident No. 1 that LaPierre "will not support you in [your] term as NRA President." In a September 2019 deposition, LaPierre testified that he withdrew his support after learning that Dissident No. 1 "was working to stack" the Audit Committee to "get[] rid of Brewer," which LaPierre "wasn't going to let [] happen." While the Nominating Committee has formal responsibility under the bylaws for nominating NRA officers, in practice, LaPierre wields tremendous influence over who was elected to the officer positions. As such, his decision not to support Dissident No. 1's re-nomination effectively guaranteed that Dissident No. 1 would not be re-nominated.

112

469.    On April 25, 2019, Dissident No. 1 wrote to the Executive Committee. He asserted that the NRA was facing "a crisis that could affect its ability to operate as a nonprofit organization" and that it was his "fiduciary duty to respond to this crisis." He stated his intention to form a "Crisis Management Committee" pursuant to NRA bylaw Article V, Section 2. One of the tasks the proposed Crisis Management Committee would undertake would be to "supervise an outside independent review of the invoices submitted by Brewer Attorneys & Counselors, which total more than $24 million over a short period of time."

470.    Just days later, Dissident No. 1 announced his resignation during the NRA's annual meeting in Indianapolis. In a letter read to NRA members, Dissident No. 1 stated, "I hoped to be with you today as NRA president endorsed for re-election. I'm now informed that that will not happen. … There is clearly a crisis. It needs to be dealt with immediately and responsibly, so the NRA can continue to focus on protecting the 2nd Amendment."

471.    Despite resigning from his position as NRA President, Dissident No. 1 did not resign from the NRA wholesale; rather, he continued on the NRA Board and remained part of the NRA's membership. The NRA is currently conducting an internal expulsion proceeding against Dissident No. 1, which, upon information and belief, was undertaken in retaliation for his exercise of fiduciary responsibilities in violation of its whistleblower policy. In June 2020, the NRA filed an action in New York State Court seeking a declaratory judgement that the expulsion of Dissident No. 1 is proper. Litigation related to that action is ongoing.

### B.  Dissident Board Members

472.    By a July 22, 2019 letter, four NRA board members requested that an independent audit be conducted into allegations of financial misconduct at the NRA and the payments made to the Brewer firm for legal fees. The board members also requested pursuant to Article IV, Section 2 of the NRA bylaws, that an outside independent special committee be formed to investigate and

113

address issues the board members describe in their letter. Upon information and belief, the dissenting board members requested additional information concerning compensation paid to other board members, salaries paid to executive officers including Powell, and the justification for expanding the scope of the Brewer firm's engagement.

473.    Upon information and belief, those inquiries were not answered to the satisfaction of the dissenting board members. According to those board members, their requests were rebuffed or ignored and they were "stonewalled, accused of disloyalty, stripped of committee assignments, and denied effective counsel necessary to properly discharge [their] responsibilities as board members."

474.    Upon information and belief, those board members who publicly (either through correspondence or social media posts) expressed concern about the NRA's actions or who called for an independent audit of the NRA, were subsequently denied the committee assignments they requested following the NRA's annual member meeting in 2019.

475.    Subsequently, several board members resigned in the summer of 2019.

## V.    The NRA Board's Failures Resulting in Violations of Law

476.    The culture of noncompliance and disregard for the internal controls was evident within the NRA Audit Committee, which similarly failed to fulfill its obligation to oversee internal controls. This lack of oversight resulted in waste and loss of the NRA's charitable assets and contributed to the NRA reaching its currently deteriorated financial state.

477.    Under New York law, the Audit Committee is responsible for overseeing the accounting and financial reporting processes of the organization and the audit of its financial statements. The Audit Committee may also be the committee designated to oversee the implementation of an organization's conflict of interest and whistleblower policies, and to review and vote on proposed related party transactions. The NRA's Audit Committee was subject to New

114

York law, and, under the NRA's internal policies, was the committee designated with oversight of those policies.

478.    Further, the Mission Statement for the NRA's Audit Committee, set out in its Charter, provides that:

> The primary function of the Audit Committee is to assist the Board of Directors in its oversight of the integrity of financial information, its review of the adequacy of the system of internal controls established by the Association, and its monitoring of the audit process. In performing these functions, the Audit Committee shall review the Association's financial reporting process and internal controls, review and appraise the audit efforts of the Association's independent auditors, and provide open means of communication between the Directors, the independent auditors, and the financial and senior management of the Association. In addition, the Audit Committee will provide oversight of regulatory compliance and business ethics compliance.

479.    In his testimony to the Attorney General, the Audit Committee Chair said that he had no knowledge of New York law governing audit committees, whistleblowers, or conflicts of interest, and could not recall the last time he had seen the Charter. He also testified that, in his view and contrary to the Charter, the Audit Committee had no role in oversight of internal controls and that its role was significantly more limited than the role set out for the Committee in its Charter. He testified, "Responsibility of the audit committee is to interact with the external auditors. And by that, I mean meet with them, planning the audit. We have one meeting during the pendency of the audit. And then when the audit is over, we have what I refer to as an exit meeting. We discuss their findings. We discuss anything that might be in the management letter, just to see if there's anything that we need to follow up on after they're through auditing."

480.    In practice, the Audit Committee failed to oversee the organization's internal controls. The Committee Chair testified that "there is no internal auditing" within the NRA. When asked why, he testified, "[i]f there is a specific reason, I don't know it. It hasn't had [an internal auditor] the whole nineteen years I've been on the Board."

481.    The Audit Committee Vice Chair testified that on at least two occasions prior to 2018, he had a discussion with Phillips and the Managing Director of Finance in which he proposed creating an internal audit function. The Vice Chair testified that "the thought process was that was very expensive, and I received assurances from both of them that we had solid documentation …" He recalled being told by Phillips and the Managing Director of Finance, "we don't necessarily see a cost benefit to it, and with … the assurances we received from a top tier national accounting firm … they were able to render an opinion based on our system of internal control."

482.    This explanation ignores the fact that the opinions rendered by the NRA's auditors always explicitly stated that the auditors "express no opinion" on the adequacy of the entity's internal controls.

483.    The Vice Chair also testified that discussions about establishing an internal audit function have been "ongoing" between himself, the Audit Committee Chair, and the current Treasurer since whistleblowers came forward in 2018. He admitted, however, that the Audit Committee has not taken any steps to recommend that the Board direct the creation of an internal audit function.

### A.  Audit Committee's Failure to Respond Adequately to Whistleblowers

484.    Under New York law, an organization of the NRA's size must "adopt, and oversee the implementation of, and compliance with, a whistleblower policy to protect from retaliation persons who report suspected improper conduct." N-PCL § 715-b.

485.    Under the NRA's Statement of Corporate Ethics, the Audit Committee was tasked with receiving whistleblower complaints concerning any financial irregularities or conflicts of interest related to NRA employees or board members.

486.    In violation of its obligations under New York law and NRA policy, the Audit Committee failed to respond adequately to whistleblowers. Along with Defendants Powell, Frazer,

116

and Phillips, members of the Audit Committee were on notice of serious complaints by the NRA Whistleblowers and failed to take appropriate action.

487.    While the Audit Committee Chair acknowledged that it was the Committee's responsibility to address whistleblower complaints, when pressing issues concerning the financial mismanagement and failure to follow internal controls of the NRA were brought to its attention, the Audit Committee failed to take appropriate action, instead referring the complaints to their outside counsel, with no effort to follow up thereafter in a timely or meaningful manner.

488.    As detailed above, in late 2017, a group of senior level staff in the Office of the Treasurer (who would go on to become the NRA Whistleblowers) began an independent review of certain transactions and violations of NRA policy. Their work culminated in a memo titled "List of Top Concerns for the Audit Committee" that they prepared in July 2018 (the "Top Concerns Memo"). The Top Concerns Memo enumerated the NRA Whistleblowers' concerns related to financial conflicts of interest, senior management override of internal controls, and vague and deceptive billing practices.

489.    On July 30, 2018, the Audit Committee held an emergency meeting at which the concerns raised in the Top Concerns Memo were presented. According to both the Chair and the Vice Chair of the Audit Committee, there was no dispute that the individuals who presented these concerns had come forward in the capacity of whistleblowers. Wayne LaPierre also testified that he regarded these individuals as whistleblowers.

490.    The Audit Committee Chair testified that he was aware that serious whistleblower concerns would be raised at the July 30, 2018 meeting. Despite this awareness, the Chair left the meeting prior to the presentation from the NRA Whistleblowers.

117

491.    In connection with this July 30, 2018 meeting, one of the NRA Whistleblowers penned a "personal statement" in which she formally announced herself as a whistleblower and documented her belief that the meeting was "being manipulated in a way as to try to explain away our issues or try to claim the items on the list are 'fixed' before we can present them as whistleblowing." The personal statement described the items in the Top Concerns Memo as "a sample of the types of issues we face daily and not to be considered all inclusive." The personal statement also asserted that, "in the past, our complaints and concerns were dismissed or 'explained away.'"

492.    The Report of the Audit Committee documenting the July 30, 2018 meeting makes no mention of the fact that whistleblowers came forward. In contrast, it was the usual practice of the Audit Committee to expressly note in its committee reports when "there were no instances of whistleblowing reported."

493.    Upon information and belief, NRA personnel took affirmative steps to conceal the nature and scope of the NRA Whistleblower' concerns from its external auditors.

494.    No one from RSM, the NRA's external audit firm, was present at the July 30, 2018 meeting, although the official report of the meeting erroneously indicates that the RSM Audit Partner attended. The Audit Committee also did not inform the NRA's external auditors about the nature and scope of the whistleblowers' complaints, nor did it alert them to the existence, or provide them with a copy, of the Top Concerns Memo. This was in spite of the fact that, as the current Treasurer testified, external auditors would routinely ask about whistleblower concerns during the audit process.

495.    In connection with its audit of the NRA's 2018 financial statements (the "2018 Audit"), RSM conducted interviews of Audit Committee members and finance staff regarding the

118

risk of fraud and internal control deficiencies. All of the interviews occurred after the July 30, 2018 meeting, so NRA personnel were well aware of the whistleblowers concerns. According to RSM's work papers, none of the NRA personnel interviewed reported any instances of whistleblowing or suspicious activity to the auditors.

496.    In the period following the July 30, 2018 meeting, the Audit Committee relied exclusively on the Brewer firm to investigate the NRA Whistleblowers' claims.

497.    Upon information and belief, the Vice Chair was made aware that at least one of the NRA Whistleblowers felt threatened and harassed because of the whistleblower complaints. The Vice Chair admitted that the Audit Committee did not undertake any measures to determine whether any of the NRA Whistleblowers who came forward at the July 30, 2018 meeting were subject to threats or harassment, including by anyone from the Brewer firm. The Vice Chair further testified that the Brewer firm did not engage in an inquiry as to whether the NRA Whistleblowers were threatened or harassed.

### B.  Audit Committee's Failure to Appropriately Review and Approve Related Party Transactions and Conflicts of Interest

498.    The Audit Committee failed to exercise proper duty of care in reviewing and approving related party transactions and conflicts of interest between the NRA and its officers, directors, and key employees.

499.    The Audit Committee is responsible for supervising the NRA's compliance with its Conflicts of Interest and Related Party Transaction Policy. A "conflict of interest" under the NRA's internal policy is broader than a "related party transaction" as that term is defined in the N-PCL, and encompasses all situations where an officer's, director's, or key employee's "personal or financial interest could be reasonably viewed as affecting his or her objectivity or independence in fulfilling their duties to the NRA."

119

500.    The Audit Committee is responsible for reviewing "all transactions that involve potential conflicts of interest" in order to "determine whether to approve or ratify such transactions. The NRA Audit Committee may only approve the underlying transaction if it determines that such transaction, under the terms and within the circumstances and conditions presented, is fair, reasonable, and in the best interests of the NRA."

501.    When determining the fairness and reasonableness of a transaction, the Audit Committee is required to consider, among other things, alternative transactions to the extent available and the NRA's mission and resources.

502.    The Audit Committee is required to document the disclosure of potential and actual conflicts of interest in its meeting minutes, and must include (1) the name of the person whose conflict is disclosed, (2) the nature of the conflict, and (3) details of the deliberations of the disinterested directors, such as documents reviewed, any alternatives considered, comparative costs or bids, market value information, and other factors considered in deliberations.

503.    Under Section 715 of the N-PCL, the NRA is prohibited from entering into any related party transaction unless the transaction is determined and documented by the Board or a designated committee of the Board to be fair, reasonable, and in the corporation's best interest at the time of the determination. The law also requires that every director, officer, or key person who has an interest in a related party transaction "shall disclose in good faith to the [B]oard … the material facts concerning such interest," and the corporation must undertake a process before approving a related party transaction and document that process.

504.    For years, the Audit Committee failed to adequately address related party transactions or conflicts of interest, in violation of both the N-PCL and the NRA's internal policy governing conflicts of interest. Upon information and belief, the Audit Committee also failed to

120

put in place procedures to ensure that the NRA would comply with New York Law governing related party transactions in the future. N-PCL § 715(j).

505.    In 2016, for example, according to records of the Audit Committee and the Secretary of the Board, the Audit Committee apparently had notice of at least eight related party transactions amounting to approximately $668,000 to be paid to NRA board members. Among the transactions the Audit Committee had notice of were:

    a.  Payments totaling $150,000 to Board Member No. 1;

    b.  Payments totaling $45,180 to Board Member No. 4's law firm; and

    c.  Payments totaling $256,000 to Board Member No. 5.

506.    Upon information and belief, the Audit Committee maintained no records in 2016 establishing whether the Committee considered market value information, alternative transactions or other information in its deliberations concerning the conflicts of interest and related party transactions. There is no resolution by the Audit Committee approving the transactions on a finding that the transactions were fair, reasonable and in the best interests of the NRA.

507.    According to the NRA's internal documents, in 2017, the Audit Committee had notice of multiple substantive related party transactions amounting to at least $730,000 to be paid to NRA board members and employees in 2017. Among the transactions the Audit Committee had notice of were:

    a.  Payments totaling $150,000 to Board Member No. 1;

    b.  Payments totaling $123,248.43 to RCR Enterprises, which is owned by a former NRA Vice President;

    c.  Payments totaling $40,000 to Board Member No. 3;

    d.  Payments totaling $45,180 to Board Member No. 4's law firm; and

121

e.   Payments totaling $134,000 to Board Member No. 5.

508.   In September 2018, the Audit Committee acknowledged in a committee report that there were "[s]everal instances in which transactions that posed conflicts of interest (and thus, should have been disclosed and approved in advance) were disclosed after the fact." The Audit Committee Chair also testified, "there were some [related party transactions] that should have been given to us, should have been captured into the [disclosure of financial interest] forms, should have been presented to us by Frazer and they weren't. That's the reason we [had] to do them after the fact." He suggested, "It may be that some of these contracts were entered into, and John [Frazer] never knew. They never disclosed it on the form."

509.   The Audit Committee then purported to ratify seven related party transactions and conflicts of interest at its September 2018 meeting, in contravention of both N-PCL § 715 and internal NRA policy. In attempting to retroactively approve the transactions at this meeting, the Audit Committee did not review any documents, including any underlying contracts, before purportedly determining that each was "fair, reasonable, and in the best interest of the NRA." There is no evidence that the Audit Committee considered alternative transactions, the NRA's need for the particular transactions, or whether the amounts NRA directors were charging was comparable to other vendors or to what those directors generally charged for those services.

510.   One of the related party transactions that the Audit Committee ratified at its September 2018 meeting was the contract between Dissident No. 1 and Ackerman.

511.   While the fact of this contract with Ackerman, along with its material terms, was known to both LaPierre and Phillips at the time it was executed, the Audit Committee was not made aware of the arrangement at that time. The Audit Committee did not review the contract prior to its execution as required by the N-PCL § 715 and the NRA Policy Manual.

122

512.     The Audit Committee Chair also admitted to relying on only a summary of the contract terms presented to it by the NRA Board Counsel. Members of the Audit Committee could not recall whether they were informed of the value of the contract at the time they purported to formally ratify it.

513.     The Audit Committee concluded that it was "fair, reasonable, and in the best interest of the NRA to approve and ratify [Dissident No. 1's] continued participation in the [Ackerman] Contract during his service on the NRA Board and as an NRA officer." When asked how the Audit Committee could determine whether the contract was in the best interest of the NRA if it didn't know the contract's value, the Chair of the Audit Committee testified, "it was a contract between [Ackerman] and [Dissident No. 1], not the NRA" and stated, "We don't care what [Ackerman] was paying [Dissident No. 1]."

514.     This characterization of the contract was false, since the payments to the incoming president were ultimately paid for by the NRA, not Ackerman.

515.     At the same meeting on September 6, 2018, the Audit Committee also purported to ratify several other transactions without considering market rate information for the contracted services or otherwise making anything other than a conclusory determination of the fairness, reasonableness and benefits of the transactions to the NRA. These transactions included:

a. A consulting agreement between the NRA and Board Member No. 5, increasing the board member's fee from $168,000 to $220,000 per year.

b. The payment of $1.36 million to HomeTelos between September 2014 and May 2017, which, as discussed above, should have been previously disclosed to and approved by the Audit Committee due to Phillips's long term personal relationship with the vendor's Chief Executive Officer.

c. The engagement of McKenna as a vendor despite Powell's belated disclosure, as discussed above, that his wife had been an independent contractor for McKenna since late 2017. The NRA paid McKenna $25,000 per month pursuant to a written contract in 2018 signed by Powell, and between $160,000 and $250,000 per month pursuant to

123

a verbal contract agreed to by Powell, exclusive of other expenses passed through to the NRA by McKenna.

516.    In 2019 and 2020, the Audit Committee again purported to retroactively approve existing NRA contracts with related parties or that presented conflicts of interest, some dating back to their inception more than fifteen years ago. At the same time, the Committee approved new contracts with many of the same vendors. The Committee, however, did not comply with the requirements of NRA policy and applicable law requiring consideration of alternative transactions and it did not properly document the Audit Committee's determination. The Committee also did not put in place procedures to prevent future related party transactions occurring without obtaining prior Board approval. Examples of the related party transactions and conflicts of interest that were improperly approved by the Audit Committee include:

   a.   On April 28, 2019, the Committee retroactively approved approximately $3,692,000 paid by the NRA to Unified Sportsmen of Florida over a *nineteen-year period*. Board Member No. 5 is the Executive Director of Unified Sportsmen of Florida. At the same meeting, the Committee also prospectively approved future payments by the NRA to Unified Sportsmen of Florida.

   b.   On April 28, 2019, the Committee retroactively approved approximately $326,000 in grants from the NRA to the New Jersey Rifle and Pistol Clubs, Inc. *over a fourteen-year period*. The president of the New Jersey Rifle and Pistol Clubs, Inc. is a board member of the NRA. At the same meeting, the Committee also prospectively approved new transactions between the New Jersey Rifle and Pistol Clubs, Inc. and the NRA.

   c.   On April 28, 2019, the Audit Committee retroactively approved transactions between SpiritWild Productions and the NRA amounting to approximately $120,000 over a two-year period. The President and Director of SpiritWild Productions is the wife of a board member of the NRA. On May 30, 2019, and again on January 9, 2020, the Audit Committee prospectively approved new transactions with SpiritWild Productions.

517.    Upon information and belief, since 2016, with the exception of the agreement with Dissident No. 1, none of the official reports of the Audit Committee reflect a consideration and rejection of a conflict of interest or related party transaction presented to it, and the Audit

124

Committee has never refused to approve prospectively any conflict of interest or related party transaction presented to it.

### C. Audit Committee's Failure to Oversee Adequately the External Auditors

518.    The Audit Committee failed to properly oversee and supervise the NRA's external auditors as mandated by the Committee's Charter and by the requirements of the N-PCL.

519.    The Audit Committee Charter sets forth the Committee's specific responsibilities with respect to "review[ing] and apprais[ing] the audit efforts of the Association's independent auditors." The Charter places the responsibility for "review[ing] the performance of the external auditors" squarely within the purview of the Audit Committee.

520.    RSM was the NRA's external auditor between 2008 and 2019. Over the course of the decade-long relationship, the Audit Committee failed to exercise the requisite level of oversight or accountability prescribed in its Charter and by the N-PCL.

521.    While, pursuant to its Charter, the Audit Committee is supposed to "provide open means of communication between the Directors, the independent auditors, and the financial and senior management of the Association," the Audit Committee itself failed to communicate essential information to RSM that may have materially impacted the quality of the audit.

522.    For example, as detailed above, the Audit Committee never informed RSM about the existence of whistleblower allegations in July 2018. RSM was not invited to participate in the July 30, 2018 emergency Audit Committee meeting. Following the meeting, the Audit Committee failed to inform RSM of the concerns raised by the NRA Whistleblowers and failed to provide RSM with a copy of the Top Concerns Memo. The only information that the Committee conveyed to RSM about the meeting was the fact that various related party transactions had been raised and would be addressed further at the September 2018 meeting. The Audit Committee failed to provide information to RSM relevant to its audit. As the RSM audit partner who was in charge of the

125

engagement acknowledged, had his team been aware of the Top Concerns Memo while the 2018 Audit was ongoing, it likely would have performed additional audit testing around certain transactions.

523.    Additionally, upon information and belief, the Audit Committee never communicated to RSM anything about the NRA's practice of passing expenses incurred by NRA executives through Ackerman. RSM was not aware that Ackerman was covering substantial expenses for NRA executives, including travel-related costs incurred by NRA executives and charges on credit cards billed to Ackerman, which the NRA was then reimbursing Ackerman for as "out of pocket expenses."

524.    Both the Chair and the Vice Chair of the Audit Committee testified that they were not aware—even as of the dates of their testimony before the Attorney General in June 2020—that RSM never interviewed LaPierre during the course of their external audits. Both expected that a standard audit would include an interview of the CEO. The Audit Committee Chair testified that, as a former auditor, he "[couldn't] imagine that [RSM] would not interview the CEO." The Vice Chair testified that, as a CPA who has conducted audits, he "can't see … not meeting with the chief executive officer. To me, that would not be appropriate."

525.    Similarly, both the Chair and the Vice Chair claimed to be unfamiliar with the NRA's practice of not having its CEO sign the management representation letter. They also were unaware that the basis for RSM not insisting that LaPierre sign the letter was because of a standing memo in RSM's work papers, which stated that LaPierre functions only as the NRA's "leading lobbyist", and "is not involved in the daily operations or finances" of the NRA.

126

526.    The Audit Committee further failed to ensure that RSM was undertaking appropriate audit testing, particularly with respect to oversight of senior management, related party transactions, employee expenses and reimbursements, and major vendors.

527.    For example, the Vice Chair of the Audit Committee testified that he did not feel the need to ask RSM for external oversight of LaPierre's expenses because he "personally [had] a great deal of trust in Wayne LaPierre" and he didn't believe that LaPierre "expends money unnecessarily." The Chair of the Audit Committee claimed to have no knowledge of whether RSM ever tested LaPierre's expenses, although he also insisted that he "couldn't imagine" that RSM would not have selected LaPierre's expenses for testing. He also had no recollection of whether the Audit Committee ever asked the external auditors to test LaPierre's expenses, nor did he have a recollection of whether the external auditors ever reported to the Audit Committee on Mr. LaPierre's expenses. In fact, RSM failed to conduct any comprehensive expense testing related to LaPierre.

528.    The Chair of the Audit Committee did not know whether the NRA's external auditors ever tested Ackerman invoices, even though he testified that he would have expected them to be tested in the ordinary course of an audit. He also did not recall ever telling the external auditors to conduct testing on Ackerman.

529.    RSM's annual audit planning presentations informed the Audit Committee that "[a]n audit is not designed to provide assurance on internal control or to identify significant deficiencies or material weaknesses. Our review and understanding of NRA's internal control is not undertaken for the purpose of expressing an opinion on the effectiveness of internal control."

530.    Despite the fact that RSM affirmatively did not test the effectiveness of the NRA's internal controls as part of its annual audits, the Audit Committee Chair and Vice Chair relied on

them to do so; the Audit Committee itself did little or nothing else to oversee internal controls themselves. In the testimony that he provided in connection with the Attorney General's investigation, the Vice Chair of the Committee testified, "It is the role of the audit committee to insist that proper controls be followed over any expenditure." When asked what the Committee did to fulfill that role, he explained, "We have an external audit that verifies based on their study and analysis of internal controls that procedures are, in fact, followed." When pressed as to whether the Audit Committee did anything to verify whether policy is followed, he reiterated, "Engage external auditors to do the testing of our transactions." He testified that the Committee did not do anything other than engage the external auditors because it "did not feel the need." As a result, the Audit Committee failed to take adequate action.

531.    The Audit Committee failed to perform its statutory, bylaw, and charter responsibilities as set forth in the preceding paragraphs. As a result, the Board was unable to exercise its responsibilities to maintain a system that was reasonably effective in identifying violations of law. In turn, the Board displayed a sustained and systematic failure to exercise their oversight function and stood by as various laws were violated by the NRA, including violations of the NRA's tax exempt status, false reporting on annual filings with the IRS and the Attorney General's Charities Bureau, improper expense documentation, improper wage reporting, improper income tax withholding, failure to make required excise tax reporting and payment, payments in excess of reasonable compensation to disqualified persons, and waste of NRA assets.

### D.  The Audit Committee Acted *Ultra Vires* in Indemnifying Officers, Directors, and Employees

532.    On March 8, 2019, the Audit Committee met and acted *ultra vires* by resolving to indemnify board members, officers, and employees for legal fees in connection with an investigation being conducted by the U.S. Department of Justice. In accordance with the NRA's

128

bylaws, the decision to indemnify board members and officers cannot be made by the Audit Committee as a standing committee.

533.   On August 7, 2019, the Audit Committee met and acted *ultra vires* by resolving to indemnify a board member for legal fees. In accordance with the NRA's bylaws, the decision to indemnify a board member cannot be made by the Audit Committee as a standing committee.

## VI.   The NRA's Failure to Institute an Effective Compliance Program

534.   Since at least 2014, the NRA has failed to put in place an effective compliance program to ensure that NRA officers, directors, and employees comply with New York law and the NRA's internal policy.

535.   Upon information and belief, the NRA does not have and has never had a dedicated compliance officer. However, in or about late 2018, LaPierre tasked Powell with handling "compliance issues." Upon information and belief, Powell's tenure in that role lasted until he was suspended in October 2019 from working at the NRA pending an investigation into his improper use of NRA money. The NRA's current Treasurer testified that Powell "certainly … was not a good choice for compliance."

536.   Neither the Chair nor Vice Chair of the Audit Committee could identify or describe an existing compliance program at the NRA. The Vice Chair identified a single presentation developed by the Brewer firm, the Chair referred to "compliance seminars, ethics seminars, whatever you want to call it. We do that," and both the Chair and Vice Chair were not familiar with who in the organization bore responsibility for compliance. The Chair of the Audit Committee identified Defendant Frazer as responsible for "regulatory compliance," whereas the Vice Chair of the Committee admitted "no specific knowledge" of the placement of a compliance function.

537.   Upon information and belief, NRA employees did not receive meaningful training on compliance with the NRA's conflicts of interest or whistleblower policies and procedures. And,

129

upon information and belief, the Brewer firm's presentation mentioned by the Audit Committee Vice Chair was given to NRA staff by Defendants Powell and Frazer, both of whom, as detailed above in Part 5, Sections I(C) and (D), were ill equipped to train anyone on compliance with New York law, IRS requirements for nonprofit organizations, and the NRA's policy. Both Powell and Frazer lacked the necessary knowledge, training, experience, skills and temperament for senior roles overseeing compliance. Each and failed to comply or enforce NRA policies and procedures, including concerning conflicts of interest.

538.    As detailed in Part Five, Section V(B), the NRA Audit Committee failed to comply with its obligations to diligently review and approve (and document such review and approval of) related party transactions and conflicts of interest between the NRA and NRA officers, directors, and key persons.

539.    In fact, as detailed in Part V, Section V(B), the NRA Audit Committee failed in its basic duty to put in place policies and procedures to ensure (1) that conflicts of interest and related party transactions would be reported to the Audit Committee in the first instance before transactions occurred, and (2) that failures to report any such conflicts of interest or related party transactions to the Audit Committee would not be repeated in the future.

540.    For example, for years, Defendant Frazer failed to comply with his obligation under the NRA bylaws and internal policy to collect and submit to the NRA Audit Committee the annual Financial Disclosure Questionnaires that NRA board members and officers are required to fill out. As the Audit Committee Chair testified, "there were some [related party transactions] that should have been given to us, should have been captured into the [disclosure of financial interest] forms, should have been presented to us by Frazer and they weren't. That's the reason we [had] to [ratify] them after the fact."

541.    Relatedly, as detailed in Part Five, Sections I and II, Defendant LaPierre failed in his obligation to "independently report to the Audit Committee any financial interest of an officer or director (or immediate family member) that comes to his knowledge or the knowledge of his office as well as any financial transactions between the NRA … and other individuals and/or organizations that present or might present the possibility of a conflict of interest."

542.    As detailed in Part Four, Section II(C), until 2020, the NRA did not have a whistleblower policy that complied with New York law. For example, the Audit Committee was designated to address whistleblower complaints, but the Chair of the Committee testified that he did not know whether there was a procedure through which whistleblowers could submit their complaints anonymously to the Audit Committee.

543.    And even with respect to the deficient whistleblower policy that was not modified until the NRA was under investigation by the Attorney General, as detailed in Part Four, Section II(C), the NRA Audit Committee failed to adequately supervise the implementation of that policy. For example, two of the five Audit Committee members—the Chair and the interim President of the NRA—left the July 30, 2018 Audit Committee meeting before the whistleblowers gave their presentation. Also, the minutes for that meeting fail to record the fact and substance of the complaints from whistleblowers. The Committee Chair was not even provided a copy of the Top Concerns Memo by the Vice Chair after the meeting. The Audit Committee has not maintained any record of steps taken to investigate and address the whistleblower complaints, other than to state that the Brewer firm was conducting an investigation.

## VII.    The NRA's False Regulatory Filings

544.    As a New York not-for-profit corporation holding charitable assets and operating in New York, the NRA must register and file accurate and complete annual reports with the Charities Bureau. In addition to these registration requirements, charitable organizations soliciting

131

contributions in New York must also register and file accurate and complete annual reports under Article 7-A of the Executive Law. These annual reports, commonly referred to as CHAR500s, must include copies of an organization's annual IRS Form 990, and, for organizations like the NRA, copies of the organization's audited financial statements.

545.    CHAR500s must be signed by: (i) the organization's President or Authorized Officer and (ii) its Chief Financial Officer or Treasurer, both of whom, by their signatures, certify under penalties of perjury that the report, including all attachments, is true and accurate.

546.    Phillips signed the NRA's CHAR500s for 2015 and 2016. Frazer signed the NRA's CHAR500s for 2015, 2016, 2017, and 2018. Frazer and Phillips knew that those CHAR500s, and their attachments, included materially misleading information concerning the NRA's financial condition, and falsely attested to the accuracy of the information provided, under penalty of perjury.

547.    Defendant NRA made materially false and misleading statements and omissions in its 2015, 2016, 2017, and 2018 CHAR500 filings with the Attorney General. These statements included, but were not limited to, false statements about compensation and benefits for officers and directors, false statements about diversion of corporate assets, false statements about enforcement of its conflict of interest policy, false statements about its processes for determining compensation of officers, false statements about compensation and benefits to directors, false statements about compensation policies and reviews, and false statements about transactions with interested persons.

548.    The false and misleading statements or omissions included, without limitation:

a. **False statements and omissions about transactions with interested persons. For example:**

i. Defendant NRA never disclosed any of the numerous payments to officers and directors in the "Related Party Transactions" note to its audited financial statements.

ii. In its Forms 990 for 2015, 2016, 2017, and 2018, the NRA falsely reported that it was not a party to business transactions with current or former officers, directors, relatives thereof or entities affiliated therewith and failed to disclose those transactions on Schedules L and/or R of its IRS Forms 990. As set forth above, the NRA has been a party to multiple business transactions with current or former officers, directors, relatives thereof or entities affiliated therewith that the NRA failed to report.

iii. In its Forms 990 before 2017, the NRA overstated the number of independent board members because it did not properly omit all board members engaged in a business transaction with the organization for which payments of over $100,000 were received, or board members who were paid more than $10,000 as independent contractors, or board members engaged in a single transaction with the organization over $10,000.

b. **False statements and omissions regarding compensation and to Officers and Directors. For example:**

i. In its Forms 990 for the relevant time period, Defendant NRA failed to disclose the complete amounts paid to LaPierre in the form of gifts from vendors, "out of pocket" expenses originally paid for by Ackerman and then paid for by the NRA, and other forms of compensation.

ii. In its Forms 990 for at least 2014 to 2018, the NRA failed to disclose taxable personal income for LaPierre, Phillips, and Powell. For example, as set forth above, LaPierre and Phillips permitted NRA executives and personnel to use vendor credit cards, alter ego accounts, and vendor charges to disguise payments to LaPierre, on LaPierre's behalf, for LaPierre's personal benefit, and as reimbursements of LaPierre's personal and family expenses, inconsistent with the reporting requirements of Section 527 of the Internal Revenue Code.

iii. In its Forms 990 for the relevant time period, the NRA failed to disclose in response to question 25a in Part IV of the IRS 990 for each relevant year that it engaged in an excess benefit transaction with a disqualified person during the year, and failed to file Form 4720 reporting such transactions pursuant to Section 4958 of the Internal Revenue Code, which governs excise taxes for excess benefit transactions.

iv. Until 2017, Defendant NRA failed to disclose payments made to a former NRA president in the form of payments to Crow Shooting, an entity owned by the former president. While these payments were disclosed in the NRA

Foundation's Form 990 for 2017, the NRA failed to properly disclose these payments in its 2017 Form 990.

v.  In its Form 990 for 2016, Defendant NRA failed to disclose a $455,753 payment by Lockton Affinity to the NRA's Managing Director of Licensing and Marketing.

vi.  In its Forms 990 for 2015, 2016, 2017, and 2018, Defendant NRA answered "No" to the question "Did the organization engage in an excess benefit transaction with a disqualified person during the year?" In fact, Defendant NRA engaged in multiple excess benefit transactions, including without limitation the compensation paid to Defendants LaPierre and Powell, and a former President.

vii.  In its Forms 990 for 2015, 2016, 2017, and 2018, Defendant NRA made false statements in Part VI, line 16 about its process for determining the compensation of officers and directors.

c.  **False statements and omissions regarding payments to vendors. For example:**

i.  In its Forms 990 prior to 2017, Defendant NRA failed to disclose the amount paid to Ackerman McQueen for "out of pocket" expenditures. In in Form 990 for 2017, the NRA disclosed that this amount was over $11 million. At that time, the NRA also disclosed that it had paid over $5 million to Mercury Group, a company wholly owned by Ackerman McQueen. Previous filings therefore significantly underrepresented the total amount that the NRA paid to Ackerman McQueen on an annual basis.

ii.  Until 2017, the NRA failed to disclose in its Form 990 the amount it paid to Under Wild Skies, Inc., even though Defendant LaPierre and his spouse were receiving free services in the form of hunting trips from the company. In its Form 990 for 2017, the NRA disclosed on Schedule O that it had paid $2,635,000 to Under Wild Skies.

d.  **Additional false statements in Part VI of the Form 990 regarding governance, management and disclosure. For example:**

i.  In its Form 990 for 2018, Defendant NRA answered "No" to the question "Did the organization become aware of a significant diversion of the organization's assets." This statement was false, since the organization did become aware of significant diversions through whistleblower reports and its own inquiries into billing by Ackerman and McKenna.

ii.  In its Forms 990 for the relevant time period, Defendant NRA answered "Yes" to the question "Did the organization regularly and consistently monitor enforcement with [its conflict of interest policy]." Based on the evidence

134

gathered in the Attorney General's investigation, as set forth above, this statement was false, as Defendant NRA repeatedly permitted violations of its conflict of interest policy, including, without limitation, by Defendant LaPierre.

iii.   In its Forms 990 for the relevant time period, the NRA filed false and/or materially incomplete responses on Schedule J, which reports information on compensation for officers, directors, key employees, and highly compensated employees, including without limitation:

1. Failing to report that the NRA paid for travel for companions until its 2018 Form 990, when in fact the NRA repeatedly paid for travel for LaPierre's wife and other family members;

2. Failing to report that it provided a housing allowance until its 2017 Form 990, when in fact it paid for housing for certain officers; and

3. Reporting that it in fact had a policy regarding tax indemnification and gross-up payments, when, upon information and belief, the NRA had no such written policy.

e.   **Failure to disclose all fundraising expenses, fundraisers and amounts paid thereto. For example:**

i.   Upon information and belief, in its Forms 990 for the relevant time period, the NRA underreported its spending on fundraising in its allocation of functional expenses, since it failed to fully report fundraising expenses that were routed through third party vendors.

ii.   In its 2016 Form 990, the NRA failed to disclose MMP as a fundraiser. MMP is not registered with the OAG as a fundraiser to solicit in New York State. In its 2016 Form 990, the NRA reported that it had paid MMP $10 million in 2016 for fundraising, printing, and mailing, but failed to report MMP or any amounts raised by it in the section dedicated to the NRA's top ten fundraisers. Instead, the NRA listed MMP, which also shares a physical address at NRA Headquarters, as an independent contractor.

## VIII.   The NRA's Violation of its Duties under the New York Prudent Management of Institutional Funds Act

549.   The NRA is an "institution" as that term is used in Article 5-A, Section 551(d) of NYPMIFA since it is "a person, other than an individual, organized and operated exclusively for charitable purposes."

135

550.    Under NYPMIFA, the obligations of the NRA are also imposed upon the governing board of directors of the NRA.

551.    The NRA holds and manages "institutional funds" as that term is used in NYPMIFA, Section 551(e).

552.    In managing institutional funds, the NRA must consider the purposes of the NRA and the purposes of its institutional funds.

553.    In managing institutional funds, pursuant to NYPMIFA, the NRA must manage institutional funds in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

554.    In managing institutional funds, under NYPMIFA, the NRA must make a reasonable effort to verify facts relevant to management of the funds.

555.    Each person at the NRA with responsibility for managing and investing institutional funds must comply with the duty of loyalty in exercising that responsibility.

556.    Each person responsible for managing and investing institutional funds is required to manage and invest the funds in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances

557.    The institutional funds of the NRA include investments, cash balances, funds derived from pledging NRA assets, funds obtained by pledging the credit of the NRA, income derived from rents to third parties, and funds held by or paid out to vendors.

558.    The NRA has failed to manage its institutional funds in accordance with the standards set forth in Section 552 of NYPMIFA. Specifically:

a. It has permitted unrestricted net assets on its balance sheet to decrease from a surplus (unrestricted assets less liabilities) of $27,802,714 at year-end 2015, to a net deficit at year-end 2016 of $14 million, to a net deficit at year-end 2017 of $31,779,599, to a net deficit at year-end 2018 of $36,276,779. The total reduction in unrestricted assets over

136

the three-year period exceeds $63 million. The Board minutes of the NRA do not reflect any consideration of this precipitous decline, or consideration of the factors set forth in NYPMIFA, with respect to this use of institutional funds. The Attorney General, upon information and belief, alleges that this decline in unrestricted assets continues to the present time.

b.   The NRA, during the period 2015 to the present, did not manage its institutional funds in good faith, or with the care and prudence an ordinarily prudent person would exercise under similar circumstances.

c.   The NRA has failed to incur only costs that are appropriate and reasonable in relation to its assets and the purposes of the NRA.

d.   The NRA has failed to make reasonable efforts to verify facts relevant to management of its institutional funds.

e.   The NRA has failed to make reasonable efforts to keep its Board and relevant committees of the Board apprised of the financial status, risks, and commitments of institutional funds.

f.   The NRA has authorized and expended significant institutional funds (in excess of $54 million) for payments to the Brewer firm without consideration of the factors set forth in 552(e)(1).

g.   The NRA has imprudently pledged capital assets to obtain loans for current expenses.

h.   The NRA has undertaken covenants associated with its credit agreement and lines of credit agreements, requiring minimum cash and investment balances, and breached such covenants.

i.   The NRA has taken loans in excess of $5 million from the separately maintained funds of the NRA-ILA, in violation of its bylaws.

j.   The NRA has permitted the use of NRA-ILA funds for payment of travel expenses of LaPierre, outside the NRA expense reimbursement system.

k.   The NRA has twice pledged its accounts receivable as collateral in order to obtain two $5 million loans from the related entity NRA Foundation. The second loan has not been repaid, and the NRA has permitted its officers to engage in related party transactions with respect to those transactions, exposing them to liability to the NRA Foundation.

l.   The NRA has permitted its Audit Committee to fail to evaluate or report on the requirements of NYPMIFA, and the NRA's compliance with those requirements.

m.   The NRA has permitted its auditor to fail to evaluate or report on the requirements of NYPMIFA, and the NRA's compliance with those requirements

137

Case MDL No. 2979   Document 1-4   Filed 10/20/20   Page 144 of 170

n. The NRA has failed to assure that institutional funds are not subject to waste or misappropriation.

o. The NRA has engaged "faithless fiduciaries" including Defendants LaPierre, Powell, and Phillips, who were given authority to manage and invest institutional funds, but failed to do so prudently.

p. The NRA has committed the NRA to undertake undisclosed future obligations to senior executives, including a ten-year post-employment obligation to Defendant LaPierre at an amount per year in excess of $1 million, a no-show consulting contract with Defendant Phillips, and a no-show consulting contract with the former Executive Director of General Operations.

559.    The failure of the NRA to perform its duties under NYPMIFA, as described here, require that this Court enter an appropriate order to secure the proper administration of these charitable funds, and to order an accounting by the NRA and appropriate officers, directors or key employees for their official conduct with respect to institutional funds.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Dissolution of the NRA – N-PCL §§ 112(a)(1), 112(a)(5), 1101(a)(2)
### (Against Defendant NRA)

560.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 559 above as though fully set forth herein.

561.    Under N-PCL § 112(a)(1), the Attorney General is authorized to maintain an action or special proceeding to dissolve a corporation that has acted beyond its capacity or power or to restrain it from carrying on unauthorized activities.

562.    Under N-PCL § 112(a)(5), the Attorney General is authorized to maintain an action or special proceeding to dissolve a corporation under Article 11 (Judicial dissolution).

563.    Under N-PCL § 1101(a)(2), the Attorney General may bring an action seeking the dissolution of a charitable corporation when "the corporation has exceeded the authority conferred upon it by law, or … has carried on, conducted or transacted its business in a persistently fraudulent

138

or illegal manner, or by the abuse of its powers contrary to public policy of the state has become liable to be dissolved."

564.    N-PCL § 102(a)(5) bars a not-for-profit corporation from permitting its assets, income or profit to inure to the benefit of an officer or director of the corporation. N-PCL§ 515(a) of the N-PCL prohibits the distribution of any part of the income of a not-for-profit corporation to the directors or officers of the corporation. The NRA violated these provisions by permitting its assets to be used for the benefit of its officers and directors, their families and other insiders.

565.    N-PCL § 515(b) limits a not-for-profit corporation to the payment of reasonable, not excessive, compensation to directors and officers and prohibits any person who may benefit from such compensation from being present or participating in the deliberation or vote to approve compensation. The NRA, through its Compensation Committee as it relates to LaPierre, Phillips and Frazer, and through LaPierre as it relates to Powell, violated these provisions in determining the compensation of the Individual Defendants. The salary, bonuses, other cash and non-cash compensation and other benefits to the Individual Defendants were excessive and constitute a waste of NRA's charitable assets, and an illegal and unauthorized activity under the N-PCL.

566.    Under N-PCL § 715-a and EPTL § 8-1.9(d), the NRA was required to adopt a conflict of interest policy to ensure that its directors and officers act in the corporation's best interest. The NRA failed to adopt and enforce a policy that met the statutory requirements and, accordingly, the NRA violated N-PCL § 715-a and EPTL § 8-1.9(d).

567.    Under N-PCL § 715-b and EPTL § 8-19(e), the NRA was required to adopt a whistleblower policy to protect people who report improper conduct from retaliation. The NRA failed to adopt and enforce a policy that met the statutory requirements and, accordingly, violated N-PCL § 715-b and EPTL § 8-1.9(e).

139

568.    Pursuant to EPTL §§ 8-1.4(d) and (f), not-for-profit organizations holding charitable assets and operating in New York must register and file annual reports with the Charities Bureau. Charitable organizations soliciting contributions in New York must also register and file annual reports called "CHAR 500s" under Article 7-A of the Executive Law. The CHAR500s must include copies of an organization's annual IRS Form 990, and, for organizations such as the NRA, copies of the organization's audited financial statements. CHAR500s must be signed by: (i) the organization's President or Authorized Officer and (ii) its Chief Financial Officer or Treasurer, both of whom, by their signatures certify, under penalties of perjury, that the report, including all attachments, is true and accurate.

569.    The annual reports filed with the Charities Bureau must also include the identities of the fundraisers with whom an entity contracts, as well as information about the services they provide and the compensation they receive.

570.    Sections 172 and 175 of the Executive Law prohibit material false statements in any application, or any registration required to be filed with the Attorney General pursuant to Article 7-A of the Executive Law.

571.    From 2015 to 2018, the CHAR500s, with accompanying IRS Form 990s, filed by the NRA with the Attorney General contained numerous material false statements.

572.    As detailed in preceding paragraphs, the NRA and its individual trustees, as that term is used in the EPTL, failed to secure the proper administration of the charitable assets in their possession and control, and violated the duties of prudence in the management of institutional funds.

573.    As a result of the foregoing, the NRA has acted beyond its capacity by persistently disregarding the limitations in its certificate of incorporation and the law, and it has conducted its

140

business in a persistently illegal manner and abused its powers contrary to the public policy of the State of New York by operating without effective oversight or control by its officers and directors.

574.    Accordingly, this Court should dissolve the NRA pursuant to N-PCL § 1109(b)(1) and distribute its remaining and future assets to be applied to charitable uses consistent with the mission set forth in the NRA's certificate of incorporation, pursuant to N-PCL §§ 1115(a) and 1008(a)(15).

**SECOND CAUSE OF ACTION**
**Dissolution of the NRA – N-PCL §§ 112(a)(7), 1102(a)(2)(D)**
**(Against Defendant NRA)**

575.    The Attorney General repeats and re-alleges the allegations in paragraphs 1 through 574 above as though fully set forth herein.

576.    Under N-PCL § 112(a)(7), the Attorney General is authorized to maintain an action or special proceeding to enforce rights granted by statute to a director or officer of a charitable corporation.

577.    Pursuant to N-PCL § 1102(a)(2)(D), directors or members, as authorized, may petition the court for judicial dissolution where the "directors or members in control of the corporation have "looted or wasted the corporate assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner."

578.    Directors or members in control of the NRA have looted or wasted the corporate assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner.

579.    Accordingly, this Court should dissolve the NRA pursuant to N-PCL § 1109(b)(1) and Order that that its remaining and future assets should be applied to charitable uses consistent

141

with the mission set forth in the NRA's certificate of incorporation, pursuant to N-PCL §§ 1115(a) and 1008(a)(15).

### THIRD CAUSE OF ACTION
### For Breach of Fiduciary Duty Under N-PCL §§ 717 and 720 and Removal Under N- PCL §§ 706(d) and 714(c)
### (Against Defendant LaPierre)

580. The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 579 above as though fully set forth herein.

581. LaPierre breached his fiduciary duties of loyalty, care and obedience to the NRA by using his powers as an officer and *ex officio* director of the NRA to obtain illegal compensation and benefits, to convert NRA funds for his own benefit, and to dominate, control, and direct the NRA to obtain private benefit for himself, his family members and for certain other insiders, including Defendants Phillips and Powell in contravention of NRA bylaws, policies and procedures, and applicable laws.

582. LaPierre's breaches of fiduciary duty have damaged the NRA by, among other things, causing its assets to be diverted for non-NRA purposes and be wasted and by exposing the NRA to liability for failure to report taxable income, failure to withhold payroll taxes, failure to report and pay excise taxes due pursuant to Section 4958 of the Internal Revenue Code, and jeopardizing the NRA's tax exempt status and authority to conduct business for failure to comply with regulatory reporting obligations.

583. Accordingly, LaPierre is liable under N-PCL § 720(a)(l) to account and pay restitution and/or damages, including returning the salary he received while breaching his fiduciary duties to the NRA, plus interest at the statutory rate of 9%, and rescission of any agreements providing for compensation following his employment as Executive Vice President of the NRA, for his conduct in the neglect and violation of his duties in the management and disposition of the

142

NRA's charitable assets and in causing loss and waste of those assets by his breaches of fiduciary duty.

584.    LaPierre should be removed for cause under N-PCL §§ 706 and 714 and be barred from re-election of reappointment as a director or officer of the NRA.

**FOURTH CAUSE OF ACTION**
**For Breach of Fiduciary Duty to the NRA Under N-PCL §§ 717 and 720 and**
**Removal Under N-PCL §§ 706(d) and 714(c)**
**(Against Defendant Frazer)**

585.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 584 above as though more fully set forth herein.

586.    Frazer is an attorney who owes a fiduciary duty to the NRA and is also bound by professional ethics in his conduct towards his client. Frazer failed to discharge his duties as an officer of the NRA, both as General Counsel and as Secretary, with the degree of care, skill, prudence, diligence and undivided loyalty required. Frazer breached his fiduciary duties of loyalty, care and obedience to the NRA.

587.    Upon information and belief, and based on his actions or failures to act on the matters detailed above, Frazer violated his professional responsibility to his client, the NRA, by failing to provide competent representation, in that he failed to act with reasonable diligence in representing the NRA and to use the thoroughness and preparation reasonably necessary for the representation of the NRA throughout his tenure, including by failing to make sufficient inquiry into and analysis of the factual and legal problems under his responsibility, and by failing to use methods and procedures meeting the standards of competent practitioners.

588.    Frazer's breaches of fiduciary duty have damaged the NRA by, among other things, causing its assets to be diverted for non-NRA purposes and be wasted; exposing the NRA to liability for failure to report taxable income, failure to withhold payroll taxes, and failure to report

143

and pay excise taxes due pursuant to Section 4958 of the Internal Revenue Code; and jeopardizing the NRA's tax exempt status and authority to conduct business for failure to comply with regulatory reporting obligations.

589.    Accordingly, Frazer is liable under N-PCL § 720(a)(l) to account and pay restitution and/or damages, including the return of salary he received while breaching his fiduciary duties to the NRA, plus interest at the statutory rate of 9%, for his conduct in the neglect and violation of his duties in the management and disposition of the NRA's charitable assets and in causing loss and waste of those assets by his breaches of fiduciary duty. Frazer should be removed for cause under N-PCL §§ 706 and 714 and barred from re-election or reappointment as an officer or director of the NRA.

### FIFTH CAUSE OF ACTION
### For Breach of Fiduciary Duty to the NRA Under N-PCL §§ 717 and 720
### (Against Defendant Phillips)

590.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 589 above as though fully set forth herein.

591.    Phillips breached his fiduciary duties of loyalty, care and obedience to the NRA by using his powers as an officer and *ex officio* director of the NRA to obtain illegal compensation and benefits, to convert NRA funds for his own benefit, and to dominate, control, and direct the NRA to obtain private benefit for himself, his personal friends, and other NRA insiders, including Defendants LaPierre and Powell, in contravention of NRA bylaws, policies and procedures and applicable laws.

592.    Phillips's breaches of fiduciary duty have damaged the NRA by, among other things, causing its assets to be diverted for non-NRA purposes and be wasted; exposing the NRA to liability for failure to report taxable income, failure to withhold payroll taxes, and failure to

report and pay excise taxes due pursuant to Section 4958 of the Internal Revenue Code; and jeopardizing the NRA's tax exempt status and authority to conduct business for failure to comply with regulatory reporting obligations.

593. Accordingly, Phillips is liable under N-PCL § 720(a)(l) to account and pay restitution and/or damages, including the return of salary he received while breaching his fiduciary duties to the NRA, plus interest at the statutory rate of 9%, the rescission of any agreements providing for compensation following his employment as Treasurer and Chief Financial Officer of the NRA, for his conduct in the neglect and violation of his duties in the management and disposition of the NRA's charitable assets and in causing loss and waste of those assets by his breaches of fiduciary duty.

**SIXTH CAUSE OF ACTION**
**<u>For Breach of Fiduciary Duty to the NRA Under N-PCL §§ 717 and 720</u>**
**(Against Defendant Powell)**

594. The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 593 above as though fully set forth herein.

595. Powell breached his fiduciary duties of loyalty, care and obedience to the NRA by using his powers as an officer and senior executive of the NRA to obtain illegal compensation and benefits, to convert NRA funds for his own benefit, and to dominate, control, and direct the NRA to obtain private benefit for himself and for his family members in contravention of NRA bylaws, policies and procedures and applicable.

596. Powell's breaches of fiduciary duty have damaged the NRA by, among other things, causing its assets to be diverted for the benefit of Powell and other individuals and be wasted.

145

597.     Accordingly, Powell is liable under N-PCL §§ 720(a)(l) to account and pay restitution and/or damages, including the return of salary he received while breaching his fiduciary duties to the NRA, plus interest at the statutory rate of 9%, for his conduct in the neglect and violation of his duties in the management and disposition of the NRA's charitable assets and in causing loss and waste of those assets by his breaches of fiduciary duty.

### SEVENTH CAUSE OF ACTION
### For Breach of EPTL § 8-1.4
### (Against Defendant LaPierre)

598.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 597 above as though fully set forth herein.

599.     Section 8-1.4(m) of the EPTL authorizes the Attorney General to institute appropriate proceedings to secure the proper administration of any not-for-profit corporation organized under the laws of this State for charitable purposes.

600.     LaPierre, in his capacity as the Executive Vice President of the NRA was a trustee pursuant to EPTL § 8-1.4 because he held and administered property for charitable purposes in the State of New York.

601.     As set forth in the preceding paragraphs, LaPierre failed to administer the charitable assets of the NRA entrusted to his care properly and, as a result, should be ordered to account for his breaches and to make restitution and/or pay damages, plus interest at the statutory rate of 9%, to the NRA. In addition, LaPierre should be permanently barred from serving as an officer, director or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

146

### EIGHTH CAUSE OF ACTION
### For Breach of EPTL § 8-1.4
### (Against Defendant Frazer)

602.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 601 above as though fully set forth herein.

603.    Section 8-1.4(m) of the EPTL authorizes the Attorney General to institute appropriate proceedings to secure the proper administration of any not-for-profit corporation organized under the laws of this State for charitable purposes.

604.    Frazer, in his capacity as the Secretary and General Counsel of the NRA, was at all times a trustee pursuant to EPTL § 8-1.4 because he was responsible for holding and administering property for charitable purposes in the State of New York.

605.    As set forth in the preceding paragraphs, Frazer failed to administer the charitable assets of the NRA entrusted to his care properly and, as a result, should be ordered to account for his breaches and to make restitution and/or pay damages, plus interest at the statutory rate of 9%, to the NRA. In addition, Frazer should be permanently barred from serving as an officer, director or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

### NINTH CAUSE OF ACTION
### For Breach of EPTL § 8-1.4
### (Against Defendant Phillips)

606.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 605 above as though fully set forth herein.

607.    Section 8-1.4(m) of the EPTL authorizes the Attorney General to institute appropriate proceedings to secure the proper administration of any not-for-profit corporation organized under the laws of this State for charitable purposes.

147

608.    Phillips, in his capacity as the Treasurer and Chief Financial Officer of the NRA was a trustee pursuant to EPTL § 8-1.4 because he held and administered property for charitable purposes in the State of New York.

609.    As set forth in the preceding paragraphs, Phillips failed to administer the charitable assets of the NRA entrusted to his care properly and, as a result, should be ordered to account for his breaches and to make restitution and/or pay damages, plus interest at the statutory rate of 9%, to the NRA. In addition, Phillips should be permanently barred from serving as an officer, director or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

### TENTH CAUSE OF ACTION
### For Breach of EPTL § 8-1.4
### (Against Defendant Powell)

610.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 609 above as though fully set forth herein.

611.    Section 8-1.4(m) of the EPTL authorizes the Attorney General to institute appropriate proceedings to secure the proper administration of any not-for-profit corporation organized under the laws of this State for charitable purposes.

612.    Powell, in his capacity as an officer and a de facto officer, was a trustee pursuant to EPTL § 8-1.4 because he was responsible for holding and administering property for charitable purposes in the State of New York.

613.    As set forth in the preceding paragraphs, Powell failed to administer the charitable assets of the NRA entrusted to his care properly and, as a result, should be ordered to account for his breaches and to make restitution and/or pay damages, plus interest at the statutory rate of 9%, to the NRA. In addition, Powell should be permanently barred from serving as an officer, director

148

or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

### ELEVENTH CAUSE OF ACTION
**Wrongful Related-Party Transactions – N-PCL §§ 112(a)(10), 715(f)**
**and EPTL § 8-1.9(c)(4)**
**(Against Defendant LaPierre)**

614.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 613 above as though fully set forth herein.

615.    As described in detail in the preceding paragraphs, LaPierre caused the NRA to enter into a post-employment contract and amendments thereto as described above (collectively, the "LaPierre Post Employment Contract") in which he had a financial interest without obtaining authorization from the Board or a determination by the Board that the transaction was fair, reasonable and in the NRA's best interest at the time of the transactions.

616.    LaPierre's conduct was willful and intentional with respect to the Post-Employment Contract in that as an officer of the NRA, he fully understood and intended the financial benefits he would derive from the transaction.

617.    By the foregoing acts and omissions, LaPierre is liable under N-PCL § 715(f) and EPTL § 8-1.9(c), to account for profits from the LaPierre Post Employment Contract not already accounted for; to the extent not already paid, pay the NRA the value of charitable assets used in the LaPierre Post Employment Contract; return assets lost to the NRA as a result of the Post Employment Contract, to the extent not already returned; pay the NRA an amount up to double the value of the amount of each benefit improperly bestowed by the LaPierre Post Employment Contract; and should be enjoined from serving as an officer, director or trustee, or in any similar capacity, of any not-for-profit charitable organization incorporated or authorized to conduct business or solicit charitable donations in the State of New York.

149

## TWELFTH CAUSE OF ACTION
### Wrongful Related-Party Transactions – N-PCL §§ 112(a)(10), 715(f) and EPTL § 8-1.9(c)(4)
### (Against Defendant Powell)

618.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 617 above as though fully set forth herein.

619.    Powell caused the NRA to enter into transactions in which he or his family members had a financial interest without obtaining authorization from the Board for those transactions or a determination by the Board that the transactions were fair, reasonable and in the NRA's best interest at the time of the transactions.

620.    Powell's conduct was willful and intentional with respect to these transactions in that as an officer and senior executive of the NRA, he fully understood and intended the financial benefits he and his family members would derive from the transactions.

621.    By the foregoing acts and omissions, Powell is liable under N-PCL § 715(f) and EPTL § 8-1.9(c), to account for profits from related party transactions not already accounted for; to the extent not already paid, pay the NRA the value of charitable assets used in such transactions; to return assets lost to the NRA as a result of the transactions, to the extent not already returned; to pay the NRA an amount up to double the value of the amount of each benefit improperly bestowed by a transaction occurring after July 1, 2014; and should be enjoined from serving as an officer, director or trustee, or in any similar capacity, of any not-for-profit charitable organization incorporated or authorized to conduct business or solicit charitable donations in the State of New York.

150

### THIRTEENTH CAUSE OF ACTION
### <u>Wrongful Related-Party Transactions – N-PCL §§ 112(a)(10), 715(f)</u>
### <u>and EPTL § 8-1.9(c)(4)</u>
### (Against Defendant Phillips)

622.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 621 above as though fully set forth herein.

623.     As described in detail in the preceding paragraphs, Phillips caused the NRA to enter into a consulting agreement with the NRA following his retirement (the "Phillips Post-Employment Consulting Agreement"), in which he had a financial interest without obtaining authorization from the Board or a determination by the Board that the Phillips Post-Employment Consulting Agreement was fair, reasonable and in the NRA's best interest at the time of the transactions.

624.     Phillips's conduct was willful and intentional with respect to the Phillips Post-Employment Consulting Agreement in that as an officer of the NRA, he fully understood and intended the financial benefits he would derive from the transaction.

625.     By the foregoing acts and omissions, Phillips is liable under N-PCL § 715(f) and EPTL § 8-1.9(c), to account for profits from the Phillips Post-Employment Consulting Agreement not already accounted for; to the extent not already paid, pay the NRA the value of charitable assets used in the Phillips Post-Employment Consulting Agreement; to return assets lost to the NRA as a result of the Phillips Post-Employment Consulting Agreement, to the extent not already returned; to pay the NRA an amount up to double the value of the amount of each benefit improperly bestowed by Phillips Post-Employment Consulting Agreement; and should be enjoined from serving as an officer, director or trustee, or in any similar capacity, of any not-for-profit charitable organization incorporated or authorized to conduct business or solicit charitable donations in the State of New York.

## FOURTEENTH CAUSE OF ACTION
### Wrongful Related-Party Transactions – N-PCL §§ 112(a)(10), 715(f)
### and EPTL § 8-1.9(c)(4)
### (Against Defendant NRA)

626.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 625 above as though fully set forth herein.

627.    Pursuant to N-PCL § 112(a)(10), the Attorney General may bring an action to "enjoin, void or rescind any related party transaction, seek damages and other appropriate remedies, in law or equity."

628.    N-PCL § 715 and EPTL § 8-1.9 provide that no corporation shall enter into any related party transaction unless the transaction is determined by the Board or an authorized committee to be fair, reasonable, and in the corporation's best interest at the time of the determination.

629.    Under N-PCL § 715 and EPTL § 8-1.9, every director, trustee, officer, and key employee of the NRA who has an interest in a related party transaction is required to disclose in good faith to the Board or an authorized committee the material facts concerning such interest.

630.    Under N-PCL § 715 and EPTL § 8-1.9, the NRA must conduct a process prior to approving a related party transaction and to contemporaneously document that process. For related party transactions that were not subject to advance approval, N-PCL § 715 and EPTL § 8-1.9 require that the NRA conduct a process for ratification of the transaction, to contemporaneously document in writing the nature of the violations of N-PCL § 715 and EPTL 8-1.9, and to put in place procedures to ensure that the NRA complies with the statutory requirements governing related party transactions in the future. For the related party transactions described in this complaint, the processes required by N-PCL § 715 and EPTL § 8-1.9 were not followed prior to

152

entering the transaction, or in an effort to ratify the transaction, and each such transaction violated these provisions, and was not reasonable and in the best interests of the NRA.

631. The NRA entered into numerous unlawful related party transactions in violation of N-PCL § 715 and EPTL § 8-1.9, including those detailed above. These transactions were outside of the NRA's authorized corporate purposes.

632. The Court should enjoin, void or rescind the unlawful related party transactions, and award damages and such other appropriate remedies, in law or equity to ensure compliance with the requirements of the law.

**FIFTEENTH CAUSE OF ACTION**
**Violation of the Whistleblower Protections of N-PCL § 715-b and EPTL § 8-1.9**
**(Against Defendant NRA)**

633. The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 632 above as though fully set forth herein.

634. N-PCL § 715-b and EPTL § 8-1.9(e) require that the NRA adopt and maintain a policy protecting whistleblowers, and providing that no director, officer, trustee, employee or volunteer of the corporation who in good faith reports any action or suspected action taken by the corporation that is illegal, fraudulent, or in violation of any adopted policy of the corporation shall suffer, intimidation, harassment, discrimination, or other retaliation.

635. N-PCL § 715-b and EPTL § 8-1.9(e) require that a trustee, director, officer, or employee be designated by the NRA to administer the whistleblower policy and to report to the Audit Committee.

636. The NRA did not adopt a policy protecting whistleblowers as required. Although the NRA had a purported policy, the NRA and its officers and directors did not comply with the policy. In fact, whistleblowers were harassed and retaliated against. Board members who raised

153

issues covered by the policy suffered intimidation, harassment, discrimination, or other retaliation, including attempted revocation of NRA membership. Defendant Powell retaliated against suspected whistleblowers. Defendant Frazer failed to perform his responsibilities as the dedicated employee with responsibility for whistleblower reporting. Defendant LaPierre retaliated against directors, including Dissident No.1, who raised issues covered by the policy, by opposing their reelection or by stripping them of committee assignments. The Audit Committee failed to make any record or take any action responding to whistleblower concerns.

637. The Attorney General seeks removal for cause of each officer, director, and trustee who violated the whistleblower policy required by N-PCL § 715-b and EPTL § 8-1.9.

## SIXTEENTH CAUSE OF ACTION
### For Breach of NYPMIFA, Article 5-A of the N-PCL
#### (Against Defendant NRA)

638. The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 637 above as though fully set forth herein.

639. Pursuant to Article 5-A of the N-PCL Prudent Management of Institutional Funds Act ("NYPMIFA"), "each person responsible for managing and investing an institutional fund shall manage and invest the fund in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." N-PCL § 552. Pursuant to Section 557 of the N-PCL, NYPMIFA applied to all institutional funds in existence at the time of its enactment. NYPMIFA, in Section 551 of the N-PCL, defines an institutional fund to include any funds held by a charity, but excludes program-related assets, such as real property owned by a charity that is used for its operations (and not as an investment).

640. The NRA is an "institution" as that term is used in NYPMIFA and holds and manages "institutional funds" as that term is used in NYPMIFA.

154

641.    As set discussed above, the NRA has failed to manage its institutional funds in accordance with the standards set forth in Section 552 of NYPMIFA.

642.    The failure of the NRA to perform its duties under NYPMIFA, as described here, requires that this Court enter an appropriate order to secure the proper administration of these charitable funds, and to order an accounting by the NRA and appropriate officers, directors or key employees for their official conduct with respect to institutional funds.

### SEVENTEENTH CAUSE OF ACTION
### For False Filings Under Executive Law §§ 172-d(1) and 175(2)(d)
### (Against Defendant NRA and Frazer)

643.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 642 above as though fully set forth herein.

644.    The NRA made materially false and misleading statements and omissions in the annual reports the organization filed with the Attorney General. Defendant Frazer signed and certified such reports notwithstanding the number of falsehoods therein, of which he was or should have been aware.

645.    As a result, the NRA and Frazer violated Section 172-d(1) of the Executive Law and, pursuant to Section 175(2)(d) of the Executive Law should be enjoined from soliciting or collecting funds on behalf of any charitable organization operating in this State and Frazer should be enjoined from serving as an officer, director or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

### EIGHTEENTH CAUSE OF ACTION
### For Unjust Enrichment Derivatively in Favor of the NRA Under
### N-PCL § 623 and common law
### (Against LaPierre, Phillips, Frazer and Powell)

646.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 645 above as though fully set forth herein.

155

647. Under N-PCL § 112(a)(7), the Attorney General may bring an action to enforce any right given under the N-PCL to members of the Corporation.

648. Under N-PCL § 623, the Attorney General may bring an action to enforce rights given to members of the corporation to procure a judgment in favor of the Corporation. The Attorney General, acting as a member pursuant to N-PCL § 623, may call upon the Board to secure the initiation of an action by the Board of the corporation on behalf of the corporation.

649. Acting pursuant to her authority under N-PCL § 623, the Attorney General initiates this action pursuant to N-PCL § 515, on behalf of the NRA and against Defendants LaPierre, Phillips, Frazer, and Powell for the illegal conduct set forth in this Complaint, including conduct set forth in N-PCL § 720(a).

650. This unjust enrichment claim seeks to recover excessive, unreasonable, and/or unauthorized compensation to Defendants LaPierre, Phillips, Frazer, and Powell, as well as payments or reimbursements to them made in violation of IRS requirements and NRA bylaws and policy.

651. Defendants LaPierre, Phillips, Frazer, and Powell were "disqualified persons" as that term is used in the Internal Revenue Code. Each received payments in excess of reasonable compensation from the NRA.

652. Under Internal Revenue Code Section 4958, "disqualified persons" in a 501 (c)(4) organization who participate in an "excess benefit" transaction are subject to a federal excise tax. The tax on the disqualified person is 25% of the "excess benefit." A tax will also be imposed on an "organization manager" who participated in the excess benefit transaction.

653. Under the Internal Revenue Code Section 4958, the term "disqualified person" means, with respect to any transaction— (a) any person who was, at any time during the 5-year

156

period ending on the date of such transaction, in a position to exercise substantial influence over the affairs of the organization. Defendants LaPierre, Phillips, and Frazer were at all relevant times between 2015 and the present date, disqualified persons under Section 4958. Defendant Powell has been a disqualified person under Section 4958 at least since July 2016, and continues to be a disqualified person.

654.     Payments or reimbursements of travel and entertainment expenses which are not made pursuant to an accountable plan are reportable and treated by the IRS as taxable income. Upon information and belief, a substantial portion of the travel expenses for defendants LaPierre, Phillips, and Powell were not made pursuant to an accountable plan.

655.     Under Section 53-4958-4 of the Internal Revenue Service regulations, amounts paid for travel and entertainment for a disqualified person other than under an accountable plan as that term is used in IRS Publication 463, and the reimbursements or payments to disqualified persons that are not based upon written contemporaneous substantiation are to be treated as automatic "excess benefit transactions" by the Internal Revenue Service. IRS Regulation 53.4958-4(c)(1). In equity and in law, a disqualified person may not receive or retain the proceeds of excess benefits transactions.

656.     The excise tax is due, and the excise tax return must be filed by the organization and each disqualified person owing the tax, whenever an excess benefit is provided by the organization, directly or indirectly to, or for the use of, any disqualified person.

657.     Schedule I of Form IRS 4720 requires reporting of the excess benefit transaction and computation of the tax liability due, a signature under penalty of perjury, and payment of the amount of the excise tax due to the IRS. Defendants were required to file Form 4720 and pay the excise tax due by May 15 following the completion of the calendar year.

157

658.    For each year 2015 to 2018, the NRA represented in response to IRS 990 question 25(a) of Part IV that it was not a party to an excess benefit transaction during the year. Each such representation was false. Plaintiff alleges, upon information and belief, that neither the NRA nor any of Defendants LaPierre, Powell, Phillips, or Frazer filed forms 4720 nor paid the excise tax due on excess benefit transactions.

659.    Defendants LaPierre, Phillips, Powell, and Frazer received illegal compensation by causing the NRA to pay, or permitting themselves to receive, compensation or reimbursements in excess of amounts permitted by law or by the bylaws and policies of the NRA.

660.    Defendants LaPierre, Phillips, Powell, and Frazer obtained a benefit that in equity and good conscience should be paid to the NRA.

661.    As the result of compensation, including salary, bonuses, expense payments, reimbursements and other benefits, which were paid in violation of law and NRA bylaws and policies, Defendants LaPierre, Phillips, Powell, and Frazer were unjustly enriched.

662.    The Attorney General brings this derivative action on behalf of the NRA against Defendants LaPierre, Phillips, Frazer, and Powell to recover excessive, unreasonable compensation and excess benefits.

663.    The Attorney General represents and avers that making demand upon the NRA Board for the initiation of an action by the Board for the benefit of the NRA would be futile, as that term is used in Section 623 of the N-PCL based upon the following facts:

a.  The Board of Directors and its committees did not fully inform themselves about the challenged transactions to the extent reasonably appropriate under the circumstances. These failures to obtain information about the transactions included:

   i.   The failure to inquire into excessive and inappropriate payments to or on behalf of Defendant LaPierre, and his family members, even after notice of allegations

158

of such payments in media reports, complaints from some NRA board members, complaints from NRA members, and complaints from NRA employees;

ii.   The failure of the Audit Committee, as set forth in Part Five, Section V to conduct or assure any system of internal controls at the NRA, and the failure of the Board to assure that a system was in place and was being reasonably complied with, including internal controls over payments and expenditures for LaPierre, Phillips, and Powell;

iii.   The failure of the Audit Committee or the Board to address adequately the 2018 memorandum from the NRA Whistleblowers—the Top Concerns Memo— detailing concerns with insider transactions;

iv.   The failure of the OCC to conduct compensation reviews and determinations in the manner described in the NRA's IRS Form 990 reports, as detailed in Part Five, Section III above, the failure of the Board to confirm and document that such reviews and determinations were appropriately conducted and the failure of the Board to set reasonable compensation;

v.   The failure of the NRA Board to address the improper reimbursement of expenses for NRA officers by Ackerman even after being put on notice by the vendor;

vi.   The failure of the NRA Board to address the improper use of credit cards by defendant Phillips even after being put on notice that Phillips had approved improper expenditures on such cards for others;

vii.   The failure to evaluate the necessity for and the lack of oversight of, expenditures made outside the existing contracting and accounts payable process at the discretion of the Director of Security;

viii.   The failure to inquire into the false representations set forth on Schedule J of IRS 990s during 2015 to 2018, concerning written policies and reviews relating to charter travel, travel for companions, and social club dues; and

ix.   The failure to record or report in any minutes of any board committee, or the board itself, of the complaints of the NRA Whistleblowers presented to the Audit Committee in July 2018.

b.   The Board of Directors, including allegedly "independent directors" and the relevant committees of the Board, passively rubberstamped the decisions of the officer-defendants, to the detriment of the NRA. For example:

159

i. Defendant LaPierre effectively dominates and controls the Board of Directors as a whole through his control of business, patronage and special payment opportunities for board members, and his public allegations to the NRA membership of a "criminal conspiracy" against board members and officers who question his activities.

ii. As set forth in Part Five, Section III, the board members and the members of the OCC did nothing to evaluate the full extent of the compensation paid to or on behalf of Defendants LaPierre and Phillips;

iii. The failure to conduct reviews of related party transactions specifically required by the N-PCL until September 2018, followed by an Audit Committee "review" and approval of all related party transactions before them, with minimal inquiry or detail;

iv. The failure of the Board to respond to requests by Dissenter No. 1, as well as the First and Second Vice Presidents for an audit or outside review of the bills submitted and compensation paid to its primary outside law firm; and

v. The threats and retaliation by the NRA against Dissenter No. 1, including an action to remove him from membership in the NRA, based upon his requesting an audit or review of the outside law firm payments.

664. The allegations of this complaint involve wrongdoing of substantial magnitude and duration.

665. The NRA exceeded the scope of its authority pursuant to N-PCL § 202, and violated N-PCL § 515, by paying compensation to officers LaPierre, Phillips, Frazer and Powell, in excess of a reasonable amount during the periods of time and for the reasons detailed in the preceding paragraphs.

666. Accordingly, this Court should require Defendants LaPierre, Phillips, Frazer and Powell to repay to the NRA all excessive, unreasonable, and/or unauthorized compensation paid to them, as well as payments or reimbursements to them made in violation of IRS requirements and the NRA's bylaws, policy and procedures, and/or without the authorizations required by the NRA's bylaws, policy, and procedures.

160

## PRAYER FOR RELIEF

WHEREFORE, the Attorney General requests judgment against the Defendants for the following relief:

A.  Dissolving the NRA and directing that its remaining assets and any future assets be applied to charitable uses consistent with the mission set forth in the NRA's certificate of incorporation pursuant to N-PCL §§ 112(a)(1), 112(a)(5), 112(a)(7), 1101(a)(2), 1102(a)(2)(D) and 1109.

B.  Declaring that the NRA has exceeded the authority conferred upon it by law, has carried on, conducted, or transacted its business in a persistently fraudulent or illegal manner, or has abused its powers contrary to the public policy of the State of New York, and determining, in the court's discretion, that it is in the interest of the public to dissolve the NRA pursuant to N-PCL §§ 112(a)(1), 112(a)(5), 1101(a)(2), 1109, and C.P.L.R. § 3001;

C.  Declaring that directors or members in control of the NRA have looted or wasted the NRA's charitable assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner, and determining, in the court's discretion, that it is in the interest of the members to dissolve the NRA pursuant to N-PCL §§ 112(a)(7), 1102(a)(2)(D), 1109 and C.P.L.R. § 3001;

D.  Removing LaPierre for cause from his position as Executive Vice President of the NRA, and permanently barring his re-election or appointment as an NRA officer or director pursuant to N-PCL §§ 706(d), 714(c), and 717 and EPTL §8-1.4;

E.  Removing Frazer for cause from his position as General Counsel and Secretary of the NRA, and permanently barring his re-election or appointment as an NRA officer or director pursuant to N-PCL §§ 706(d), 714(c), and 717, EPTL § 8-1.4, and Executive

161

Law § 175(2)(d);

F.   Permanently barring the Individual Defendants from serving as officers, directors, or trustees of any not-for-profit or charitable organization incorporated or authorized to conduct business or solicit charitable donations in the State of New York pursuant to EPTL §8-1.4;

G.   Directing the Individual Defendants to account for their conduct in failing to perform their duties in managing the NRA's charitable assets; to pay full restitution to the NRA for the waste and misuse of its charitable assets, including the return of salary received while breaching their fiduciary duties to the NRA, plus interest at the statutory rate; and to pay damages to the NRA arising from the breach of fiduciary duties pursuant to N-PCL §§ 720 and EPTL §8-1.4;

H.   Enjoining, voiding or rescinding the related party transactions entered into or proposed by Defendants; directing the Individual Defendants to account for profits made from and the value of charitable assets used in those transactions, to the extent not already paid; and due to their willful and intentional conduct as alleged, directing the Individual Defendants to pay the NRA an amount up to double the value of each benefit improperly bestowed by such transactions occurring after July 1, 2014 pursuant to pursuant to N-PCL §§ 112(a)(10), 715(f) and EPTL § 8-1.9(c)(4);

I.   Enjoining the NRA and Frazer from soliciting or collecting funds on behalf of any charitable organization operating in this State pursuant to Executive Law § 175(2)(d);

J.   Directing the Individual Defendants to pay the NRA restitution for all excessive, unreasonable, and excess benefits that were paid to and unjustly enriched the Individual Defendants in violation of law and NRA bylaws and policies;

162

K.     Directing the NRA, through its governing Board of Directors, to provide an accounting for its official conduct with respect to the NRA's institutional funds pursuant to N-PCL § 552; and

L.     Granting such other and further relief as the Court deems just and proper.

Dated:     New York, New York
           August 6, 2020

LETITIA JAMES
Attorney General of the
State of New York

By: _____
James Sheehan
Charities Bureau Chief
28 Liberty Street
New York, New York 10005
Tel. (212) 416-8401

JENNIFER LEVY, *First Deputy Attorney General*
MEGHAN FAUX, *Chief Deputy Attorney General for Social Justice*
EMILY STERN, *Co-Chief of Enforcement Section, Charities Bureau*

*Of Counsel*

163

### VERIFICATION

STATE OF NEW YORK ⎫
⎬ ss.:
COUNTY OF NEW YORK ⎭

JAMES SHEEHAN, being duly sworn, deposes and says:

I am an Assistant Attorney General in the office of Letitia James, Attorney General of the State of New York (the "Attorney General"). I am duly authorized to make this verification.

I have read the foregoing complaint and am acquainted with the facts alleged therein based on the Attorney General's investigation of the transactions upon which the complaint is based, the annual filings and other reports made by the National Rifle Association of America, Inc. with the Charities Bureau of the Attorney General's office, and the investigative materials contained in the files of the Attorney General's office. To my knowledge based on such acquaintance with the facts, the complaint is true, except as to those allegations made upon information and belief, and as to those allegations, I believe them to be true.

The reason this verification is not made by plaintiff is that plaintiff is a body politic and the Attorney General is its duly authorized representative.

James Sheehan
Charities Bureau Chief

NOTARY PUBLIC

*Roxanne E. Wild*

Sworn to before me this
10th day of August, 2020

ROXANNE E. WILD
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02WI6378871
QUALIFIED IN NEW YORK COUNTY
MY COMMISSION EXPIRES AUG. 6, 2022

*Audio-video*
*8/10/2020  4⁴⁴ pm*
*ID - Known to me.*
*JS: Albany County*
*REW: NY County*

*Verification on NRA*
*complaint.*